AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Delaware

| United States of America | ) |
| v. | ) |
| ADRIAN WOOD | ) Case No. 20-116M |
| | ) |
| Defendant(s) | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __May 30, 2020__ in the county of __New Castle__ in the _____ District of __Delaware__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 231(a)(3) | Civil Disorder |

This criminal complaint is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

FILED

JUN -8 2020

U.S. DISTRICT COURT DISTRICT OF DELAWARE

_Anthony L. Needler_
Complainant's signature

Anthony L. Needler, Special Agent, FBI
_Printed name and title_

Sworn to before me over the telephone and signed by me pursuant to Fed R. Crim. P.4.1 and 4(d).

Date: 06/05/2020

_Christopher J. Burke_
Judge's signature

City and state: Wilmington, Delaware

The Honorable Christopher J. Burke
_Printed name and title_

## AFFIDAVIT

I, Anthony L. Needler, Special Agent with the Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follow:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been a Special Agent with the Federal Bureau of Investigation (FBI) since February 2020, and in that time, I have worked on the Delaware Joint Terrorism Task Force, where I am currently assigned. During my tenure with the FBI, I have gained experience investigating federal criminal violations including international and domestic terrorism violations. Among other things, I have conducted or participated in surveillances, execution of search/arrest warrants, reviewed surveillance footage and monitored phone conversations. Prior to being employed with the FBI, I was a United States Army Officer and investigated violations of the Uniform Code of Military Justice. My training includes courses at the FBI Academy Basic Field Training. I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request an arrest warrant.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 231(a)(3) (Civil Disorder) has occurred. The relevant portions of this statute is set forth below:

18 U.S.C. § 231(a)(3), reads, in pertinent part:

> (a)(3) Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function…

> Definitions for the above offense are set forth at 18 U.S.C. § 232. The term "civil disorder" is defined as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(a)(1). The term "law enforcement officer" includes "any officer or employee of the United States, any State, any political subdivision of a State . . . while engaged in the enforcement or prosecution of any of the criminal laws of the United States, a State, [or] any political subdivision of a State."

## PROBABLE CAUSE

4. On May 25, 2020, George Floyd died while in the custody of the Minneapolis Police Department. The nature and circumstances of Mr. Floyd's arrest, subsequent death, and the actions of the Minneapolis Police Department came under intense public scrutiny. Almost immediately following Mr. Floyd's death, public protests began in Minneapolis and expanded throughout the country, including in Wilmington, Delaware.

5. On or about May 30, 2020, at approximately 2:00 p.m., a planned protest regarding Mr. Floyd's death and other issues began at the Wilmington Police Department ("WPD"). The protest initially included between 50 and 100 people.

6. At approximately 3:30 p.m., the protesters began marching away from the WPD into the city of Wilmington. As the protestors moved into the city the number of individuals protesting expanded in size. Between approximately 5:00 and 5:30 p.m., the protestors split into two groups – one group stayed in and around Rodney Square in the center of Wilmington, while

2

the other group marched onto Interstate Highway I-95. The group that marched onto Interstate Highway I-95 blocked traffic moving in both directions.

7. At approximately 6:00 p.m., the protestors exited Interstate Highway I-95 and re-entered the city of Wilmington. The protestors marched northwest on Delaware Avenue through the Trolley Square section of Wilmington, before turning south on DuPont Street. While the protestors marched along this route, several WPD officers monitored the situation from their marked patrol cars that were positioned in front of the protestors as they moved throughout the city. Among other people observed by the WPD officers, police officers observed a white male, with a green mohawk, black tank top shirt, and tan pants walking with the protestors. This individual was later identified as Adrian WOOD.

8. During this portion of the protest, WPD officers observed various unidentified protestors engage in the following behavior: (1) use rocks or hard projectiles to damage various cars driven on the streets of Wilmington by motorists; (2) attempt to enter into a CVS Pharmacy, assault the store manager, and cause the store to close; and (3) cause damage to other commercial businesses along the route described above. The CVS and other commercial businesses referenced in this paragraph conduct business in interstate commerce.

9. At approximately 7:10 p.m., the protestors marched east from DuPont Street onto Fourth Street. At least one WPD officer ("WPD Officer #1"), who was on official duty, continued to monitor the protestors from his marked patrol car, which continued to be positioned in front of the protestors. As the protestors marched in and around Fourth and Van Buren Streets, WPD Officer #1 observed WOOD throw a hard projectile at the back window of his police vehicle. The projectile shattered the back window of his police vehicle. WPD Officer #1 immediately notified his command via radio transmission regarding WOOD's conduct and

3

provided a description of WOOD's person for other WPD police officers. The protestors, including WOOD, continued to march east along Fourth Street until the group reached Market Street.

10. At approximately 7:30 p.m., while WOOD was protesting on Market Street, WPD Officer #1 observed WOOD using his cell phone in a manner consistent with someone recording photographs and videos, as well as sending and/or receiving messages.

11. For the next several hours the protest grew increasingly violent until numerous commercial businesses on Market Street, including restaurants, bars, retail stores, and at least one sporting goods store, were damaged and looted by protestors. The commercial businesses referenced in this paragraph conduct business in interstate commerce.

12. At approximately 11:00 p.m., WOOD was observed by another WPD officer ("WPD Officer #2"), who was on official duty, walking along King Street. WPD Officer #2 recognized WOOD's description from the earlier radio transmissions described above. WPD Officer #2 stopped WOOD and asked him to identify himself. WOOD initially provided a false name and date of birth to the officer, before eventually confirming his identity. WPD Officer #1 came over to King Street where WOOD was located and positively identified WOOD as the person that shattered the back window of his police vehicle. WOOD was then arrested. During a search incident to his arrest, WPD officers found: (1) a cell phone; (2) a valid Washington State Driver's license with WOOD's true name and date of birth; (3) a 6-inch fixed blade knife concealed on WOOD's person; (4) a lock picking kit with approximately 30 pieces; and (5) a backpack full of fireworks.

13. WOOD was subsequently transported to WPD headquarters to be booked on charges related to his conduct during the protest. After arriving at WPD headquarters, however,

4

WPD officers experienced problems with their computers systems and, as a result, released WOOD after a period of time.

14. On June 1, 2020, the State of Delaware filed formal charges against WOOD related to his criminal conduct during the May 30, 2020 protest.

15. On June 2, 2020, WOOD surrendered himself at WPD headquarters. WOOD was interviewed by another FBI Special Agent and a WPD Detective; I observed the interview. Prior to the start of the interview, WOOD waived his *Miranda* warnings both verbally and in writing. WOOD stated that he resided at his mother's residence in Wilmington. WOOD admitted that during the protest he threw the brick through the back window of the WPD police vehicle. WOOD also admitted that he used his cell phone during the protest to take videos and that he sent these videos to his mother and brother. WOOD stated that he left the protest for a period of time to go back to his mother's house because the protest was becoming too violent. WOOD claimed that when he left the protest an unidentified male gave him a bag of fireworks. WOOD explained that when he arrived at his mother's house, he showered, changed his clothes, and left shortly thereafter to go back to the protest. WOOD stated that he left with his brother and brought the fireworks that the unidentified person had provided to him back to the protest. WOOD claimed that it was his intention to sell these fireworks to individuals at the protest. WOOD denied picking any locks, looting, and setting off any fireworks. Following his arrest and subsequent release, WOOD explained that he went back to his mother's residence and used his laptop to remotely lock his cellular telephone, which remained in police custody.

16. On June 2, 2020, an FBI Special Agent conducted a voluntary interview of WOOD's mother. The interview occurred at her residence in Wilmington. WOOD's mother confirmed that WOOD is her biological son. She explained that attended a portion of the protest

5

with WOOD and her other son on May 30, 2020. She stated that during the protest WOOD sent her videos and messages about the protest via Facebook Messenger. WOOD's mother voluntarily showed the agent the message chain sent to her by WOOD, which contained approximately 10 images or video clips. WOOD's mother stated that WOOD had fireworks, Roman Candles, Ground fireworks, and possibly leftover mortars, but that these items were no longer in his possession.

## CONCLUSION

17. For the reasons detailed above, I believe probable cause exists to issue a criminal complaint and arrest warrant for Adrian WOOD for a violation of 18 U.S.C. § 231(a)(3) (Civil Disorder).

Respectfully submitted,

*Anthony L. Needler*

Anthony L. Needler
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on: June 5, 2020

*Christopher J. Burke*

THE HONORABLE CHRISTOPHER J. BURKE
UNITED STATES MAGISTRATE JUDGE

6