**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|   |   |   |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 20-56-MN |
| | : | |
| ADRIAN WOOD, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OMNIBUS RESPONSE TO**
**DEFENDANT'S MOTIONS TO DISMISS**

**<u>TABLE OF CONTENTS</u>**

BACKGROUND .................................................................................................................... 1

  I.   Defendant's Violent Conduct During Wilmington Protests ................................ 2

  II.  Procedural Background.......................................................................................... 4

ARGUMENT ........................................................................................................................ 4

  I.    THE CIVIL DISORDER STATUTE IS CONSTITUTIONAL. .................... 5

    A.   Civil Disorder is Properly Regulated Under the Commerce Clause. .......................... 7

    B.   Because the Civil Disorder Statute Regulates Intentional Acts, Not Protected Speech, It Does Not Violate the First Amendment for Overbreadth ...................................... 13

      1.   Section 231(a)(3) prohibits obstructive conduct, not protected speech. ................ 15

      2.   Section 231(a)(3) requires intent. ....................................................................... 20

      3.   Section 231(a)(3) has a plainly legitimate sweep and is not overbroad. ............... 22

      4.   The statute's plainly legitimate sweep encompasses violent criminal conduct. ...... 23

      5.   Defendant's hypotheticals do not justify facially invalidating Section 231(a)(3) for overbreadth. ...................................................................................................... 24

    C.   The Civil Disorder Statute Is Content-Neutral and Survives Scrutiny..................... 25

    D.   Section 231(a)(3) Is Not Vague. ........................................................................... 26

    E.   The Indictment Is Properly Framed and Constitutionally Adequate. ....................... 28

  II.   THE GOVERNMENT PROPERLY EXERCISED ITS DISCRETION TO PROSECUTE DEFENDANT BASED ON HIS VIOLENT CONDUCT. ................ 29

    A.   Standard of Review and Applicable Legal Principles........................................... 30

    B.   Defendant Fails to Establish Discriminatory Intent. ............................................ 31

    C.   Defendant Fails to Establish Discriminatory Effect............................................. 33

CONCLUSION.................................................................................................................... 36

## TABLE OF AUTHORITIES

**CASES**                                                                   **PAGE(S)**

*Arizona v. Gant* 556 U.S. 332 (2009) .......... 9

*Bostick v. Clayton County*, 140 S. Ct. 1731 (2020) .......... 18

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) .......... 13, 14, 23

*City of Chicago v. Morales*, 527 U.S. 41 (1999) .......... 27

*City of Houston v. Hill*, 482 U.S. 451 (1987) .......... 14, 23, 24

*Clark v. Martinez*, 543 U.S. 371 (2005) .......... 20

*National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) (opinion of Roberts, C.J.). .......... 7

*Elonis v. United States*, 135 S. Ct. 2001 (2015) .......... 20

*Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469 (1992) .......... 5

*Exxon Mobile v. Allapattah Servs.*, 125 S. Ct. 2616–27 (2005) .......... 18

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) .......... 16, 17

*Gonzales v. Raich*, 545 U.S. 1 (2005) .......... 7, 11

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .......... 14, 22, 23

*Hamling v. United States*, 418 U.S. 87 (1974) .......... 28

*Hill v. Colorado*, 530 U.S. 703 (2000) .......... 10, 25, 26, 27

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .......... 28

*Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32 (1999) .......... 13

*McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232 (1980) .......... 7

*Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984) .......... 14, 22, 24, 26

*National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994) .......... 12

*New York v. Ferber*, 458 U.S. 747 (1982) .......... 13, 14, 20

*Perez v. United States*, 402 U.S. 146 (1971) .......... 7

iii

*Taylor v. United States*, 136 S. Ct. 2074 (2016) ................................................................ *passim*

*United States v. Armstrong*, 517 U.S. 456 (1996) ............................................................ 30, 32

*United States v. Bass*, 404 U.S. 336 (1971) ........................................................................ 8

*United States v. Bass*, 536 U.S. 862 (2002) ...................................................................... 32

*United States v. Brien*, 391 U.S. 367 (1968) .................................................................... 25

*United States v. Lopez*, 514 U.S. 549 (1995) .................................................................. 7, 8

*United States v. Morrison*, 529 U.S. 598 (2000) ............................................................ 5, 7, 8

*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007) ...................................................... 28

*United States v. Stevens*, 559 U.S. 460 (2010) .............................................................. 17, 21

*United States v. Williams*, 553 U.S. 285 (2008) ............................................................ *passim*

*Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988) ............................................ 14

*Virginia v. Black*, 538 U.S. 343 (2003) ........................................................................ 22

*Virginia v. Hicks*, 539 U.S. 113 (2003) ........................................................................ 14

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .......................................................... 25

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008) ..... 13, 22

*Wayte v. United States*, 470 U.S. 598 (1985) ................................................................ 30, 31

**U.S. CONSTITUTION**
U.S. Const. Art. I, § 8, Cl. 3 ................................................................................ 7, 12

**FEDERAL COURT OPINIONS**
*Gilani v. Matthews*, 843 F.3d 342 (8th Cir. 2016) ............................................................ 32-33

*Johnson v. City and County of Phila.*, 665 F.3d 486 (3d Cir. 2011) ...................................... 26

*Loza v. Mitchell*, 766 F.3d 466 (6th Cir. 2014) .............................................................. 33

*Martinez v. Att'y Gen. of United States*, 693 F.3d 408 (3d Cir. 2012) ...................................... 18

iv

*National Mobilization Committee to End War in Vietnam v. Foran*,
   411 F.2d 934 (7th Cir. 1969) ..................................................................... 22, 23, 25

*Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir. 2008) ..................................................... 33

*Steele v. Blackman,* 236 F.3d 130 (3d Cir.2001) .......................................................... 18

*United States v. Alderman*, 565 F.3d 641 (9th Cir. 2009) ............................................................. 9

*United States v. Banks*, 368 F. Supp. 1245 (D.S.D. 1973) .................................................. 21, 23

*United States v. Boffa*, 513 F. Supp. 444 (D. Del. 1980) ............................................................. 12

*United States v. Brantley*, 803 F.3d 1265 (11th Cir. 2015) ........................................................ 31

*United States v. Brice*, 926 F.2d 925 (9th Cir. 1991) .................................................... 16

*United States v. Buckland*, 289 F.3d 558 (9th Cir. 2002) ........................................................ 21

*United States v. Cassel*, 408 F.3d 622 (9th Cir. 2005) .................................................. 20, 21, 27

*United States v. Cook*, 488 F. App'x 643 (3d Cir. 2012) ...................................................... 9

*United States v. Daniels*, 48 F. App'x 409 (3d Cir. 2002) ........................................................ 11

*United States v. Dorsey*, 418 F.3d 1038 (9th Cir. 2005) ...................................................... 9, 10

*United States v. Du Bo*, 186 F.3d 1177 (9th Cir. 1999) ........................................................ 28

*United States v. Featherston*, 461 F.2d 1119 (5th Cir. 1972) ............................................... 15, 23

*United States v. Fisher*, 289 F.3d 1329–38 (11th Cir. 2002) ...................................................... 18

*United States v. Fokker Servs. B.V.*, 818 F.3d 733 (D.C. Cir. 2016) ......................................... 30

*United States v. Gilbert*, 813 F.2d 1523 (9th Cir. 1987) ...................................................... 20, 22

*United States v. Hedaithy*, 392 F.3d 580 (3d Cir. 2004) ........................................................ 30, 33

*United States v. Hill*, 927 F.3d 188 (4th Cir. 2019) ...................................................... 9

*United States v. Huet*, 665 F.3d 588 (3d Cir. 2012) ...................................................... 28

*United States v. Jeter*, 775 F.2d 670 (6th Cir. 1985) ...................................................... 15

v

*United States v. Juvenile Male*, 118 F.3d 1344 (9th Cir. 1997) .....................................................11

*United States v. Lewis*, 517 F.3d 20 (1st Cir. 2008) ............................................................. 32, 33

*United States v. Maxwell*, 446 F.3d 1210 (11th Cir. 2006) ..................................................9

*United States v. Mechanic*, 454 F.2d 849 (8th Cir. 1971) .................................................. *passim*

*United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020) ...............................................17

*United States v. Patton*, 451 F.3d 615 (10th Cir. 2006) .........................................9

*United States v. Rodriguez*, 360 F.3d 949 (9th Cir. 2004) ...........................................28

*United States v. Rundo, No. 19-50189*, 2021 WL 821938 at *2 (9th Cir. 2021) .............14, 16, 17

*United States v. Schoolcraft*, 879 F.2d 64 (3d Cir. 1989) .......................................... 31

*United States v. Singletary*, 268 F.3d 196 (3d Cir.2001) .......................................... 9

*United States v. Taylor*, 686 F.3d 182 (3d Cir. 2012) .......................................... 30, 33

*United States v. Wunsch,* 84 F.3d 1110 (9th Cir. 1996) ............................................. 27

**UNITED STATES CODE**
18 U.S.C. § 231 ..................................................................................... 1, 4, 15
18 U.S.C. § 232 ..................................................................................... 5, 8, 15, 23
18 U.S.C. § 922 ..................................................................................... 9
18 U.S.C. § 1503 ..................................................................................... 16
18 U.S.C. § 1951..................................................................................... 11
18 U.S.C. § 2101 ..................................................................................... 16
18 U.S.C. § 2237 ..................................................................................... 16
26 U.S.C. § 7212 ..................................................................................... 15-16
42 U.S.C. § 13981 ..................................................................................... 9

**RULES**
Fed. R. Crim. P. 7 ..................................................................................... 28, 29

**OTHER**
41 C.F.R. § 101-20.305 ..................................................................................... 16
supra ..................................................................................... 18

In May 2020, the death of George Floyd prompted intense public scrutiny and resulted in nation-wide protests, including protests that occurred May 30 in Wilmington. Although the protests in Wilmington started peacefully, they escalated throughout the day and eventually resulted in violence and significant damage to businesses throughout the city. During the unrest, Defendant Wood hurled a brick through the back window of an occupied police vehicle that was monitoring the protests and attempting to maintain order. He was subsequently arrested and charged federally.

Defendant now moves this Court to dismiss his prosecution in two separate motions. Principally, Defendant alleges that the Civil Disorder statute with which he is charged is unconstitutional and asks the Court to dismiss the Indictment on this basis. *See* D.I. 25. Alternatively, Defendant claims the government is selectively prosecuting him for peacefully exercising his First Amendment rights. *See* D.I. 22. Both arguments lack merit. The criminal statute at issue—18 U.S.C. § 231(a)(3)—has been on the books for decades, and well-settled precedent forecloses Defendant's attacks based on the Commerce Clause and the First Amendment. And Defendant's Motion regarding selective prosecution is devoid of any evidence or credible allegation that the government discriminated against him either intentionally or in effect. To the contrary, the government properly exercised its discretion to charge Defendant based on many factors, including, among others, his violent conduct, repeated lies to the FBI, and unlawful possession of dangerous weapons. Accordingly, both of Defendant's Motions fail.

## **BACKGROUND**

On May 25, 2020, George Floyd died while in the custody of the Minneapolis Police Department. The nature and circumstances of Mr. Floyd's arrest, death, and the actions of the Minneapolis Police Department came under intense public scrutiny. Almost immediately, public

1

protests began in Minneapolis and expanded throughout the country.  As the number of protests grew, so, too, did the number of violent incidents involving looting, destruction of business, arson, assaults, and shootings.[1]  Prior to the May 30 protests that occurred in Wilmington, at least five people, including both civilians and law enforcement, had died as a result of the protests across the nation.[2]

**I.      Defendant's Violent Conduct During Wilmington Protests**

On May 30, around 2:00 p.m., a planned public protest began at the Wilmington Police Department ("WPD") headquarters.  Initially, approximately 50-100 people were in attendance, including Defendant Adrian Wood, although the number grew throughout the afternoon.  Around 3:30 p.m., the protesters split into two groups.  One group stayed around Rodney Square in the center of Wilmington, while the other group marched toward Trolley Square.  Members of the second group blocked traffic on Interstate Highway I-95; entered a CVS and assaulted an employee; and attacked a man along the protest path.  Multiple businesses were forced to close.

In the second, more aggressive group, WPD officers observed a white male with a green Mohawk and black tank top—later identified as Defendant—who appeared to be encouraging the crowd.  WPD Sergeant Evans monitored the protesters from inside his patrol cruiser.  Around 7

---

[1] *See, e.g.*, https://www.nytimes.com/article/george-floyd-protests-timeline.html, last visited March 23, 2021; *Riot, looting in downtown Portland; fires set at Justice Center, other buildings*, KATU, May 29, 2020, https://katu.com/news/local/protesters-take-to-the-streets-of-portland-damage-reported (last visited March 12, 2021).

[2] *See, e.g.*, *Hundreds Gather to Mourn Slain Federal Security Officer David Patrick Underwood*, available at https://sanfrancisco.cbslocal.com/2020/06/19/boogaloo-boys-steven-carrillo-david-underwood-homeland-security-race-war-george-floyd/, last visited March 22, 2021; *Report on the 2020 Protests & Civil Unrest*, MAJOR CITIES CHIEFS ASS'N–INTELLIGENCE COMMANDERS GROUP, Oct. 2020, https://majorcitieschiefs.com/wp-content/uploads/2021/01/MCCA-Report-on-the-2020-Protest-and-Civil-Unrest.pdf (last visited March 12, 2021) (hereafter "MCCA Report").

p.m., the group grew more unruly, with several people beginning to throw small rocks at Sergeant Evans's vehicle. Defendant, however, ratcheted up the violence. Sergeant Evans saw Defendant throw a brick at his windshield, which shattered the back window. Although Sergeant Evans immediately described Defendant and his conduct to assisting officers, because more and more people began throwing rocks at Sergeant Evans's vehicle, officers instructed Evans to pull away from the group for his own safety and to prevent a further escalation of the violence. Throughout the rest of the evening, protesters wrecked multiple businesses in the downtown district. https://www.delawareonline.com/videos/news/2020/05/31/george-floyd-protests-wilmington-turn-violent-police-respond-riot-gear/5295709002/, last visited March 23, 2021.

Around 11:00 p.m., another WPD officer recognized Defendant based on Sergeant Evans's earlier description over the radio. When the officer stopped Defendant, he gave a fake name. Sergeant Evans, however, positively identified Defendant as the individual who had hurled the brick and destroyed his windshield. During a search incident to Defendant's arrest, WPD officers found a State of Washington driver's license; a 6-inch fixed-blade knife concealed on Defendant's person; a lock-picking kit; and a backpack full of fireworks and a box of matches. Defendant was released that night due to computer problems but told to return the next day.

When he did so, Defendant agreed to be interviewed by the FBI. During that interview, he confessed that he threw the brick and busted the windshield of the police cruiser. According to Defendant, later in the evening after he had thrown the brick, he returned to his residence, showered, collected his backpack and other items, and returned to the protest. The rest of Defendant's story, however, strained credulity. When asked about the lock-picking kit, for example, he claimed that he had "always had an interest in locksmithing." Defendant told the officers that he always kept a 6-inch knife with him in case he needed to "open a bail of hay."

3

Defendant told the officers that a random person had given him the fireworks on the street and that he intended to sell them, a claim that Defendant's mother revealed to be a lie.  Although Defendant denied that he had broken into or ransacked any of the businesses that had suffered damage, he also conceded that he had locked his phone and deleted videos he had taken during the protests. Defendant also disclaimed that he had any associations or coordinated with any radicalized group.

## II.    <u>Procedural Background</u>

The day he was arrested, June 1, Defendant was charged by the State of Delaware with two felonies (rioting and carrying a concealed deadly weapon), as well as several misdemeanors (including a property damage charge for the busted windshield).  On June 8, the United States lodged a criminal complaint in federal court charging Defendant with one count of Civil Disorder, a felony, in violation of 18 U.S.C. § 231(a)(3).  D.I. 1.  As Defendant notes in his Motion, the government did not seek to detain Defendant.  The State dismissed its charges against Defendant on July 8.  On September 10, a federal grand jury indicted Defendant on the Civil Disorder charge. Before the grand jury returned an Indictment, the government obtained a search warrant related to Defendant's Facebook account, in part to investigate the veracity of Defendant's claim that he had not coordinated with any outside group.

## <u>ARGUMENT</u>

During a period of intense civil unrest, Defendant injected himself into the Wilmington protests by instigating violence and interfering with a civil servant who was doing his job and trying to maintain order.  Defendant attempts to shield his conduct by asserting that the Civil Disorder statute is unconstitutional and that the government is selectively prosecuting him based on his exercise of his peaceful right to protest.  As explained in more detail below, both arguments are incorrect.  Defendant's various theories that the Civil Disorder statute is constitutionally flawed

lack merit.  And Defendant's selective-prosecution argument is a self-serving attempt to reframe his prosecution as a referendum on law enforcement actions in other jurisdictions.  This Court should deny both of Defendant's Motions.

## I.     THE CIVIL DISORDER STATUTE IS CONSTITUTIONAL.

Section 231(a)(3) criminalizes acts to "obstruct, impede, or interfere" with any police officer or fire fighter "lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function."  The statute defines civil disorder as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual."  18 U.S.C. § 232(1).  And criminal liability extends to actions directed against any federal, state, or local law enforcement officer.  18 U.S.C. § 232(7).

This statute has been used over 50 years in a variety of contexts to punish obstructive, dangerous acts committed against peace-keeping officers during a civil disorder whose scope affects interstate commerce.  Most recently, the government has employed the statute to charge at least 60 participants for their conduct during the Capitol Insurrection.  Defendant's varied arguments regarding the statute's unconstitutionality rely on stray remarks from legislative history[3] or a parade of purely hypothetical examples.  But these arguments all miss the mark.  The

---

[3] Defendant's focus on the legislative history of § 231(a)(3) on pages 2-8 and 16-17 of his Motion to Dismiss the Indictment does not change the legal analysis.  Constitutional statutory analysis begins with the statute's plain language, not its provenance.  *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992).  Federal legislation enjoys a presumption of constitutionality that may only be overturned "upon a plain showing that Congress has exceeded its constitutional bounds."  *United States v. Morrison*, 529 U.S. 598, 607 (2000).  The government thus focuses its argument on the language of the statute itself rather than selective legislative history.

presumption in favor of the constitutionality of legislative enactments is part of the cornerstone of the separation of powers doctrine, and applying black-letter law, this Court should affirm Section 231(a)(3)'s constitutionality in all respects challenged.

Defendant first argues that Section 231(a)(3) is unconstitutional because it exceeds Congress's power under the Commerce Clause. But by its language, Section 231(a)(3) contains an express jurisdictional hook to interstate commerce, and Defendant's critiques regarding the type or scope of the commercial nexus are contradicted by multiple Supreme Court and circuit cases interpreting similar criminal statutes. Simply put, Section 231(a)(3) properly charges criminal conduct that has a federal, interstate hook. The statute thus passes constitutional muster.

Defendant next argues that Section 231(a)(3) is invalid under the First Amendment both due to overbreadth and because it is a content-based restriction. But these arguments fail, too. As to overbreadth, the Civil Disorder statute rightly focuses on conduct, not speech, and its inclusion of an intent *to obstruct, impede, or interfere* separates pure First Amendment expressions from the more violent acts covered by the statute. As to the argument about content-based restriction, once again the statute's focus on conduct rather than speech makes the argument an ill fit, and given its neutrality, the statute is narrowly tailored to curb violent conduct without regard to the content of any expression.

Defendant next pivots to arguing that Section 231(a)(3) is vague as a criminal statute because it fails to give a defendant notice as to what is prohibited. But the intent element included in the statute—forbidding acts intended to obstruct, impede, or interfere with officers during a defined civil disorder—gives clear notice of the type of prohibited conduct, within which Defendant's violent act squarely falls. That Defendant once again is forced to resort to

6

hypotheticals rather than actual examples of misapplied cases is fatal to this argument, too.

Finally, Defendant launches a misguided argument that this particular Indictment fails to provide *him* notice under the Fifth Amendment. But as the Indictment tracks the language of the statute—and as it followed a criminal complaint specifically setting forth his conduct in more detail—Defendant has no viable argument as to notice.

The Court should deny Defendant's Motion to Dismiss the Indictment (D.I. 25) based on the various constitutional arguments in full.

### A. Civil Disorder is Properly Regulated Under the Commerce Clause.

The Commerce Clause authorizes Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8, Cl. 3. "[I]t is now well established that Congress has broad authority under th[at] Clause." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) (opinion of Roberts, C.J.). Among other things, "the Commerce Clause has . . . long been interpreted" to grant Congress authority "extend[ing] beyond activities actually in interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially affect interstate commerce." *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 241 (1980). The Supreme Court's precedents accordingly establish that, "under its commerce power," Congress may regulate the "channels of interstate commerce," "instrumentalities of interstate commerce" and "persons or things in interstate commerce," and "those activities that substantially affect interstate commerce." *Taylor v. United States*, 136 S. Ct. 2074, 2079 (2016) (quoting *United States v. Lopez*, 514 U.S. 549, 558-559 (1995)); *accord Morrison*, 529 U.S. at 608-609; *see also, e.g., Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005); *Perez v. United States*, 402 U.S. 146, 150 (1971).

Section 231(a)(3) is one of many statutory provisions enacted by Congress to protect the

flow of interstate commerce from unwarranted interference.  Where a civil disorder is "obstruct[ing], delay[ing], or adversely affect[ing]" interstate commerce or the movement of an item in interstate commerce,[4] Congress sought to provide law enforcement and firefighters with the ability to contain and ultimately end the crisis without obstruction from persons like the defendant who would impede them.  In doing so, Congress acted to protect the channels of interstate commerce, including roads and highways, to protect the flow of items in interstate commerce, and to regulate activity that substantially affects interstate commerce.  Section 231(a)(3) thus fits comfortably within all three of the areas of Congressional power identified by the Supreme Court in *Lopez*, *Morrison*, and *Taylor*.

Defendant's reliance on *Lopez* and *Morrison* is misplaced.  Those decisions struck down statutory provisions that regulated non-economic activity unconnected to interstate commerce and which, crucially, did not contain a jurisdictional element related to interstate commerce.  It has long been understood that Congress may regulate even non-economic intrastate activity so long as there is a jurisdictional provision that ensures the statute applies only where the regulated activity affects (or would affect) interstate commerce.  *Compare United States v. Bass*, 404 U.S. 336 (1971) (applying a statute that regulated "receiv[ing], possess[ing], or transport[ing] in commerce or affecting commerce . . . any firearm" by a felon), *with Lopez*, 514 U.S. at 562 (striking down statute where, "[u]nlike the statute in *Bass*, [the Gun-Free School Zones Act had] no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have

---

[4] The term "commerce" in § 231(a)(3) is defined to mean "commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia."  18 U.S.C. § 232(2).  The first two prongs of this definition define commerce as interstate commerce and implement Congress' Commerce Clause power.  The third prong, which relies on Congress' plenary power to legislate over the seat of government, is not at issue in this case.

8

an explicit connection with or effect on interstate commerce"), *and Morrison*, 529 U.S. at 613 (holding that the civil remedies in 42 U.S.C. § 13981 were beyond Congress' power under the Commerce Clause where, "[l]ike the Gun–Free School Zones Act at issue in *Lopez*, § 13981 contain[ed] no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce.").

Indeed, the very constitutional defect identified in *Lopez* was cured by the addition of a jurisdictional element. *United States v. Dorsey*, 418 F.3d 1038, 1046 (9th Cir. 2005) ("This jurisdictional element saves § 922(q) from the infirmity that defeated it in *Lopez*"), *abrogated on other grounds*, *Arizona v. Gant* 556 U.S. 332 (2009). As in *Dorsey*, the Third Circuit has "consistently held" that a "jurisdictional hook is sufficient to bring" a particular statute "within the ambit of Congress's commerce powers." *United States v. Cook*, 488 F. App'x 643, 645 (3d Cir. 2012) (unpublished) (relying on *United States v. Singletary*, 268 F.3d 196, 205 (3d Cir.2001)). So, too, have other circuits. *See, e.g.*, *United States v. Hill*, 927 F.3d 188, 199 (4th Cir. 2019) (quoting *Taylor*, 136 S. Ct. at 2079) (recognizing that Supreme Court precedent holds that "Congress may regulate violent conduct interfering with interstate commerce even when the conduct itself has a 'minimal' effect on such commerce.").

To be sure, a constitutionally adequate jurisdictional element must be meaningful and not merely a "talisman that wards off constitutional challenges." *United States v. Alderman*, 565 F.3d 641, 648 (9th Cir. 2009) (citing *United States v. Patton*, 451 F.3d 615, 632 (10th Cir. 2006)). It cannot be a "pretextual incantation evoking the phantasm of commerce." *United States v. Maxwell*, 446 F.3d 1210, 1218 (11th Cir. 2006). Section 231(a)(3)'s jurisdictional hook easily meets this test. There are innumerable disturbances of the peace, but § 231(a)(3) applies only to the subset of civil disturbances that affect interstate commerce, such as those that cut off through-

fares or prevent use of significant commercial or government buildings for an extended period of time.  And an individual can be charged under § 231(a)(3) only if he or she impedes or attempts to impede police or firefighters – the very public safety professionals charged with containing, mitigating, and ultimately ending the public disturbance, and thereby restoring the channels and instrumentalities of interstate commerce.  The statute thus only applies in relation to civil disturbances that adversely affect interstate commerce and only with regard to a specific class of activities that will tend to prolong the obstruction of interstate commerce.

The jurisdictional element that the Ninth Circuit in *Dorsey* found sufficient to make the Gun-Free School Zones Act constitutional required that the firearm at issue "ha[ve] moved in" or "otherwise affect[] interstate or foreign commerce."  418 F.3d at 1045.  Section 231(a)(3)'s jurisdictional element has a much tighter temporal limitation.  While, under § 231(a), the defendant's conduct must take place contemporaneous with the civil disorder that disrupted commerce, under the gun statute the gun may have moved in interstate commerce at some point in the distant past.  Section 231(a) also has a more proximate relationship to Congress' goal of protecting interstate commerce.  Section 231(a) aims directly to end an impediment to interstate commerce, while the gun statute regulates commerce indirectly by prohibiting the intrastate use of an item that previously moved in interstate commerce.  Thus, *Dorsey*'s holding requires a similar holding here.[5]

Additionally, Defendant's argument that the jurisdictional element is required to involve a *substantial* effect on commerce is wrong.  Jurisdictional elements generally condition the application of a statute on an effect on interstate commerce in the particular case.  For example,

---

[5] Moreover, even if there were some hypothetical application of § 231(a)(3) that reached beyond Congress' constitutional power, that would not facially invalidate the statute.  *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 733 (2000).

10

similar to the Gun-Free School Zones Act element discussed above, the Hobbs Act likewise applies to one who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce" by robbery or extortion.   18 U.S.C. § 1951.   Section 231(a)(3)'s jurisdictional element is no broader than this.   *See Taylor*, 136 S. Ct. at 2079 (discussing the breadth of the Hobbs Act jurisdictional element); *see also United States v. Juvenile Male*, 118 F.3d 1344, 1347-1349 (9th Cir. 1997) (holding that RICO's jurisdictional nexus requirement can, consistent with *Lopez*, be satisfied by showing a de minimis effect on commerce in the individual case); *United States v. Daniels*, 48 F. App'x 409, 417 (3d Cir. 2002) (non-precedential opinion) (citing *Juvenile Male* for this proposition).

The "substantially affects" test that Defendant advocates applies where Congress seeks to regulate an entire class of activities based on the aggregate effect of that entire class rather than the specific effect of the activity of a particular defendant.   Thus, in *Raich*, the Supreme Court found the Controlled Substances Act's categorical ban on intrastate manufacture and possession of marijuana was constitutional because Congress had a rational basis for concluding that the "class of activities" *in the aggregate* substantially affected commerce, and the Act could be applied constitutionally to Angel Raich's intrastate growing of marijuana for personal medicinal purposes even though her activity did not substantially affect interstate commerce.   545 U.S. at 15-22. Defendant is thus mistaken that the government must show that *his* activity *substantially* affected commerce or that a jurisdictional element must include a "substantially affects" requirement.

Defendant is also wrong in arguing that § 231(a)(3)'s jurisdictional element is insufficient, because the defendant's personal conduct need not affect commerce as long as the underlying civil disorder affected commerce.   Other statutes likewise do not require proof that the defendant personally affected commerce, where the defendant's conduct relates to an underlying activity that

11

had the required effect.  *See, e.g.*, *Juvenile Male*, 118 F.3d at 1347-49 (upholding RICO's jurisdictional nexus requirement where it is the racketeering enterprise, not the defendant himself, that must affect commerce).

Defendant's attempt to distinguish the Hobbs Act on the ground that the Hobbs Act is "directly aimed at economic activities" likewise fails.  Both the Hobbs Act and § 231(a)(3) aim to protect interstate commerce from illegal acts that impede commerce.  In any event, the courts have upheld RICO's similar jurisdictional nexus requirement, and RICO applies to non-economic enterprises.  *See National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 256-58 (1994) (holding that RICO does not require that the enterprise or predicate acts be accompanied by an economic motive); *see generally United States v. Boffa*, 513 F. Supp. 444, 465 (D. Del. 1980) (holding that RICO statute "is clearly a valid exercise of Congressional power under the commerce clause.").  Like a RICO enterprise, a civil disorder "surely can have a detrimental influence on interstate or foreign commerce without having its own profit-seeking motives."  *Scheidler*, 510 U.S. at 258.

Because § 231(a)(3) applies only where a defendant seeks to impede the work of police or firefighters incident to a civil disturbance that affects interstate commerce, well-settled precedent provides that it is within Congress' Commerce Clause power.  Even under the most restrictive theory of Congress' Commerce Clause power, a law protecting interstate commerce from interference (as Section 231(a)(3) does) is a permissible use of Congressional power.  Such a law "bears an obvious, simple, and direct relation to regulating interstate commerce: it allows commerce to flow between States unobstructed."  *Taylor*, 136 S. Ct. at 2085 (Thomas, J., dissenting) (quotation marks omitted); *see also id.* ("Congress' power '[t]o regulate Commerce among the several States,' Art. I, § 8, cl. 3, would lack force or practical effect if Congress lacked

12

the authority to enact criminal laws prohibiting interference with interstate commerce or the movement of articles or goods in interstate commerce."); *cf.* Def's Ex. B at 2 (statement of Sen. Long that "if the riot impedes interstate commerce, Congress has a duty to protect the movement of commerce").

The jurisdictional element in § 231(a)(3) ensures that the statute applies only where the civil disturbance that a defendant sought to prolong – by obstructing the public safety personnel whose duty is to mitigate, contain, and end the disturbance – is one that adversely affected interstate commerce. Such a jurisdictional provision renders the statute constitutional. Moreover, under any understanding of the Commerce Clause, a statute that protects the flow of commerce between the states from obstructions, as § 231(a)(3) does, is a permissible use of Congress' Commerce Clause powers.

### B.  Because the Civil Disorder Statute Regulates Intentional Acts, Not Protected Speech, It Does Not Violate the First Amendment for Overbreadth

Defendant's argument that § 231(a)(3) is facially overbroad under the First Amendment also fails. Defendant seeks "to challenge [the] statute not because [his] own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Defendant must identify an exception to the normal rules favoring as-applied challenges and case-specific standing, *see, e.g., Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999), to facially invalidate § 231(a)(3) as substantially overbroad, because his own conduct is clearly not speech.

Overbreadth can invalidate a criminal law only if "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (quoting *New*

*York v. Ferber*, 458 U.S. 747, 769-771 (1982)); *see also United States v. Williams*, 553 U.S. 285, 293 (2008); *City of Houston v. Hill*, 482 U.S. 451, 458 (1987) (citing *Ferber*, 458 U.S. at 769).

"A statute is facially invalid if it prohibits a substantial amount of protected speech." *Williams,* 553 U.S. at 293; *see also Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972).  An overbreadth challenge faces a steep uphill climb when the statute focuses mainly on conduct.  *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to . . . constitutionally unprotected conduct").

Moreover, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge."  *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).  Rather, a defendant must show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court . . . ."  *Id.* at 801.  And laws that are "not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)" are far less likely to present such a danger.  *Hicks*, 539 U.S. at 124; *see id.* (observing that an "overbreadth challenge" to such a law will "[r]arely, if ever, . . . succeed").

 Invalidating a statute for overbreadth is "strong medicine" to be applied "sparingly and only as a last resort."  *Broadrick*, 413 U.S. at 613.  Thus, if the statute is "readily susceptible" to a narrowing construction that would make it constitutional, it must be upheld.  *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988); *accord Broadrick*, 413 U.S. at 613; *United States v. Rundo*, No. 19-50189, 2021 WL 821938 at *2 (9th Cir. 2021) ("we construe [the riot statute] as constitutional if we can reasonably do so").

Defendant is charged with violating a provision that criminalizes obstructing police officers

14

or firefighters in the context of civil disorders.  The crime primarily prohibits conduct, not speech.

And to the extent it reaches speech, it does so incidentally and only with respect to the type of

illegal, obstructive, or threatening communications that have long been recognized as unprotected.

It does not criminalize verbally criticizing police or other protected speech, and it is therefore not

an overbroad restriction of speech.

### 1.   Section 231(a)(3) prohibits obstructive conduct, not protected speech.

The starting point for analyzing Defendant's claim that § 231(a)(3) is overbroad is to

determine what the statute criminalizes.  *Williams,* 553 U.S. at 293. "[I]t is impossible to determine

whether a statute reaches too far without first knowing what the statute covers."  *Id.*  The next step

is to determine whether the statute, as it is construed, "criminalizes a substantial amount of

protected expressive activity."  *Id.* at 297.

The Civil Disorder statute criminalizes "any act to obstruct, impede, or interfere with any

fireman or law enforcement officer" who is engaged in the lawful performance of his official duties

during a civil disorder that affected interstate commerce.  18 U.S.C. § 231(a)(3).  And it does so

in the context of a civil disorder, which is "any public disturbance involving acts of violence by

assemblages of three or more persons, which causes an immediate danger of or results in damage

or injury to the property or person of any other individual."  18 U.S.C. § 232(1).  The statute's

scope consists primarily, if not exclusively, of conduct or unprotected speech, such as threats.

The Civil Disorder statute prohibits not the presence at a civil disorder, but rather, "an act

committed during the course of such disorder."  *United States v. Mechanic*, 454 F.2d 849, 853 (8th

Cir. 1971).  It covers intentional conduct, not "mere inadvertent conduct."  *United States v.*

*Featherston,* 461 F.2d 1119, 1122 (5th Cir. 1972).  Moreover, § 231(a)(3) is not unique; many

state and federal statutes likewise criminalize obstructing the government's efforts to enforce the

law and maintain public order.  *See, e.g., United States v. Jeter*, 775 F.2d 670, 679 (6th Cir. 1985) (holding that federal obstruction of justice statute, 18 U.S.C. § 1503, is neither overbroad nor vague); 26 U.S.C. § 7212(a) (prohibiting obstructing or impeding the administration of the tax laws); 18 U.S.C. § 2237 (making it unlawful to "oppose, prevent, impede, intimidate or interfere with" a maritime investigation); *United States v. Brice,* 926 F.2d 925, 930-31 (9th Cir. 1991) (rejecting overbreadth and vagueness challenges to 41 C.F.R. § 101-20.305, regulation prohibiting impeding or disrupting government duties).

Defendant relegates prior decisions interpreting § 231(a)(3) to a footnote because they predate much of the recent First Amendment jurisprudence.  The Eighth Circuit squarely rejected First Amendment attacks leveled against § 231(a)(3) in *Mechanic*.  Defendant's argument glosses over the critical import of these cases – the determination of what the statute actually criminalizes. Section 231(a)(3)'s applications to conduct, rather than protected speech, present no First Amendment concerns.  And even where applying the statute to particular forms of conduct might incidentally implicate speech, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."  *Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 502 (1949).  The Ninth Circuit recently affirmed this principal in *Rundo,* when it recognized that the anti-riot statute, 18 U.S.C. § 2101, permissibly criminalized both acts and unprotected speech that incites or instigates a riot or that constitutes a true threat.  2021 WL 821938 at **7, 9.

To the extent § 231(a)(3) might apply to speech, such speech is unprotected because it is integral to the criminal conduct of obstructing police or firefighters.  *See Williams*, 553 U.S. at 298 ("Many long established criminal proscriptions – such as laws against conspiracy, incitement, and

solicitation – criminalize speech (commercial or not) that is intended to induce or commence illegal activities."); *United States v. Stevens*, 559 U.S. 460, 468-469 (2010) (including "speech integral to criminal conduct" as a class of speech "'which ha[s] never been thought to raise any Constitutional problem'") (citation omitted); *Giboney*, 336 U.S. at 498 ("[T]he constitutional freedom for speech and press" does not "extend[] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute."). The underlying context of officers at the scene of a defined, civil disorder is critical to the statute, and it renders Defendant's examples (D.I. 25 at 21) unlikely candidates for the statute's application. Unsurprisingly, the Defendant can cite no real-life examples of the statute being applied to speech or expression that merely annoys or offends officers.

Section 231(a)(3)'s context and purpose confirm the statute's focus on conduct, not protected speech. Congress designed the Civil Disorder statute to provide federal support when people "agitate and incite such violence by the use of facilities in interstate commerce." 90th Congress, 1st Session, House Report No. 472, at 2-3. Recognizing the need to support local law enforcement, Congress believed the federal government should lend a hand. Senate Congressional Record, March 6, 1968, at 5537. This help included not only sending federal law enforcement to assist, but also criminalizing violent acts that are directed at local partners. Construing the statute to cover only intentional obstructive conduct, rather than as a sweeping prohibition on protected speech, is consistent with Congress' basic objective in passing the Civil Disorder statute. *See Rundo,* 2021 WL 821938 at *2 (striking down portions of the riot statute and preserving others, noting that invalidation for overbreadth is "strong medicine that is not to be causally employed"); *United States v. Miselis,* 972 F.3d 518, 543 (4th Cir. 2020) (severing portions of the Anti-Riot Act that violate First Amendment was consistent with Congress' intention in passing statute to

criminalize "unprotected speech and conduct that both relates to a riot and involves the use of interstate commerce.").

Relatedly, Defendant devotes a great deal of time purportedly explicating the legislative history of § 231(a)(3). Those efforts are misplaced. As set forth *supra*, fn. 3, the starting point for interpreting a statute is the language of the text itself. And "[w]here the language of the statute is clear ... the text of the statute is the end of the matter." *Steele v. Blackman*, 236 F.3d 130, 133 (3d Cir. 2001). "[L]egislative history can never defeat unambiguous text." *Bostick v. Clayton County*, 140 S. Ct. 1731, 1750 (2020). Only if a statute is "silent or ambiguous" on a particular issue should a court look behind the text of the statute to legislative history. *Martinez v. Att'y Gen. of United States*, 693 F.3d 408, 411 (3d Cir. 2012); *cf. United States v. Fisher*, 289 F.3d 1329, 1337–38 (11th Cir. 2002) ("[F]irst rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute." (internal quotation marks and citations omitted). However, even in circumstances where textual ambiguity necessitates analyzing a statute's legislative history, the Supreme Court has cautioned against relying just on cherry-picked statements. *See Exxon Mobile v. Allapattah Servs.*, 125 S. Ct. 2616, 2626–27 (2005) (specifying that legislative history is only useful where it illuminates the views of the enacting legislature and observing that, "legislative history is itself often murky, ambiguous, and contradictory).

Here, because Defendant has not demonstrated any ambiguity in § 231(a)(3), his resort to legislative history misses the mark. But even if he had made the requisite showing of an ambiguity, his focus on the statements of a lone Senator, and silence on the rest of the statute's legislative history, is not the proper method of analysis. What is more, Defendant's version of the legislative

18

history is thoroughly one-sided and omits important context.[6]  For these reasons, the biased version

---

[6] It is important to address Defendant's mischaracterization of Section 231(a)(3)'s legislative history.  Defendant opens his Motion by claiming that Section 231(a)(3) was enacted "to counter the protections of the Civil Rights Act and to silence civil rights leaders in 1968."  (D.I. 25).  He is wrong.

Defendant's use of only select portions of the legislative history has led to a gross mischaracterization of the statute, due largely due to the almost-exclusive focus on comments from Senator Long (D-Louisiana).  As Defendant correctly observes, Senator Long has made highly offensive remarks.  However, most of the statements highlighted by Defendant relate not to § 231(a)(3), but rather to *earlier* proposed legislation.  *See* D.I. 25, p. 4.  Furthermore, Defendant fails to mention that Senator Long ultimately voted *against* H.R. 2516, which contained Section 231.  *See* 114 CONG. REC. 5992 (1968).

A broader look at this statute's legislative history paints a very different picture than the one Defendant presents to this Court.  What eventually became § 231(a)(3) was enacted as part of bipartisan legislation following a series of civil disorders in the 1960s.  The legislation was designed to address, among other things, (1) racial and religious discrimination in connection with federally protected activities; (2) the rights of Native Americans; and (3) racial discrimination in housing.  PUB. L. NO. 90-284, 82 STAT. 73-92 (1968).  Far from being enacted to counter civil rights legislation, this legislation was intended to counter both the evils of racial discrimination and civil unrest.  *See* 114 CONG. REC. 9608–09 (1968).  As Representative Clarence "Bud" Brown (R-Ohio) succinctly stated:

> We need legislation to prevent interference with those pursuing their own civil rights or attempting to educate others about their rights.  But we also need legislation to prevent inciting of violence in the name of civil rights or under whatever pretext. . . .  For all of these reasons — but with emphasis on the continuing need to do justice, to discourage racial discrimination, to bring new hope to all our people — I urge colleagues to approve the resolution and to pass the bill.

114 CONG. REC. 9608–09 (1968).

Defendant's brief does not accurately portray the debate over § 231 in the Senate either.  Defendant fails to mention that after Senator Long stated that § 231 "would be used to put down uprisings of the Ku Klux Klan, just as it would be used to put down an uprising caused by Rap Brown," Senator Robert F. Kennedy (D-New York) responded, "I shall support the Senator from Louisiana.  I believe this would be very important legislation.  It would be a historic day in the Senate of the United States, and I congratulate the Senator from Louisiana."  114 CONG. REC. 5541 (1968) (statements of Sens. Long and Kennedy).  The Senate passed this legislation, in bipartisan fashion, with votes from high-profile civil rights supporters, including Senator Kennedy and Senator Everett Dirksen (R–Illinois), the later of whom was instrumental in the passage of the Civil Rights Act of 1964.  114 CONG. REC. 5592, 5598.

of legislative history put forth by Defendant should not be used as part of this Court's constitutional analysis of Section 231(a)(3).

## 2. Section 231(a)(3) requires intent.

Section 231(a)(3) requires intent, which further narrows its scope. *See Williams*, 553 U.S. at 294 (focusing on scienter requirement in finding that a statute was not overbroad). The requirement that a defendant who violates § 231(a)(3) act with the intent to obstruct, interfere or impede is critical to the First Amendment analysis. *See United States v. Gilbert*, 813 F.2d 1523, 1529 (9th Cir. 1987) (intent requirement prevents application of statute to protected speech).

The statute requires proof that the "act" was done "to obstruct, impede, or interfere" with a firefighter or police officer, *i.e.* the defendant's purpose or intent in performing the "act" must be to obstruct, impede, or interfere. *See Mechanic*, 854 F.2d at 854 (construing Section 231(a)(3) to include an intent requirement). And even if the statute lacked an express scienter requirement, courts "generally interpret [] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (citation omitted); *see also United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) ("[E]xcept in unusual circumstances, we construe a criminal statute to include a mens rea element even when none appears on the face of the statute.").

Defendant's arguments that § 231(a)(3) applies broadly to protected speech and lacks an intent requirement ignore the clear directive from the Supreme Court that courts should avoid "constitutional problems" by asking whether the statute is "subject to [] a limiting instruction." *Ferber*, 458 U.S. at 769 n.24 (citation omitted); *see Clark v. Martinez*, 543 U.S. 371, 385 (2005) (constitutional avoidance canon "comes into play" if a statute is "susceptible of more than one

---

Thus, the narrative portrayed— that § 231(a)(3) was enacted as part of a racist fervor to reign in the Civil Rights Movement — is false.

construction" even after the "application of ordinary textual analysis").  The inclusion of a mens rea element is precisely the kind of limit that the Supreme Court has endorsed.  The "existence of a mens rea is the rule . . . rather than the exception" and "except in unusual circumstances, [the Court] construe[s] a criminal statute to include a mens rea element even when none appears on the face of the statute." *Cassel*, 408 F.3d at 634.  Reading a statute to lack intent, thereby rendering it unconstitutional, is "untenable in light of the principle that 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'"  *Id.* (*citing United States v. Buckland*, 289 F.3d 558, 564 (9th Cir. 2002)).   Interpreting § 231(a)(3) "in a constitutionally permissible light" to include intent does not rewrite the statute.  *See United States v. Banks*, 368 F. Supp. 1245, 1247 (D.S.D. 1973).

In *Williams*, the Supreme Court rejected an overbreadth argument that, like Defendant's argument here, was based on misreading statutory language to ban as much protected speech as possible.  553 U.S. 285.  In that case, the Court upheld a law that prohibited, among other things, presenting and promoting child pornography.  The Court noted that the words "present" and "promote" could "in isolation" be understood capaciously, to include mere advocacy of child pornography, but the Court rejected that construction based on textual indicators, including the statute's scienter requirement, and the history of similar laws upheld by the Court.  *See id.* at 294-97; *see also id.* at 307 (Stevens, J., concurring) (observing that the Court's construction would be "compelled by the principle that 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality'").

Section 231(a)(3) requires intent; the intent requirement limits the statutory prohibition on "any act" to those acts which are designed to impede or obstruct.  *See Mechanic*, 454 F.2d at 854 (§ 231(a)(3) requires intent and indictment alleges intent).  This avoids the problem defendant

21

fears – arrests based purely on protected speech.  This intent requirement is "the determinative factor separating protected expression from unprotected criminal behavior."  *Gilbert*, 813 F.2d at 1529; *see also Virginia v. Black*, 538 U.S. 343, 363 (2003) (holding that a statute that prohibits cross burning with the intent to intimidate passes constitutional muster).  This distinguishes § 231(a)(3) from similar state statutes that have been found suspect.  *See National Mobilization Committee to End War in Vietnam v. Foran*, 411 F.2d 934, at 937-38 (7th Cir. 1969) (concluding that intent requirement makes statute different from other interfering and resisting statutes).  And this dooms Defendant's arguments that the Civil Disorder Act violates the First Amendment.

### 3.   Section 231(a)(3) has a plainly legitimate sweep and is not overbroad.

Nor can Defendant show that he is charged with a crime that is "impermissibly overbroad" relative to its "plainly legitimate sweep."  *Washington State Grange*, 552 U.S. at 449 n.6. Defendant's own conduct of violently hurling a brick at an occupied police cruiser perfectly illustrates a constitutionally valid application of the statute to conduct and unprotected speech. And far from showing a "realistic danger" of unconstitutional applications in other cases, *Taxpayers for Vincent*, 466 U.S. at 801, Defendant fails to identify a single example of a prosecution under § 231(a)(3) based on arguably protected speech.  The express terms of § 231(a)(3) render the possibility of any such prosecution remote at best, and any such case could be the subject of an as-applied challenge.  There is no basis for the "strong medicine" of overbreadth invalidation in this case.

Despite the clear focus on intentional acts, not speech, Defendant challenges § 231(a)(a) as being facially overbroad under the First Amendment.  The "crucial question" here is whether § 231(a)(3) "sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments."  *Grayned*, 408 U.S. at 114-15.  Defendant argues it does and cites

hypothetical scenarios that might offend the First Amendment.  But a statute is not invalid "merely because it is possible to conceive of a single impermissible application . . . ." *City of Houston*, 482 U.S. at 458 (quoting *Broadrick*, 413 U.S. at 630) (internal quotation marks omitted).

> **4.  The statute's plainly legitimate sweep encompasses violent criminal conduct.**

The Civil Disorder statute punishes intentional conduct that occurs in the context of a civil disorder, which, by definition, requires acts of violence, even if those violent acts only imminently threaten, rather than actually result in, personal injury or property damage.  18 U.S.C. § 232(1). The statute has historically been applied to defendants who have engaged in physical conduct, often violent, against police officers or firefighters who are attempting to protect the public from the dangerous harms flowing from violent civil disorders.  *See, e.g., Mechanic*, 454 F.2d at 853 (defendants charged with throwing cherry bombs at police officers protecting firefighters who were battling arson at ROTC building); *Featherston*, 461 F.2d at 1121 (charges against members of group that demonstrated for fellow members how to make explosives for "'the coming revolution'"); *Foran*, 411 F.2d at 936 (various defendants charged with activities during August 1968 Democratic Convention); *Banks*, 368 F. Supp. at 1246 (charges involve the "occupation-siege of the town of Wounded Knee, South Dakota").

These sorts of prosecutions form the core of § 231(a)(3)'s plainly legitimate sweep.  All of them, like Defendant's prosecution, are entirely proper under the First Amendment because they involve only non-expressive conduct.  And to the extent that § 231(a)(3) prohibits the obstruction of officers accomplished partially or entirely through speech, it covers only speech, such as threats or speech integral to criminal conduct, that is unprotected under the First Amendment.  Thus, although "peaceful demonstrations in public places are protected by the First Amendment[,] . . . where demonstrations turn violent, they lose their protected quality as expression under the First

Amendment." *Grayned*, 408 U.S. at 116 (footnotes omitted).  Therefore, in the context of a violent civil disorder, acts committed with the intent of interfering, obstructing, or impeding a firefighter or police officer engaged in lawful performance of his duties are not protected speech.  *Mechanic*, 454 F.2d at 852 (citation omitted).

### 5.   Defendant's hypotheticals do not justify facially invalidating Section 231(a)(3) for overbreadth.

Defendant cites no actual prosecutions that he argues were unconstitutional.  Instead, he relies on the unfortunate "tendency of [the] overbreadth doctrine to summon forth an endless stream of fanciful hypotheticals."  *Williams*, 553 U.S. at 301.  But facial invalidation is only warranted when a statute presents a "realistic danger" of chilling the speech of third parties. *Taxpayers for Vincent*, 466 U.S. at 801.  Defendant has not shown any realistic danger here.  And the hypothetical scenarios he invents are particularly misplaced because § 231(a)(3), properly construed, does not criminalize the speech that the hypotheticals describe.

Section 231(a)(3) is not akin to the municipal statutes that have fallen under First Amendment scrutiny.  For example, the municipal regulation in the *City of Houston* case made it "unlawful" to "in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty."  *City of Houston,* 482 U.S. at 455.  On its face, the municipal ordinance covered both speech and action, but the assault portions of the statute were preempted leaving the statute limited to verbal opposition.  *Id.* at 460.  The ordinance also swept broadly, covering "any manner" of verbal opposition.  *Id.* at 462-64.  The Texas courts had never limited the ordinance's broad sweep and it had, in fact, been applied to simple verbal confrontations.  *Id.* at 469-70.

Section 231(a)(3) is different in several critical respects.  First, it covers intentional acts of interference, not mere verbal opposition.  If the municipal ordinance had included a similar intent provision, it could have narrowed the scope of the statute and potentially rendered it constitutional.

24

*See id.* at 474 (Powell, J., concurring in part, dissenting in part) (reasoning that if the statute required proof that person "intended to interfere with the officer's performance of his duties," it would "narrow substantially the scope of the ordinance, and possibly resolve the overbreadth question"). The Civil Disorder statute also lacks the core offending language – "in any manner oppose" – found in the municipal ordinance. To the extent the Civil Disorder statute could be read to sweep more broadly, every court to have considered it has narrowed it to cover only unprotected conduct. *See, e.g.*, *Mechanic*, 454 F.2d 849 (§ 231(a)(3) covers intentional conduct); *Foran*, 411 F.2d 934 (same). And, of course, in this case the charges were directed at acts, not speech.

***

Interpreting the statute to criminalize those violent acts – and not protected speech – is consistent with Congress' intent and is fatal to Defendant's overbreadth claims.

### C.  The Civil Disorder Statute Is Content-Neutral and Survives Scrutiny

Defendant argues that strict scrutiny review applies here because § 231(a)(3) is a content- and viewpoint-based restriction on speech. That argument fails at the outset because the statute prohibits only obstructive conduct and unprotected speech, such as threats. The statute is decidedly content-neutral under the three reasons set forth in *Hill v. Colorado*, 530 U.S. 703, 719-20 (2000) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). First, it is not a regulation of speech, but conduct, as discussed more fully above. *See, e.g.*, *United States v. Brien*, 391 U.S. 367, 376 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). Second, regardless of the political views of one Senator who favored the Act's adoption, its use over the years to punish particular acts rather than broad movements or ideas shows that the purpose of the Act is not about disagreeing with a particular message. That

25

principle is highlighted this past year as the Act was applied alike to selective extreme and violent acts occurring at Black Lives Matter protests and also at the Capitol Insurrection protest. *See, e.g.*, *Hill*, 530 U.S. at 719 (noting that statute's "restrictions apply equally to all demonstrators, regardless of viewpoint, and the statutory language makes no reference to the content of the speech."). Finally, the government's interest in protecting the safety of police and the safety of other more peaceful protesters is clearly unrelated to the message being conveyed at any particular protest. *See also Hill*, 530 U.S. at 738 (concurrence, *J.*, Souter) ("Here, the evidence indicates that the ostensible reason [for regulating the circumstances of speech] is the true reason. The fact that speech by a stationary speaker is untouched by this statute shows that the real reason for its restriction on approaches goes to the approaches, not to the content of the speech of those approaching.").

In any event, even assuming the statute regulates speech such that a heightened level of scrutiny applies, § 231(a)(3) easily survives such scrutiny because it is narrowly tailored to advance important governmental interests in enabling first responders to protect the public from violent civil disorders that impede interstate commerce. *See, e.g.*, *Taxpayers for Vincent*, 466 U.S. at 808. It does not and has not limited the speech of non-violent protesters. *See Johnson v. City and County of Phila.*, 665 F.3d 486, 495 (3d Cir. 2011) (upholding an ordinance that was "content-neural, narrowly tailored to serve a significant government interest, and leav[ing] open ample alternative channels for communication"). Defendant's reliance on isolated statements of one particular Senator does not transform a statute – that on its face applies neutrally regardless of the viewpoint underlying a defendant's obstructive conduct – into impermissible content discrimination.

### D. Section 231(a)(3) Is Not Vague.

The civil disorder statute criminalizes the intentional interference with the lawful activities of police and firefighters during a civil disorder.  It prohibits not the presence at a civil disorder, but rather, "an act committed during the course of such disorder."  *Mechanic*, 454 F.2d at 853. Yet, Defendant argues that the statute is vague and, therefore, unconstitutional because of the lack of mens rea.  This argument ignores the requirement that a defendant act with the intent to impede or interfere, as discussed above, which saves the statute for a claim of vagueness.  *Cf. Cassel*, 408 F.3d at 634 (reading intent requirement into statute to save it from constitutional challenge).  That express scienter requirement addresses any vagueness concerns.

A statute is impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. at 732 (*citing City of Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)); *see also United States v. Wunsch,* 84 F.3d 1110, 1119 (9th Cir. 1996).  The civil disorder statute punishes intentional conduct directed against firefighters and law enforcement officers working to protect the public during violent protests.  The statute prohibits only concrete "act[s]" that are performed with the specific purpose to "obstruct, impede, or interfere" with firefighters or law enforcement.  Contrary to Defendant's argument, those terms are quite different from statutory terms that courts have found to be vague, such as statutes that turn on subjective judgments of whether the defendant's conduct was "annoying" or "indecent."  *See Williams*, 553 U.S. at 306.

The statute's intent is plain and provides ample notice; no one could credibly claim to believe that he could lawfully throw a brick at an officer's vehicle.  Section 231(a)(3) is "sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden."  *Mechanic*, 454 F.2d at 854.

27

Defendant argues (Motion at 32) that the statute is vague because certain hypothetical applications of the statute might chill third parties from engaging in constitutionally protected speech. But that argument improperly "incorporate[s] elements of First Amendment overbreadth doctrine" into the Fifth Amendment vagueness analysis. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010). A defendant "who engages in some conduct that is clearly proscribed," such as attacking a police officer, "cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 20.

### E. The Indictment Is Properly Framed and Constitutionally Adequate.

An Indictment is sufficient if it contains the elements of the charged offense and enough detail to allow a defendant to prepare a defense and invoke the Double Jeopardy Clause if necessary. *Hamling v. United States*, 418 U.S. 87, 117-119 (1974); *United States v. Resendiz-Ponce*, 549 U.S. 102, 108-10 (2007); *United States v. Rodriguez*, 360 F.3d 949, 958 (9th Cir. 2004). Beyond that, the Federal Rules of Criminal Procedure simply require an Indictment to "be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c). *See United States v. Huet*, 665 F.3d 588, 598-99 (3d Cir. 2012) (invoking the Supreme Court's maxim that words be given common sense import in construing indictment).

Following his citations to general Fifth Amendment and due process principles, Defendant's only authority for his attack on the format of the Indictment is *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999). But *Du Bo* is inapposite because its Indictment failed to allege all elements of the offense. *Id.* at 1179-80 (concluding Hobbs Act charge was fatally flawed where it failed to "properly allege an offense"). That omission explains the Court's concern for whether the defendant was convicted on the basis of facts "perhaps not even presented to [] the

28

grand jury that indicted him." *Id.* at 1179 (internal quotations omitted).  But there is no reason to examine what facts the grand jury received in this case, or what facts could have been added to the Indictment, because the Indictment itself properly alleges all elements of a § 231(a) charge.  Indeed, Defendant does not claim otherwise.

The charging instruments and disclosures in this case make clear what Defendant is charged with doing, which is why he did not seek a bill of particulars within the required 14 days of his arraignment in June.  The criminal complaint (D.I. 1) describes Defendant's conduct clearly, satisfies the elements of the offense, and is sufficient to enable him to prepare his defense.  And the Indictment properly charges him with committing a violent act on May 30, 2020, during a civil disorder in violation of § 231(a)(3).  Nothing further need be included, despite Defendant's characterization of his Indictment.  Taken together, the complaint, Indictment and discovery fully apprise Defendant of the charges and satisfy Rule 7(c).

*** 

Defendant offers many arguments and hypotheticals in his attempt to locate a rationale to invalidate § 231(a)(3).  They are all in vain.  The statute is constitutional and was applied to his conduct in a permissible manner.  Accordingly, his Civil Disorder Motion fails.

## II.     THE GOVERNMENT PROPERLY EXERCISED ITS DISCRETION TO PROSECUTE DEFENDANT BASED ON HIS VIOLENT CONDUCT.

In his selective-prosecution Motion, Defendant claims that the government prosecuted him because of his peaceful participation in the May 30 protests.  In support of this Motion, Defendant contends that rioters who stormed the Capitol in January 2021 are similarly situated to him and that the government has failed to prosecute them.  Defendant's arguments, however, are belied by the record.  The government properly considered Defendant's violent conduct, as well as a number of other factors, in exercising its discretion to prosecute Defendant.  And the government has

aggressively prosecuted the Capitol rioters, who are not similarly situated to Defendant in any event. Accordingly, Defendant's selective-prosecution Motion likewise fails.

A. **Standard of Review and Applicable Legal Principles**

The standard for evaluating a selective prosecution claim "is a demanding one." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Because the decision to prosecute is a "core executive constitutional function," *id*. "judicial authority is . . . at its most limited" when reviewing charging determinations. *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (citations omitted). The exercise of prosecutorial discretion involves balancing myriad factors, including "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to those priorities," and is therefore "particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985). Charging decisions thus enjoy a "presumption of regularity" and may be called into question only by "clear evidence" that a prosecutor inappropriately acted based on racial discrimination or some other unconstitutional motive. *Armstrong*, 517 U.S. at 463-65.

"To establish selective prosecution, the defendant must provide evidence that persons similarly situated have not been prosecuted and that the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor." *United States v. Taylor*, 686 F.3d 182, 197 (3d Cir. 2012) (citations and internal alterations omitted). Defendant bears the burden of proof on both prongs and must present clear evidence of both discriminatory intent and discriminatory effect. *Id*.; *see also United States v. Hedaithy*, 392 F.3d 580, 606-07 (3d Cir. 2004). A "correspondingly rigorous standard" for compelling discovery requires a defendant to meet a "substantial evidentiary threshold" with "credible evidence" of both discriminatory intent and discriminatory effect. *Hedaithy*, 392 F.3d 580 at 607. (internal citations

30

omitted).  "[N]umerous newspaper articles" or "nationwide statistics" are insufficient. *Id.*

### B. **Defendant Fails to Establish Discriminatory Intent.**

Defendant has not made a credible showing that the decision to prosecute him was "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification . . . including the exercise of protected statutory and constitutional rights." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (citations omitted).  Instead, the record demonstrates that Defendant's prosecution was based "on the usual determinative factors."  *United States v. Schoolcraft*, 879 F.2d 64, 68-69 (3d Cir. 1989).  His claim therefore fails.

Here, Defendant conceded in his interview that he threw a brick at an occupied law enforcement vehicle and smashed its windshield.  Such violent conduct unquestionably constituted a crime and could have severely injured the officer, regardless of the circumstances. *See generally United States v. Mechanic*, 454 F.2d 849, 852 (8th Cir. 1971) (defendants convicted for throwing objects at police).  But the circumstances matter.  Defendant's actions were particularly dangerous, as they occurred during a precarious moment in the protests when tensions could have escalated.  Indeed, that is exactly what happened.  After Defendant threw the brick, others followed his lead, forcing Sergeant Evans to stop monitoring and to retreat from the crowd. *United States v. Brantley*, 803 F.3d 1265, 1273 (11th Cir. 2015) ("[T]here is nothing in our Constitution that prohibits a prosecutor from taking into account the circumstances of a crime in making a charging decision.").

Nor did Defendant's actions constitute a momentary lapse in judgment.  After Defendant left the protests, he returned—this time bringing with him a knife, fireworks, and a lock-picking kit.  That is not the behavior of someone who is merely intending to peacefully exercise his First Amendment rights.  Further, after having an opportunity to reflect on his conduct and the significant damage occasioned by the protests, Defendant did not express remorse or appreciate

31

the gravity of his situation.  Instead, he lied repeatedly to the FBI.  The bottom line is that the government acted well-within its discretion to prosecute Defendant for his conduct.  *See, e.g., United States v. Lewis*, 517 F.3d 20, 27-28 (1st Cir. 2008) ("A multiplicity of factors legitimately may influence the government's decision to prosecute one individual but not another.") (citations omitted).

Defendant's sole argument that he is being prosecuted because of his participation in the protest is a statement from the former Attorney General ("AG") of the United States allegedly encouraging prosecutors "to be aggressive when charging violent demonstrators with crimes, including potentially prosecuting them for plotting to overthrow the U.S. government." Defendant's reliance on this statement misses the mark both legally and factually.  Defendant was charged in federal court on June 6, 2020, several months *before* the AG allegedly made his statement.  Likewise, the AG's statement calls on prosecutors to pursue violent demonstrators, not crack down on peaceful protests.  And the statement underscores that the government's enforcement priorities are a "core executive constitutional function" and "not readily susceptible to the kind of analysis the courts are competent to undertake." *Armstrong*, 517 U.S. at 465. Defendant's citations to statements made by high-ranking Justice Department officials are precisely the kind of conclusory allegations that are insufficient to establish discriminatory purpose.  *See United States v. Bass*, 536 U.S. 862, 863 (2002) (summarily reversing despite statements from Janet Reno and Eric Holder as evidence of discriminatory purpose).

Besides speculation, Defendant has offered no credible evidence to support his claim that the government prosecuted him because he exercised his First Amendment rights.  To the contrary, the record establishes that the government properly exercised its discretion to prosecute Defendant after considering the totality of his conduct.  Because Defendant has failed to make a credible

showing of discriminatory purpose, his Motion fails.

**C.  Defendant Fails to Establish Discriminatory Effect.**

Defendant's selective prosecution claim also fails because Defendant cannot establish discriminatory effect.  Discriminatory effect occurs when similarly situated persons could have been but were not prosecuted.  *Taylor*, 686 F.3d at 197 (internal citation omitted).  A person is similarly situated only if he or she is "alike in all relevant aspects."  *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008); *Gilani v. Matthews*, 843 F.3d 342, 348 (8th Cir. 2016).  "A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced."  *Lewis*, 517 F.3d at 27.

Here, Defendant has not pointed to any similarly situated person who was not participating in a protest or otherwise engaged in First Amendment activity, interfered with a law enforcement officer during a civil disorder when tensions were extremely high, destroyed government property, and was not prosecuted.  In fact, Defendant has not offered any person who *was* participating in the Wilmington protests who engaged in similar conduct but was not prosecuted.  Nor has Defendant proffered another person who engaged in similar conduct who was as easily identified as Defendant and against whom the evidence was equally strong.  *See Loza v. Mitchell*, 766 F.3d 466, 496 (6th Cir. 2014) (no discriminatory effect when evidence against defendant was "significant and substantial" compared to another individual).  Defendant's failure to offer any similarly situated person is fatal to his selective prosecution claim.

Rather than offering any similarly situated comparators, Defendant cites to inflammatory articles about the insurrection at the Capitol in January and law enforcement actions regarding other protests outside of Wilmington.  Such argument-by-innuendo is insufficient to make a

33

credible showing of discriminatory effect.  *See Hedaithy*, 392 F.3d at 607-08 (no credible showing of discriminatory effect when "evidence that [defendant] did present was in the form of numerous newspaper articles").  Moreover, Defendant's brief demonstrates that the federal government *is* in fact aggressively prosecuting more than 300 rioters who stormed the Capitol, including filing Civil Disorder charges against roughly 60 of the defendants.  *See* https://www.npr.org/2021/02/09/965472049/the-capitol-siege-the-arrested-and-their-stories#database, last visited March 23, 2021; https://www.delawareonline.com/storytelling/capitol-riot-mob-arrests/, last visited March 23, 2021.

Rather than offer any meaningful analysis tethered to the facts of his case, Defendant cherry-picks certain prosecutions in D.C. to compare to his own prosecution.  But these arguments are equally misguided.  None of the individual prosecutions cited by Defendant include allegations that the defendant destroyed property or placed a law enforcement officer in danger.  Defendant points to the prosecution of Joshua Pruitt, for example, as someone who is similarly situated and charged only with a misdemeanor.  *See* Ex. A.[7]  The complaint against Pruitt, however, indicates he entered the Capitol and did not engage in any unlawful activity while inside.  Pruitt was only arrested after disobeying the 6 p.m. curfew.  Likewise, the complaint against Cindy Fitchett mentions that a crowd of two dozen people were "making loud noises" and "kicking chairs" inside the Capitol, as well as "spraying an unknown substance at officers."  *See* Ex. B.  But the specific allegation against Fitchett was that she refused to comply with an order to leave.  Nothing more. Robert Bauer used a side door to enter the Capitol; took photographs of himself with his middle

---

[7] For the Court's convenience, this brief attaches the various criminal complaints cited by Defendant as Exhibits A-J.

finger raised; did not assault any officers; and told other rioters to stop throwing objects at law enforcement because the officers "had stood down." *See* Ex. C. That is not comparable to Defendant's conduct, either. Joshua Matthew Black admitted to being inside the Capitol, carrying a knife, and being "tempted" to smash a glass door. *See* Ex. D. In contrast to Defendant Wood, however, Black *did not* break the glass or destroy any other property. The only arguably similar conduct—Matthew Council, who apparently pushed an officer—is also readily distinguished from Defendant's conduct: Council apologized to the officer he had pushed. *See* Ex. I. Contrary to Defendant's characterizations, none of the individual prosecutions he cites include similarly situated persons who engaged in similar conduct. And because Defendant has offered no evidence of similarly situated persons who were not prosecuted, much less some credible evidence, he is also not entitled to discovery.[8]

***

The bulk of Defendant's Motion is devoted to describing an extremely chaotic and unsettling period in our country. Defendant's invocation of inflammatory imagery and rhetoric may pack a punch. But it does not establish that other protesters in other cities involving other prosecuting authorities are similarly situated to Defendant. Because Defendant has failed to meet his burden of establishing a discriminatory effect, his Motion lacks merit.

---

[8] Defendant's citation to the Justice Manual fares no better, as it conveniently omits the most important caveat—that the ultimate determination of whether to prosecute a particular case is left in the prosecutor's ultimate discretion. *See Armstrong*, 517 U.S. at 465.

## **CONCLUSION**

For the reasons set forth above, the Defendant's Motions should be denied.

Respectfully submitted,

David C. Weiss
United States Attorney

_ /s/ Christopher R. Howland_
Christopher R. Howland
Assistant United States Attorneys

Date: March 29, 2021

36