IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 20-56-MN |
| | : | |
| ADRIAN WOOD, | : | |
| | : | |
| Defendant. | : | |

**REPLY TO GOVERNMENT'S OMNIBUS RESPONSE TO
DEFENDANT'S MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................. iii

I.     SECTION 231(a)(3) IS UNCONSTITUTIONAL. ........................................... 1

  A.   The Legislative History Establishes Suppression Of Civil Rights Advocacy As The Purpose Of The Statute. ............................................................... 1

  B.   .............. The Government's Flawed Account Of The George Floyd Protests Is Not Only Inaccurate But Irrelevant To The Constitutionality Of A Statute That Must Be Judged Based On The Facts At The Time Of Enactment And On Its Overbroad And Vague Text. ....................................................................... 3

    1.   The Government Omits the Role Of The Police In Contributing To Violence During Protests................................................................................ 4

    2.   The Government Lists Offenses Involving Federal Officers And Federal lnterests That Do Not Pertain To The Statute Referencing State Law Enforcement. ....................................................................................... 4

    3.   The Government's Characterizations Regarding The Protests Do Not Address Or Cure The Statute's Unconstitutionality............................................ 5

  C.   The Primary Case Relied Upon By The Government Perfectly Illustrates That Only Congress – Not The Courts – Has Authority To Rewrite Statutes To Cure Constitutional Defects................................................................................ 7

  D.   The Civil Disorder Statute Does Not Directly Implicate Interstate Commerce, So The Statutory "In Any Way Or Degree" Cannot Meet The Requirement Of A "Substantial" Effect. ................................................................................... 9

    1.   Section 231(a)(3) Does Not Narrowly Regulate The Channels Or Goods Of Interstate Commerce. ....................................................................... 11

    2.   The Unprecedented Attenuation Between The Prohibited Act And The Jurisdictional Element Of § 231(a)(3) Fails To Establish The Required Federal Nexus. ............................................................................................ 12

    3.   *Raich* Is Inapplicable Because Section 231(a)(3) Does Not Form An Essential Part Of Any Comprehensive Regime Of Commercial Regulations. ............ 14

i

E.    The Civil Disorder Statute Violates The First Amendment Both As Over-Broad And As Motivated To Suppress A Particular Viewpoint.................................................. 18

   1.   Section 231(a)(3) Contains No Mental State Element, And Congress Intended It To Impose Minimal Burdens On Prosecutions. ............................................................. 19

   2.   Section 231(a)(3) Burdens A Substantial Amount Of Protected Speech, Including Expressive Conduct. ..................................................................................... 20

   3.   Strict Scrutiny Is Warranted Because § 231(a)(3) Was Intended To Suppress Disfavored Viewpoints Of Civil Rights Leaders. ........................................................ 23

F.    The Statute's Multiple Ill-Defined Terms Fail To Provide Required Notice And To Protect Against Arbitrary And Discriminatory Enforcement................................... 24

G.    The Indictment Fails To Comply With The Grand Jury Requirements Of The Fifth Amendment And Rule 7................................................................................ 26

II.    THE COURT SHOULD DISMISS THE INDICTMENT FOR SELECTIVE PROSECUTION. ....................................................................................................... 28

A.    The Decision to Prosecute Was Based on a Discriminatory Intent and There Are Direct Admissions of Discriminatory Purpose by the Prosecution Entitling Mr. Wood to Discovery. ..................................................................................................... 28

B.    There is "Some Evidence" of Discriminatory Effect.................................................... 31

III.    CONCLUSION………………………………………………………………………..33

ii

# TABLE OF AUTHORITIES

Page

## SUPREME COURT OPINIONS

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234, 258 (2002) ..................................................................................... 1, 8

*Bordenkircher v. Hayes*,
  434 U.S. 357, 364 (1978) ........................................................................................ 29

*Broadrick v. Oklahoma*,
  413 U.S. [601, 612(1973) ......................................................................................... 8

*City of Houston, Tex. v. Hill*,
  482 U.S. 451, 461 (1987) ......................................................................................... 24

*Cohen v. California*,
  403 U.S. 15, 18 (1971) ............................................................................................. 22

*FDIC v. Meyer*,
  510 U.S. 471, 476 (1994) ......................................................................................... 26

*Gonzales v. Raich*,
  545 U.S. 1, 13 (2005) .......................................................................................... 15, 16

*Gozlon-Peretz v. United States*,
  498 U.S. 395, 404 (1991) ......................................................................................... 21

*Hartman v. Moore*,
  547 U.S. 250, 256 (2006) ......................................................................................... 29

*Holder v. Humanitarian Law Project*,
  561 U.S. 1, 21 (2010) ............................................................................................... 27

*Iancu v. Brunetti*,
  139 S. Ct. 2294, 2301 (2019) .................................................................................... 6

*Johnson v. United States*,
  576 U.S. 591, 602 (2016) .................................................................................. 4, 22, 26

iii

*McLain v. Real Estate Bd. of New Orleans, Inc.*,
    444 U.S. 232, 246 (1980) ................................................................ 14

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
    138 S. Ct. 617, 629 (2018) .............................................................. 27

*Puerto Rico v. Franklin Cal. Tax–Free Trust*,
    136 S. Ct. 1938, 1949 (2016) ........................................................... 27

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155, 166 (2015) .......................................................... 24, 25

*Reno v. American Civil Liberties Union*,
    521 U.S. 844, 884 (1997) ............................................................ 1, 6

*Rivers v. Roadway Express Inc.*,
    511 U.S. 298, 312-13 (1994) ............................................................. 3

*Russello v. United States*,
    464 U.S. 16, 23 (1983) .................................................................. 21

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) ................................................................. 26

*Smith v. Goguen*,
    415 U.S. 566, 573 (1974) ............................................................... 27

*Spence v. Washington*,
    418 U.S. 405, 409 (1974) ............................................................... 22

*Stirone v. United States*,
    361 U.S. 212, 215-16 (1960) ........................................................... 29

*Taylor v. United States*,
    136 S. Ct. 2074, 2081 (2016) .......................................................... 13

*Terminiello v. City of Chicago*,
    337 U.S. 1, 4 (1949); *see Hague v. CIO*, 307 U.S. 496, 515 (1939) ............................ 4

*United States v. Armstrong*,
    517 U.S. 456, 465 (1996) ................................................... 30, 33, 35

*United States v. Bailey,*
    444 U.S. 394, 406 (1980) ........................................................................ 21

*United States v. Kozminski,*
    487 U.S. 931, 949 (1988) ........................................................................ 28

*United States v. Lopez,*
    514 U.S. 549, 558 (2000).................................................................... passim

*United States v. Miller,*
    471 U.S. 130, 143 (1985) ........................................................................ 29

*United States v. Morrison,*
    529 U.S. 598, 618 n. 8 (2000) .................................................................. 11

*United States v. Stevens,*
    559 U.S. 460, 473 (2010) .................................................................... passim

*United States v. Treasury Employees,*
    513 U.S. 454, 479, n. 26 (1995) ................................................................ 6

*United States v. Williams,*
    553 U.S. 285 (2008) ......................................................................... passim

*Virginia v. American Booksellers Assn., Inc.,*
    484 U.S. 383, 397 (1988) .......................................................................... 6

*Ward v. Rock Against Racism,*
    491 U.S. 781, 791 (1989)........................................................................ 25

*Wayte v. United States,*
    470 U.S. 598, 608 (1985) ........................................................................ 29

**FEDERAL COURT OPINIONS**

*Anderson v. City of Hermosa Beach,*
    621 F.3d 1051, 1061 (9th Cir. 2010)........................................................ 22

*Edge v. City of Everett,*
    929 F.3d 657, 668 (9th Cir. 2019)............................................................ 22

*Guerrero v. Whitaker,*
    908 F.3d 541, 544 (9th Cir. 2018)............................................................ 26

*Long Beach Area Peace Network v. City of Long Beach*,
    522 F.3d 1010, 1027 (9th Cir. 2008) .......................................................... 23

*McCoy v. City of Columbia*,
    929 F. Supp. 2d 541, 550 (D.S.C. 2013) ................................................... 23

*Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a
    Generation v. City of Seattle*,
    550 F.3d 788, 797 (9th Cir. 2008) .............................................................. 23

*United States v. Aguilera-Rios*,
    769 F.3d 626, 631 (9th Cir. 2014) ................................................................ 3

*United States v. Atcheson*,
    94 F.3d 1237, 1242 (9th Cir. 1996) ............................................................ 13

*United States v. Bird*,
    124 F.3d 667, 682 n.15) (5th Cir. 1997) .................................................... 18

*United States v. Carrillo*,
    No. 4:20-mj-70785, Complaint at 14- 16 (N.D. Cal. June 16, 2021) ........... 5

*United States v. Clausen*,
    328 F.3d 708, 710 (3d Cir. 2003) ............................................................... 13

*United States v. Dorsey*,
    418 F.3d 1038 (9th Cir. 2005) .................................................................... 10

*United States v. Jones*,
    231 F.3d 508, 514 (9th Cir. 2000) .......................................... 11, 13, 14, 17

*United States v. Juvenile Male*,
    118 F.3d 1344, 1348 (9th Cir. 1997) .......................................................... 14

*United States v. Keith*,
    605 F.2d 462, 464 (9th Cir. 1979) .............................................................. 28

*United States v. Kilpatrick*,
    921 F.2d 1456, 1463 (105h Cir. 1987) ....................................................... 28

*United States v. Mechanic*,
    454 F.2d 849 (8th Cir. 1971) ............................................................... 26, 27

*United States v. Polanco,*
    93 F.3d 555, 563 (9th Cir. 1996) ........................................................................... 13

*United States v. Rivera-Nevarez,*
    418 F.3d 1104, 1107 (10th Cir. 2005) ...................................................................... 3

## UNITED STATES CODE

18 U.S.C. § 1962 ...................................................................................................... 14

18 U.S.C. § 231(a)(3) ...................................................................................... passim

18 U.S.C. § 232(1) ................................................................................................... 15

18 U.S.C. § 922(q)(1) .............................................................................................. 10

## I.      SECTION 231(a)(3) IS UNCONSTITUTIONAL.

The legislators' words establish that racial prejudice and vindictiveness toward civil rights advocacy animated subsection 3 the Civil Obedience Act. The government's response on the factual background of the legislative history of 18 U.S.C. § 231(a)(3) is wrong and is also wrong and irrelevant on the events that led to the government's revival of this statute after 50 years of well-deserved obscurity. The government's legal arguments depend on cases addressing statutes that were legislatively fixed after judicial invalidation. Section 231(a)(3) has never been fixed. The primary case upon which the government relies – *United States v. Williams*, 553 U.S. 285 (2008), upheld a rewritten statute after the Ninth Circuit and Supreme Court struck down its predecessor as unconstitutional in *Free Speech Coalition v. Reno*, 198 F.3d 1083 (9th Cir. 1999), *affirmed sub nom. Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002). The unreconstructed § 231(a)(3) violates the Commerce Clause, the First Amendment, and the Due Process Clause. After five decades of the statute's obsolescence, it is long past time to permanently remove this stain from the criminal code.

### A.      The Legislative History Establishes Suppression Of Civil Rights Advocacy As The Purpose Of The Statute.

The government dismisses the racist and vindictive history of § 231(a)(3) by claiming the extensive legislative history provided by the defense constitutes "stray remarks" from legislative history.  DI 28 at 5. Far from being "stray remarks," the comments reflect the views of the proponent and primary sponsor of the statute who repeatedly and explicitly invoked his legislation as a tit-for-tat to target civil rights advocates who might be protected by the "hate crime" protections of the Civil Rights Act. The supposed "stray remarks" provide the only legislative history, and demonstrate the statute's explicit purpose of targeting civil rights

advocacy.

Animus toward civil rights advocacy was not a "stray remarks" glitch, it was the feature in the statute's enactment. Senator Long was not alone in his opposition to the "hate crime" provision of the Civil Rights Act. Senator Allen Ellender of Louisiana complained that the hate crime bill would "protect[] anarchists such as [civil rights organizers] Rap Brown and Stokely Carmichael who go about the country stirring up trouble," while imposing a "lengthy sentence" on the "party charged" when "a troublemaker is injured while inflaming the local people." 114 Cong. Rec. 1154 (Jan. 26, 1968).[1] Senator Benjamin Jordan of North Carolina recalled when "a group of Negroes descended on the House Gallery" and hypothesized that "any of those Negroes could have invoked the Federal [hate crime] law against our own policemen right here because of claimed police brutality." 114 Cong. Rec. 1160 (Jan. 26, 1968). Senator Herman ("There will never be mixed schools while I am governor") Talmadge of Georgia worried that the hate crime bill would penalize a person who "hit Rap Brown with an open hand while he was causing people to riot and drew a little blood." DI 25, Exh. D at 2.

The government offers nothing to contradict the extensive legislative history provided by the defense in support of the obvious proposition that Senator Long's legislation intended to create means for suppression of civil rights advocacy. Perhaps in recognition of its constitutional defects, the statute has been virtually unused for 50 years, and even the few times it has ever been used, the focus was on acts directed against federal interests. Its use against the summer

---

[1] Senator Ellender's hostility to Dr. King and civil rights advocates is reflected in his opposition to voting rights for Black Americans: "The bill is tailor-made to Martin Luther King's demand for Negro control of the political institutions of the South. Only through such a nefarious piece of legislation could incompetents gain control of the political processes in the South or in the United States." 111 Cong. Rec. 5555 (Mar. 22, 1965).

2020 civil rights actions, whether advertently or not, matches the sponsor's intent in it being used

against civil rights advocates.[2] Regardless of its use in this case, the animus behind the

legislation is unequivocal and invalidates the statute.

**B.     The Government's Flawed Account Of The George Floyd Protests Is Not Only Inaccurate But Irrelevant To The Constitutionality Of A Statute That Must Be Judged Based On The Facts At The Time Of Enactment And On Its Overbroad And Vague Text.**

The government's account of national and local Black Lives Matter demonstrations

provides little useful information for determining the constitutionality of the 1968 civil

disorder statute. The statute's meaning does not change after enactment based on new facts or

considerations. *See United States v. Aguilera-Rios*, 769 F.3d 626, 631 (9th Cir. 2014)

("Decisions of statutory interpretation are fully retroactive because they do not change the law,

but rather explain what the law has always meant.") (quoting *United States v. Rivera-Nevarez*,

418 F.3d 1104, 1107 (10th Cir. 2005) (citing *Rivers v. Roadway Express Inc.*, 511 U.S. 298,

312-13 (1994)). And the government's account completely omits the role of law enforcement

in committing and contributing to acts of violence.[3] *See* Kim Barker, Mike Baker and Ali

Watkins, *In City After City, Police Mishandled Black Lives Matter Protests*. N.Y. Times

(March 20, 2021). Most basically, the breadth and motivation behind the statute at the time of

enactment render it unconstitutional, regardless of whether "there is some conduct that clearly

falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2016); *accord*

*United States v. Stevens*, 559 U.S. 460, 473 (2010) (statute overbroad despite plainly legitimate

---

[2] Although the government notes the statute's invocation against Capitol defendants this year, those cases, unlike Mr. Wood's case, all involve a direct federal nexus ("the conduct or performance of any federally protected function") and have not resulted in litigated convictions.
[3]

3

applications).

1.     **The Government Omits the Role Of The Police In Contributing To Violence During Protests.**

The government's response provides not a hint of the policing failures and violence initiated by the police during last summer's Black Lives Matters protests. And context matters. The government's account of the Black Lives Matters protests echoes the last Administration's mischaracterization of Portland, for example, which President Biden recently rejected by executive order. Exec. Order No. 14,016, 86 Fed. Reg. 11,089 (Feb. 17, 2021) (revoking Memorandum of September 2, 2020) (Reviewing Funding to State and Local Government Recipients of Federal Funds That Are Permitting Anarchy, Violence, and Destruction in American Cities).

The government's response betrays no concern for the chilling effect of federal intervention into state protests with poorly defined parameters, leaving police officers and prosecutors to determine whether to sweep in speech and expressive conduct along with state-covered criminal activity. "Under our system of government," the First Amendment may "serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949); *see Hague v. CIO*, 307 U.S. 496, 515 (1939) (noting historic role of streets for protest).

2.     **The Government Lists Offenses Involving Federal Officers And Federal Interests That Do Not Pertain To The Statute Referencing State Law Enforcement.**

The government's list of horribles from the summer of Black Lives Matter protests provides no relevant information because the incidents involve clear federal statutory

jurisdiction or easily prosecutable crimes under state law. As reflected by its 50-year

dormancy, § 231(a)(3) has no critical, or even minimal, function that is already not covered by

applicable state and federal laws.

For example, the government's references the killing of a federal security officer in

Oakland during a protest. DI 28 at 2. What the government omits is that the government has

accused two men associated with the right-wing Boogaloo movement of the murder. Mario

Dinzeo, *Two Charged in Murder of Oakland Federal Officer During Protests*, Courthouse

News (June 16, 2020); Katie Shepherd, *An Officer Was Gunned Down. The Killer Was A*

*'Boogaloo Boy' Using Nearby Peaceful Protests As Cover, Feds Say*, Washington Post (June

17, 2020). The right-wing murderers tried to smear the Black Lives Matter movement by

escalating violence during BLM protests.  The government here falls directly into to that trap,

asking the Court to consider a right-wing murder of a Black federal contract security officer as

something resulting from Black Lives Matter protests. *See United States v. Carrillo*, No. 4:20-

mj-70785, Complaint at 14- 16 (N.D. Cal. June 16, 2021) (setting out evidence linking the

alleged murderer to the "Boogaloo" movement).

3. **The Government's Characterizations Regarding The Protests Do Not Address Or Cure The Statute's Unconstitutionality.**

Although claiming that the statute must be construed, the government fails to provide a

meaningful summary of how the multiple vague and general terms in the statute can be

narrowed without judicial legislation. The face of the statute applies broadly to speech and

expressive conduct during demonstrations against police conduct. The Supreme Court has

been unequivocal that Congress, and not the courts, is responsible for rewriting

unconstitutional statutes:

> [T]his Court may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 884 (1997). We "'will not rewrite a ... law to conform it to constitutional requirements,'" *id.*, at 884-885 (quoting *Virginia v. American Booksellers Assn., Inc.*, 484 U.S. 383, 397 (1988), for doing so would constitute a "serious invasion of the legislative domain," *United States v. Treasury Employees*, 513 U.S. 454, 479, n. 26 (1995), and sharply diminish Congress's "incentive to draft a narrowly tailored law in the first place," *Osborne* [*v. Ohio*, 495 U.S. 103 (1990). To read § 48 as the Government desires requires rewriting, not just reinterpretation.

*Stevens*, 559 U.S. at 481 (parallel citations and signals omitted); *see Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019) ("[E]ven assuming the Government's reading would eliminate First Amendment problems, we may adopt it only if we can see it in the statutory language."). Nothing in the statute provides bases for narrowing through construction, and the statute's sponsors indicated no limiting intention.

The Court has also been clear that the government does not allay concerns regarding a statute's constitutionality by assuring that it will be used wisely:

> But the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.

*Stevens*, 559 U.S. 480. The government claims to only use the statute for physical or assaultive conduct. But unlike the federal obstruction statute, there § 231(a)(3) has no element requiring force.

Neither does the statute contain any language describing the mental element, the scope of "obstruct, impede, or interfere," the knowledge and relationship between the "any acts," and the attenuated "in any way or degree" commerce language. The hopelessly ill-defined "any act," the lack of a mental element, and other nebulous internal language in the statute all leave the statute

open to the widest interpretation for the purposes of all constitutional analyses. Unlike the

surviving part of *Rundo*, there is no surviving part of "any act" that can be severed or can be

considered "readily susceptible" to construction without judicially law-writing far beyond what

the words and expressed intentions of the legislators permits. *Supra* (quoting *Stevens*, 559 U.S.

at 481).

### C. The Primary Case Relied Upon By The Government Perfectly Illustrates That Only Congress – Not The Courts – Has Authority To Rewrite Statutes To Cure Constitutional Defects.

The government places primary reliance on *Williams*, citing the case repeatedly

throughout its brief. In doing so, the government fails to note that the Court upheld the statute

in *Williams* only after its predecessor statute had been invalidated as unconstitutional, and after

Congress had engaged in a thorough rewrite addressing and curing the statute's constitutional

defects. Section 231(a)(3) is directly analogous to the statute invalidated *prior* to *Williams*, so

the case perfectly illustrates that Congress, not the courts, provides the appropriate forum for

the statutory rewrite needed to cure constitutional defects.

The Supreme Court affirmed a lower court ruling striking down the Child Pornography

Prevention Act ("CPPA") of 1996. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 258 (2002).

The Supreme Court affirmed based on First Amendment overbreadth without reaching the

lower court's additional findings on vagueness. The Court determined that the reach of the

CPPA was overbroad in extending to virtual images. *Id.* at 250-51.

> *The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter.* The Constitution requires the reverse. "[T]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted ...." *Broadrick v.*

7

> *Oklahoma*, 413 U.S. [601, 612(1973)]. *The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process.*

*Free Speech*, 535 U.S. at 255 (emphases added). Applying the same analysis to this case, it is clear that the overbreadth of "any act" in § 231(a)(3) is much more spacious and covers a wider scope of expressive conduct and speech than did the CPPA.

The Court in *Free Speech* also held that the provision banning depictions of sexually explicit conduct that are "advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct" is substantially overbroad in violation of the First Amendment. *Id.* at 257-58. The overbroad "conveys the impression" language suffers the same defect as § 231(a)(3), which places the officer in the position of deciding whether the subjective standard of the statute – "obstruct, impede, or interfere with" the officer who decides whether "any act" has done those things – has been met. Motion at 31-33.

In *Williams*, after *Free Speech*, the Court upheld Congress's replacement statute against First Amendment and vagueness challenges. In doing so, the Court described the narrowing and specificity that saved the statute from vagueness, especially the definitional section explaining the meaning of the term "sexually *explicit* conduct" and the "commonsense canon of noscitur a sociis." *Williams*, 553 U.S. at 294-97 (emphasis in original). In contrast to the specificity required in *Williams* to uphold the statute, § 231(a)(3) remains in a far worse form than the CPPA invalidated in *Free Speech* and has never received a congressional make-over to bring it within constitutional bounds.

The unreconstructed civil disorder statute bears all the markers of unconstitutionality

8

with none of the remedial steps illustrated by *Williams* as necessary for the statute to be valid.

As the main case upon which the government relies, *Williams* fully supports the present

statute's invalidation under the First Amendment and Due Process Clause and forecloses

judicial rewriting of the statute.

> **D.    The Civil Disorder Statute Does Not Directly Implicate Interstate Commerce,
> So The Statutory "In Any Way Or Degree" Cannot Meet The Requirement
> Of A "Substantial" Effect.**

The Supreme Court limits the categories of permissible regulation under the Commerce

Clause to (1) "the use of the channels of interstate commerce;" (2) "the instrumentalities of

interstate commerce, or persons or things in interstate commerce;" and (3) "those activities that

substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558 (2000).

After *Lopez* invalidated the Gun-Free School Zones Act under the Commerce Clause,

Congress amended the statute's language to require actual use of the channels of interstate

commerce and made detailed congressional findings establishing bases for federal action.

In the absence of any language in § 231(a)(3) meeting the first two *Lopez* conditions,

the government claims the statute meets all three, placing primary reliance on *United States v.

Dorsey*, 418 F.3d 1038 (9th Cir. 2005). As in *Williams*, the *Dorsey* court addressed a previously

invalidated statute after Congress addressed the issues rendering it unconstitutional and, by

amending the statute, established Commerce Clause compliance. In *Dorsey*, the court

addressed the new language that narrowed the offense to possession of a firearm that has

"moved in or that otherwise affects interstate or foreign commerce" 418 F.3d at 1045. This

jurisdictional element, the Ninth Circuit recognized, established a "concrete tie to interstate

commerce" by requiring, "through case-by-case inquiry, that the firearm possession in

9

question affects interstate commerce." *Dorsey*, 418 F.3d at 1046. Section 231(a)(3) has no equivalent requirement.

By contrast with the present case, *Dorsey* perfectly illustrates the invalidity of § 231(a)(3), which has had none of the congressional repair work addressed in *Dorsey*.

Further, the amended statute reviewed in *Dorsey* included extensive and detailed findings to establish a substantial effect on commerce. Unlike the general platitudes in the previous statute, and in § 231(a)(3), Congress considered and listed eight express and detailed findings establishing the effects on interstate commerce of guns in schools. 18 U.S.C. § 922(q)(1). Nothing remotely similarly to such findings can be gleaned from what the government calls the "stray remarks" of § 231(a)(3)'s sponsor or any other part of the legislative history.

The government provides no basis for finding the kind of federal interest required by the Constitution as a limitation on federal power. *See United States v. Morrison*, 529 U.S. 598, 618 n.8 (2000) ("With its careful enumeration of federal powers and explicit statement that all powers not granted to the Federal Government are reserved, the Constitution cannot realistically be interpreted as granting the Federal Government an unlimited license to regulate."). The Commerce Clause's limitation on federal legislative authority, and reservation to the States of general police power, depends on "the distinction between what is truly national and what is truly local." *Id.* at 617-618 (citing *Lopez*, 514 U.S. at 568). A federal statute that criminalizes "any act" that interferes with a state officer, incident to a disturbance involving three or more people, that "in any way or degree" affects commerce, addresses a quintessentially local crime and unconstitutionally cedes to the federal government state police authority.

10

The government's position that the Commerce Clause encompasses individual acts to interfere with police and firefighters, as described under § 231(a)(3), "would effectually obliterate the distinction between what is national and what is local and create a complete centralized form of government." *Lopez*, 514 U.S. at 557 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). In order to preserve the federalist separation of powers enshrined in the Constitution and in the American form of government, the Court should invalidate the commercial means of committing § 231(a)(3) under the Commerce Clause.

1.      **Section 231(a)(3) Does Not Narrowly Regulate The Channels Or Goods Of Interstate Commerce.**

The government claims that § 231(a)(3) is not only a regulation on "activity that substantially affects commerce," but it also regulates "the channels of interstate commerce, including the roads and highways" and serves "to protect the flow of things in interstate commerce" within the meaning of *Lopez*. The government's position finds no support in § 231(a)(3)'s plain language. Section 231(a)(3) is not narrowly drafted as to apply only to activities impacting the channels of commerce or the flow of goods in commerce. Neither the substantive offense of interfering with a police officer's duties, nor the incidental occurrence of a civil disorder that "in any way or degree" affects commerce, can reduce application of § 231(a)(3) to only those activities that impact the channels or goods pertaining to interstate commerce. The "in any way or degree" statutory language cannot reasonably be narrowed to fit the government's interpretation of civil disorders "that cut off through-fares or prevent use of significant commercial or government buildings for an extended period of time." Because § 231(a)(3) prohibits intrastate, noneconomic activity that need not itself cause any impact to interstate commerce, the first two *Lopez* categories, which require direct impacts to commerce,

11

cannot apply.

   2.   **The Unprecedented Attenuation Between The Prohibited Act And The Jurisdictional Element Of § 231(a)(3) Fails To Establish The Required Federal Nexus.**

   The degree of attenuation between the substantive offense element and jurisdictional element of § 231(a)(3) is unprecedented: the government points to no other federal felony replicating this unique structure. By its own terms, the jurisdictional element of § 231(a)(3) contains no requirement "that a defendant's actions implicate interstate commerce" to any degree at all. Instead, it is the civil disorder, and not the defendant's offense conduct, that must be shown to have affected commerce.

   Federal laws that regulate "forms of conduct that, even in the aggregate, may not substantially affect commerce" must contain a jurisdictional element so that their "applications . . . do not exceed Congress's authority." *Taylor v. United States*, 136 S. Ct. 2074, 2081 (2016). "[T]he jurisdictional element 'insures, on a case-by-case basis, that a defendant's actions implicate interstate commerce to a constitutionally adequate degree.'" *United States v. Jones*, 231 F.3d 508, 514 (9th Cir. 2000) (quoting *United States v. Polanco*, 93 F.3d 555, 563 (9th Cir. 1996)). All of the statutes that the government uses for comparison are distinguishable because, unlike § 231(a)(3), the crimes referenced all require that a defendant's activity directly impacted commerce or involved a commercial good.

   The government argues that the Hobbs Act is analogous to § 231(a)(3).  However, the jurisdictional elements contrast sharply.  The Ninth Circuit determined "that *Lopez*'s 'substantially affects' test is not applicable" because "the Hobbs Act is concerned solely with *inter* state, rather than *intra* state, activities." *United States v. Atcheson*, 94 F.3d 1237, 1242

12

(9th Cir. 1996) (emphasis in original); *see also United States v. Clausen*, 328 F.3d 708, 710

(3d Cir. 2003). Rather than requiring a substantial effect "the Hobbs Act speaks to one who

'affects commerce' by robbery or extortion," implying "a *direct* impact on interstate

commerce." *Id.* (emphasis added). "In contrast to the Gun- Free School Zones Act, which was

aimed at purely local, noneconomic activities, the Hobbs Act is directly aimed at economic

activities which 'in any way or degree . . . affects commerce." *Id.* While robbery under the

Hobbs Act can only be carried out by "affect[ing] commerce," § 231(a)(3) contains no

requirement that an individual "affect commerce" by interfering with the duties of police

officer.

Second, the jurisdictional element in the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. § 1962, also provides no help to the government's arguments.

Unlike § 231(a)(3), RICO can apply criminal liability to any enterprise "engaged in, or the

activities of which affect, interstate or foreign commerce." 18 U.S.C. §§ 1962(a), 1962(b), and

1962(c). The Ninth Circuit therefore upheld the constitutional validity of RICO under the

Commerce Clause because, "[l]ike the Hobbs Act," RICO requires that a defendant's activities

impact commerce directly, and that such direct effects "in the aggregate, have a substantial

effect on interstate commerce." *United States v. Juvenile Male*, 118 F.3d 1344, 1348 (9th Cir.

1997). While both RICO and the Hobbs Act require direct impacts to interstate commerce that

cause a substantial effect in the aggregate, § 231(a)(3) imposes no requirement "that a

defendant's actions implicate interstate commerce to a constitutionally adequate degree."

*Jones*, 231 F.3d at 514.

Finally, the government's reference to the Supreme Court's decision in *McLain v. Real*

*Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 246 (1980), which addressed the Sherman Anti-

13

Trust Act's jurisdictional element, is also unavailing. The Court in *McLain* held that an indictment under the Sherman Act must indicate that, "as a matter of practical economics," the defendant's offense had "a not insubstantial effect on the interstate commerce involved." 444 U.S. at 246. As with the other offenses, the Sherman Act also requires some showing that the defendant's offense conduct itself affected commerce. While recognizing the Commerce Clause to "extend beyond activities actually in interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially affect interstate commerce," the Court in *McLain* added, "it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce." *Id.* at 242.

The express terms of § 231(a)(3) – "in any way or degree" – require exactly such a nebulous connection to commerce and are not susceptible to construction that could resolve the gap between the offense of interfering with police or firefighters and a civil disorder's commercial impacts. "Civil disorders," as 18 U.S.C. § 232(1) defines them, can occur in any situation, in any place, at any time, so long as three individuals are engaged in actions of violence threatening danger to property. Given such breadth, the law has vast potential to sweep up individuals who, while interfering with the duties of police, are utterly lacking in culpability with respect to the civil disorder that affected commerce. Nothing in the language of § 231(a)(3) can safeguard such individuals from liability for a federal felony conviction because the statutory language simply cannot be contorted to require that any commercial effect at all result from a defendant's actual acts.

3. *Raich* **Is Inapplicable Because Section 231(a)(3) Does Not Form An Essential Part Of Any Comprehensive Regime Of Commercial Regulations.**

14

The government misplaces reliance on *Gonzales v. Raich*, 545 U.S. 1, 13 (2005). The Supreme Court's decision in *Lopez* relied in part on the fact that the Gun-Free School Zones Act was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 514 U.S. at 561. In *Raich*, the Court upheld a regulation on intrastate marijuana cultivation for personal use because such a regulation was necessary to effectuate the commercial aims of the Controlled Substances Act (CSA) and therefore served "a larger regulation of economic activity." 545 U.S. at 13. Because the CSA's purpose was "to control the supply and demand of controlled substances in both lawful and unlawful drug markets," the "failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." *Raich*, 545 U.S. at 19, 22. By contrast, enforcement of § 231(a)(3) is not necessary to effectuate any commercial regulation, nor to advance the goals of any federal regulatory scheme.

While the regulation of intrastate marijuana cultivation in *Raich* was part of a "comprehensive regime to combat the international and interstate traffic in illicit drugs," the Civil Obedience Act cannot be described as "comprehensive" in any way. *Raich*, 545 U.S. at 19. The clearest illustration of the relative "comprehensiveness" of the statutory schemes is simple numbers. Since the early 1970s, the drug enforcement under the CSA has been massively regulated in federal courts, while § 231(a)(3) has been in almost complete hibernation:

- Controlled Substances Act: over 970,000 convictions.[4]

- The commerce prong of § 231(a)(3): 0 convictions or very close thereto.

---

[4] Compiled from data available in the Annual Statistical Reports of the Offices of the United States Attorney, 1970-2019. https://www.justice.gov/usao/resources/annual-statistical-reports.

For offenses under the CSA, the Sentencing Guidelines determine offense severity in direct proportion to the marketable quantity of the illicit contraband at issue. U.S.S.G. § 2D1.1. By contrast, § 231(a)(3) has so little connection to federal regulation that the offense, for 50 years, has not warranted prosecutions, nor has a guideline been promulgated to address the offense. The government can point to no "larger regulation of economic activity" involving this moribund statute.

The legislative history confirms the statute as a mere vestige of opposition to civil rights for Black Americans rather than a good faith effort to regulate commercial activity. The Senate rejected a majority of the provisions that Senator Long had originally included in his amendment, and, in the end, Senator Long said, "little is left." DI 25, Exh. B at 15. Whereas the Senate voted to adopt §§ 231(a)(1) and (a)(2) together in a single vote, § 231(a)(3) was approved on its own after a voice vote. Although both § 231(a)(1) and (a)(2) concern firearms and explosives, nothing suggests that § 231(a)(3) forms an "essential part" of any scheme of firearms and explosives regulation.[5] Because § 231(a)(3) was adopted in isolation after the Senate had rejected a majority of the Civil Obedience Act, it is "not an essential part of a larger regulation of economic activity." *Lopez*, 514 U.S. at 561. The provisions of the Civil Obedience Act are a far cry from the CSA's pervasive regime of drug regulations.

---

[5] Although Senator Long mentioned snipers to appeal to gun control advocates, DI 25, Exh. B at 9, § 231(a)(3) as passed includes no reference to firearms. Furthermore, accounts of "black snipers" during the 1967 uprisings were later shown to be false and based in racial anxiety. James Ridgeway and Jean Casella, *Newark to New Orleans: The Myth of the Black Sniper*, Mother Jones (July 16, 2007), https://www.motherjones.com/politics/2007/07/newark-new-orleans-myth-black-sniper/ .

With only the slightest reference to its legislative history, the government simply asks the Court to assume that Congress's enactment of § 231(a)(3) was founded on adequate findings and pure motives. The opposite is true. The legislative history behind § 231(a)(3) shows that the law was intended to silence civil rights leaders, not to help regulate interstate commerce. In offering § 231(a)(3), Senator Long sought "to pass a law . . . to do something to keep people like Stokely Carmichael and Rap Brown from going around accusing all the American people of being a bunch of murderers and assassins, which we are not, accusing us of being international criminals, which we are not." DI 25, Exh. D at 1. Accordingly, the law's commercial element was worded to not "leave available to Rap Brown or Stokely Carmichael the technical defense that they did not cross the State boundary with the intent to create a riot." DI 25, Exh. B at 3. Congress therefore intended that § 231(a)(3) be used to suppress and chill activists' support for civil rights and criticism of the government, only including a token commercial element to accomplish its non-commercial purpose. *See United States v. Bird*, 124 F.3d 667, 682 n.15) (5th Cir. 1997) ("Surely, it would be a perversion of congressional authority to uphold as constitutional a federal statute that purported to be an exercise of Commerce Clause power but was for the sole purpose of reaching intrastate activity without regard to whether or how that activity would actually affect interstate commerce.")

The government suggests that, in voting to adopt § 231(a)(3), Congress recognized "the need to support local law enforcement" based on the belief that "the federal government should lend a hand." On the contrary, the bill's proponent and supporters vehemently *opposed* federal involvement in state law under the Civil Rights Act. In proposing § 231(a)(3), Senator Long sought not to expand federal authority, but rather to diminish and to counteract the

17

federal government's authority to police hate crimes against Black citizens. Motion at 12. Indeed, in the process of proposing § 231(a)(3) for the first time in the Senate, Senator Long criticized the hate crime law as "inimical to proper Federal-State relations" and dubbed it "a legal club" by which the Attorney General "can browbeat State and local officials into submission to his will and thus assume control of what are essentially State or local government matters." DI 25, Exh. A at 2. The plain statements contradict the government's assertion that § 231(a)(3) sought to facilitate federal intervention into the States' law enforcement powers.

As in *Lopez*, the government here asks the Court "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567. If the Commerce Clause is to carry any force at all to maintain our federal form of government, then the commercial prong of § 231(a)(3) must be struck down.

### E.   The Civil Disorder Statute Violates The First Amendment Both As Over-Broad And As Motivated To Suppress A Particular Viewpoint.

Section 231(a)(3) reaches a substantial amount of protected expression beyond its legitimate sweep, and the provision's enactment was motivated by the impermissible purpose of punishing and chilling viewpoints of the civil rights movement. The government contends that any potential First Amendment infirmities of § 231(a)(3) can be resolved by grafting a mens rea element into the provision for the purpose of confining its application to "those acts which are designed to impede or obstruct." To the contrary, the wording of § 231(a)(3) is fatally afflicted with ambiguous, imprecise, and overbroad terms that work together to extend the law's application to a broad spectrum of expressive activity entitled to protection under the First Amendment. Moreover, although the government suggests that Congress intended for §

18

231(a)(3) to apply only to unprotected criminal acts, the legislative history of the Civil Obedience Act in fact shows that the law's proponents intended precisely to criminalize protected forms of political expression that derived from certain viewpoints and specific speakers.

1.    **Section 231(a)(3) Contains No Mental State Element, And Congress Intended It To Impose Minimal Burdens On Prosecutions.**

Section 231(a)(3) contains no mens rea element. The government focuses on "any act to obstruct, impede, or interfere" – language that offers no clarity as to the degree of mental culpability the provision requires as a matter of law. The government does not point to any federal felony statute that expresses a mental state requirement with the word "to" alone. This single word lacks specificity to connote the degree of mental knowledge and intent required for conviction.

The fact that § 231(a)(3)'s text itself requires no culpable mental state is confirmed by comparing its wording with the mental state requirements under §§ 231(a)(1) and (a)(2). A person can be found guilty under § 231(a)(1) for teaching the use of weapons or explosives while "knowing or having reason to know or intending that the same will be unlawfully employed for use in, or in furtherance of, a civil disorder." A conviction under § 231(a)(2) requires that a defendant transports or manufactures firearms or explosives while "knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder." "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) (citing to *Russello v. United States*, 464 U.S. 16, 23 (1983)).

19

Congress rejected the mental element the government now attempts to incorporate into subsection (3) of § 231(a).

Without an expressed mens rea element, the Court "must follow Congress' intent as to the required level of culpability for any particular offense." *United States v. Bailey*, 444 U.S. 394, 406 (1980). The legislative history behind § 231(a)(3) contains significant evidence that, contrary to the government's assertions, Congress intended the language of § 231(a)(3) to relieve prosecutors of the burden of proving the defendant's culpable mental state. Senator Long regarded the burden of proving whether a man crossed state lines or what his intentions were in doing so as "insurmountable" and "irrelevant." DI 25, Exh. B at 3. He complained that it would "leave available to Rap Brown or Stokely Carmichael the technical defense that they did not cross the State boundary with the intent to create a riot." *Id*. In place of a mental state requirement in § 231(a)(3), Congress included only a commercial element also devoid of an explicit mens rea. Senator Long explained that, under this standard, a prosecutor would be required to "prove merely that commerce was interrupted," and having established that fact, "the one who started the riot can then be held responsible for interfering with it." *Id*. The text, context, and purpose of § 231(a)(3) therefore contradict the government's interpretation of a narrowly drawn intent requirement.

### 2. Section 231(a)(3) Burdens A Substantial Amount Of Protected Speech, Including Expressive Conduct.

By contending that § 231(a)(3)'s "applications to conduct, rather than protected speech, present no First Amendment concerns," the government ignores the Supreme Court's protection of an array of "conduct" that falls under the speech protections of the First Amendment. The Constitution's speech protections extend to "symbolic conduct that, 'on its

20

face, does not necessarily convey a message.'" *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010) (quoting *Cohen v. California*, 403 U.S. 15, 18 (1971)). The government's label of "conduct" is unhelpful for the legal determination at issue because conduct and speech are not mutually exclusive. *Id.* The question is not whether the terms of § 231(a)(3) apply to conduct rather than speech, but rather whether a substantial amount of the activities prohibited under § 231(a)(3) are "'sufficiently imbued with the elements of communication' to receive First Amendment protection." *Id.* at 1058 (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)).

Expressive conduct is characterized by two requirements: (1) 'an intent to convey a particularized message' and (2) a 'great' 'likelihood ... that the message would be understood by those who viewed it.'" *Edge v. City of Everett*, 929 F.3d 657, 668 (9th Cir. 2019) (quoting *Texas v. Johnson*, 491 U.S. 387, 404 (1989)). Accordingly, so long as § 231(a)(3) burdens a substantial amount of activities intended to convey a message to an audience who would understand it, the provision is facially overbroad under the First Amendment.

Section 231(a)(3) burdens a substantial amount of speech and conduct imbued with communicative elements. The provision criminalizes "any act" that could "interfere with" the "duties" of police and firefighters incident to a civil disorder involving three or more people. 18 U.S.C. § 231(a)(3). The term "interfere" is left undefined, as is "impede" and obstruct," permitting an expansive application to any form of expression that tends to interfere with, that is, to interrupt, a police officer's duties during a civil disorder. *See McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 550 (D.S.C. 2013) ("the terms of the Ordinance undefined, it is not clear whether the Columbia City Council intended the Ordinance to apply to physical conduct alone,

21

and the court cannot say that the Ordinance is valid."). Section 231(a)(3) is not restricted by time or place, extending broadly across all venues including traditional public fora. *See Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 797 (9th Cir. 2008) ("When the government seeks to regulate access to the streets, 'First Amendment protections are at their strongest and regulation is most suspect.'") (quoting *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1027 (9th Cir. 2008)). Rather than narrowing § 231(a)(3)'s application, the requirement of a contemporaneous "civil disorder" only ensures that the provision will be invoked to quell political demonstrations, both large and small, that are infused with a communicative purpose. For these reasons, § 231(a)(3) not only applies to pure speech, but the provision also places severe burdens on a substantial amount of protected conduct.

Section 231(a)(3) applies to non-violent speech and actions intended to communicate ideas. The government never contests the fact that the terms of § 231(a)(3) reach nonviolent protected expression. Although the government correctly asserts that § 231(a)(3)'s "plainly legitimate sweep encompasses violent criminal conduct," this does not overshadow the fact that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473. While some of the activities under § 231(a)(3) can be classified as violent and unprotected, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987). Section 231(a)(3) is susceptible to no interpretation that could prevent its application to "a significant amount of verbal criticism and challenge directed at police officers," and the Court should invalidate it on this basis.

22

### 3. Strict Scrutiny Is Warranted Because § 231(a)(3) Was Intended To Suppress Disfavored Viewpoints Of Civil Rights Leaders.

The overbroad terms of § 231(a)(3) only serve to advance the impermissible goal, articulated repeatedly throughout underlying legislative history, of suppressing disfavored viewpoints in support of civil rights and against white supremacy. The government offers little to contest this claim, contending only that the "isolated statements of one particular Senator does not transform a statute – that on its face, applies neutrally regardless of the viewpoint underlying a defendant's obstructive conduct – into impermissible viewpoint discrimination." DI 28 at 26. However, even if § 231(a)(3) were content-neutral on its face, which it is not, the Supreme Court has recognized that "[b]ecause strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 166 (2015).

The Supreme Court teaches that, contrary to the government's position, a law may be held to be impermissibly viewpoint-based where evidence shows the law was "adopted by the government 'because of disagreement with the message [the speech] conveys." *Id*. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Although the government references "isolated statements," the legislative background behind § 231(a)(3) is replete with evidence of a purpose to silence particular viewpoints. Section 231(a)(3) was enacted in response to certain legislators' fear that Black civil rights activists would gain legal protections under the hate crime law that would "help" them to "carry on their conduct and to stir up hatred and ill will among people of their race." DI 25, Exh. A at 4. Senator Long expressed hostility to specific speeches, writings, and communications, including Dr. King's *Letter From*

23

*A Birmingham Jail*, as reasons for the legislation. *Id.* at 8. In response to a legislative record rife

with illicit targeting, one Senator complained that, by enacting provisions of the Civil

Obedience Act, Congress would "not be legislating . . . out of prudence," but rather would "be

legislating in retaliation against Carmichael and Brown." DI 25, Exh. B at 10.

The impermissible viewpoint-discriminatory purpose behind § 231(a)(3) is evident

from the unambiguous and repeated statements of legislators during its adoption. Therefore, §

231(a)(3) can be categorized among "additional category of laws that, though facially content

neutral, will be considered content-based regulations of speech." *Reed*, 576 U.S. at 164.

> **F.    The Statute's Multiple Ill-Defined Terms Fail To Provide Required Notice
> And To Protect Against Arbitrary And Discriminatory Enforcement.**

The government provides only a passing defense of the statute under the void for

vagueness provision of the Due Process Clause. The lack of certainty throughout the statute

shifts the enforcement definitions from the legislature to police and prosecutors. Section

231(a)(3) provides no textual basis to limit the statute and no reason for the general public

know citizens cannot be subjected to arbitrary and discriminatory enforcement. Because the

statute does not define its terms, the terms must be read "in accordance with [their] ordinary or

natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). The ordinary meaning of the

statute's terms are dangerously broad and depend on the reactions of the particular officer.

The government relies on out-of-Circuit cases to contend that the statute's vagueness

can be saved by construction. DI 28 at 7 (citing *United States v. Mechanic*, 454 F.2d 849 (8th

Cir. 1971). Most critically, *Mechanic* has long since been superseded by Supreme Court

authority limiting judicial ability to rewrite statutes and requiring certainty to protect against

the evils of vagueness articulated after those cases were issued. DI 25 at 23, n.11. In *Mechanic*,

24

the Eighth Circuit rejected the defendant's void-for-vagueness argument by determining that, under the law at that time, "defendants may not challenge [criminal statutes] as vague or overly broad if their own conduct may be constitutionally prohibited." *Mechanic*, 454 F.2d at 853.

Since *Mechanic* was decided, the Supreme Court has embraced facial vagueness challenges that may not apply to the specific case. *See Johnson*, 576 U.S. at 603 (rejecting the proposition that "a statute is void for vagueness only if it is vague in all its applications."); *Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018) ("*Johnson* and [*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)] expressly rejected the notion that a statutory provision survives a facial vagueness challenge merely because some conduct clearly falls within the statute's scope."). The decision in *Mechanic* is also at odds with the Supreme Court's later recognition of a "personal right not to be convicted under a constitutionally invalid law." *Bond v. United States*, 564 U.S. 211, 226 (2011).

Finally, the decision of the *Mechanic* court to append a requirement of "violence" to the acts prohibited under § 231(a)(3) finds no support in the statutory language and is inconsistent with later Supreme Court directives foreclosing judicial rewriting of a statute's plain terms. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 629 (2018) ("Of course, those are not the words that Congress wrote, and this Court is not free to 'rewrite the statute' to the Government's liking.") (citing *Puerto Rico v. Franklin Cal. Tax–Free Trust*, 136 S. Ct. 1938, 1949 (2016) ("[O]ur constitutional structure does not permit this Court to rewrite the statute that Congress has enacted."); *Stevens*, 559 U.S. at 481 (same). The government does not appear to even offer such an indefensible interpretation of the statute.

The government also claims that the First Amendment considerations do not apply to

25

Due Process vagueness, citing to *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010).

Not so. Where, as here, "a statute's literal scope [reaches] expression sheltered by the First

Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Smith*

*v. Goguen*, 415 U.S. 566, 573 (1974). Unlike the statute banning "expert advice or assistance"

to foreign terrorist organizations upheld in *Humanitarian Law Project*, Congress has *not* taken

care to add narrowing definitions to § 231(a)(3) that increase "the clarity of the statute's terms."

561 at 21. Section 231(a)(3) does *not* rely on "statutory definitions, narrowing context, or

settled legal meanings" like the material-support statute but instead depends on "untethered,

subjective judgments." 561 U.S. at 20-21 (quoting *Williams*, 553 U.S. at 306).

The statute leaves individuals uncertain regarding criminalized conduct and "would

delegate to prosecutors and juries the inherently legislative task of determining what type of . .

. activities are so morally reprehensible that they should be punished as crimes." *United States*

*v. Kozminski*, 487 U.S. 931, 949 (1988). By doing so, the statute unconstitutionally invites

"arbitrary or discriminatory prosecution and conviction." *Id*.

### G. The Indictment Fails To Comply With The Grand Jury Requirements Of The Fifth Amendment And Rule 7.

The indictment fails in two ways: the indictment fails to incorporate the government's

interpretive overlays required to describe the elements of the offense; and the indictment does

not describe the facts that constitute the offense.

Section 231(a)(3) is not amenable to judicial rescue by rewrite of its provisions to meet

minimum constitutional standards. The government, in the face of statutory silence on mens

rea, asks the Court to read into the statute that a defendant's acts must be "*designed to* impede

or obstruct." DI 28, at 21 (emphasis added). But the grand jury never found such a mens rea,

nor any intent to commit the offense. See, *United States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979) (indictment must be specific enough to assure that the grand jury had found all the facts necessary to constitute an offense); *see also*, *United States v. Kilpatrick*, 921 F.2d 1456, 1463 (105h Cir. 1987) (courts cannot imply additional essential elements to the indictment)

Here, the statute's text includes no mental element; the indictment includes no mental element. Yet the government claims that the Court should read in a mental element. The indictment quotes the statute, so the grand jury did not need to find that the defendant acted with mens rea, the same defect recognized in *Keith.* The basic protection included in the Fifth Amendment becomes meaningless when the grand jury essentially acts as a rubber stamp, without being required to find all the elements of a statute – especially the mental component – that are not apparent from the text.

To the same effect, the "act" that the government refers to are not specified, leaving the government free to vary from the theory of the case presented to the grand jury. While notice can be provided by alternative means, the grand jury itself limits the case the prosecution can present to the petit jury. "[A]fter an indictment has been returned its charges may not be broadened," although they may be narrowed. *United States v. Miller*, 471 U.S. 130, 143 (1985) (quoting *Stirone v. United States*, 361 U.S. 212, 215-16 (1960)). Thus, only by providing at least some specificity of the conduct alleged are the Fifth Amendment rights of defendants protected from expansion to any other behavior not presented to the grand jury that the prosecution could present at trial as a basis for conviction.

The indictment in the present case provides neither required notice nor protection of the interceding role of the grand jury of defining the offense to which a defendant must answer and limiting the prosecutor's presentation at trial.

27

II.     **THE COURT SHOULD DISMISS THE INDICTMENT FOR SELECTIVE PROSECUTION.**

Prosecutorial discretion is broad, but it is not "'unfettered.' Selectivity in the prosecution of criminal laws is . . . subject to constitutional constraints." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (citation omitted). "[T]he decision to prosecute may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,'" *id*. (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978), including the First Amendment, *see Hartman v. Moore*, 547 U.S. 250, 256 (2006).

To obtain discovery on a selective prosecution claim, a defendant must show only that there is "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). In circumstances where there are direct admissions by the government of a discriminatory intent, however, the Supreme Court has suggested that the prosecution's admission is sufficient to obtain discovery. *See id*, at 469 n.3 ("reserve[ing] the question whether a defendant must satisfy the similarly situated requirement in a case 'involving direct admissions by [prosecutors] of discriminatory purpose"; *see also Hartman*, 547 U.S. at 264 ("A prosecutor's disclosure of retaliatory thinking on his part, for example, would be of great significance in addressing the presumption of retaliatory purpose.").

A.     **The Decision to Prosecute Was Based on a Discriminatory Intent and There Are Direct Admissions of Discriminatory Purpose by the Prosecution Entitling Mr. Wood to Discovery.**

The government argues that the defense has failed to show discriminatory intent in the decision to prosecute him and that the "usual determinative factors" were at play. DI 28 at 37. The government also incorrectly states that Mr. Wood did not express remorse when in fact

28

voluntarily showed up at the police station, without counsel, and make an extremely tearful, remorseful statement.

Most egregiously, however, is that the government argues that the defense's claim is based on one "alleged" statement, DI 28 at 32, from former Attorney General ("AG") Barr made months after the decision to prosecute Mr. Wood.  The government would have the Court question whether AG Barr even made the statement, but the public record is replete with statements from former President Trump and former AG Barr both before and after the decision to file the federal complaint.  AG Barr made plain his discriminatory intent to target for federal prosecution those involved in protests and charged with criminal conduct, and he instructed the United States Attorneys to do so.

 On May 30, less than one week after Mr. Floyd's murder, AG Barr issued a statement saying that "protests had been hijacked by violent radical elements," and that "it appears that the violence is planned, organized, and driven by anarchistic and far left extremists using Antifa-like tactics."  William P. Barr, Dep't of Justice, "Attorney General William P. Barr's Statement on the Death of George Floyd and Riots," (May 30, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barr-s-statement-death-george-floyd-and-riots.  In demanding order, AG Barr pledged to "support these local efforts and take all action necessary to enforce federal law."  *Id*.

Later, AG Barr issued further statements without offering evidence that outside groups and agitators with extremist agendas were wreaking havoc and violence and that federal law enforcement were directed to apprehend and charge "the radical[s]."  William P. Barr, Dep't of Justice, "Attorney General William P. Barr's Statement on the Death of George Floyd and Riots," (May 31, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-

29

statement-riots-and-domestic-terrorism.

The next day, President Trump warned that organizers of the violence, including "Antifa" and "professional anarchists" would "face severe criminal penalties." CNN, "READ: President Trump's Rose Garden speech on protests," (June 1, 2020), https://www.cnn.com/2020/06/01/politics/read-trumps-rose-garden-remarks/index.html. Later that day, President Trump and AG Barr held a call with state governors. President Trump explained that "we will activate Bill Bar and activate him very strongly." CNN, "READ: President Trump's call with US governors over protests'" (June 1, 2020), https://www.cnn.com/2020/06/01/politics/wh-governors-call-protests/index.html. The AG explained that federal law enforcement would be needed to go after the troublemakers. President Trump emphasized: "Total domination, you have to dominate. . . . These are terrorists, these are terrorists looking to do bad things to our country." *Id.*

On June 26, 2020, AG Barr sent a memorandum to all United States Attorneys regarding a task force on "anti-government violent extremists." He spoke with Fox News on June 8, 2020 and on August 9, 2020, emphasizing the evils of "Antifa" as a "revolutionary group that is interested in some form of socialism communism . . . . their tactics are fascistic." *See* Gregg Re, "Barr, in FNC interview, confirms 'focused investigations' of Antifa, hammers 'dangerous' push to defund police," Fox News, (June 8, 2020), https://www.foxnews.com/politics/barr-exclusive-fox-news-interview; Chantal de Silva, "Barr Accuses Protestors of 'Facistic' Tactics. They Said Same About Feds," https://www.newsweek.com/william-barr-accusers-protesters-fascistic-tactics-blm-antifa-1523930.

The government here notes that it investigated Mr. Wood for ties to such "groups," but

presents no evidence.  Meanwhile, the government makes excuses for the Capitol rioters and insurrectionists charged only with misdemeanors, but who were explicitly anti-government extremists and took part in criminal, dangerous, and ultimately deadly acts at the United States Capitol with a full session of Congress and the Vice President present.

Throughout the summer of 2020, AG Barr told United States Attorneys "to be aggressive when charging violent demonstrators with crimes, including potentially prosecuting them for plotting to overthrow the U.S. government." Aruna Viswanatha and Sadie Gurman, *Barr Tells Prosecutors to Consider Charging Violent Protesters with Sedition*, The Wall Street Journal (Sep. 17, 2020), https://www.wsj.com/articles/barr-tells-prosecutors-to-consider-charging-violent-protesters-with-sedition-11600276683.  He also told the United States Attorneys to seek federal charges when charging demonstrators even when state charges could apply, as they did in Mr. Wood's case. *See* Michael Balamo, et al., *Justice Dept: Sedition charge may apply to protest violence*, Associated Press, (Sept. 17, 2020), https://apnews.com/article/state-courts-violent-crime-arson-violence-crime-cbca8672a70f9f170a086a7a252a751e.

Attorney General Barr's statements and directives to the United States Attorneys are unequivocal—people accused of criminal conduct in relation to or in the proximity of protests—were to be treated more severely than other criminal defendants and were selected for federal prosecution.  This disclosure of discriminatory intent is sufficient to entitle Mr. Wood to discovery on the decision to prosecute him.  *See Armstrong*, 517 U.S. at 469 n.3.

B.    **There is "Some Evidence" of Discriminatory Effect.**

The government argues there is no discriminatory effect.  The government's own description of the George Floyd protests in Wilmington make clear that hundreds of people

31

were involved in the protest and that Mr. Wood was not the only protestor who is alleged to have engaged in criminal conduct during the protests.  As the instant Reply recounts, §231(a)(3) has been largely dormant, *see also* DI 25, hardly used, and never so in the District of Delaware, until AG Barr and President Trump ordered federal prosecution of protestors marching against police violence.

The government then attempts to downplay the seriousness of the acts of the insurrectionists who broke and pushed their way through police barriers and into the US Capitol while Congress and the Vice President were in session to certify the national election.  The government calls the news reports "inflammatory," and then graciously notes that some of those charged with only misdemeanors merely entered the Capitol and disobeyed curfew (Joshua Pruitt), entered the Capitol and refused to leave when ordered (Cindy Fitchett), entered the Capitol and took and posted photographs to social media of himself with his middle finger raised (Robert Bauer), entered the Capitol carrying a knife (Joshua Matthew Black), and entered the Capitol and pushed an officer (Matthew Council).  The government accepts that Council was apologetic after officers had to pepper spray him to calm him down, but denies that Mr. Wood was remorseful after he turned himself into police.  The government makes no comment about Bryan Betancour (who lied about travelling while on probation and is a known white supremacist), Michael Bledsoe (who posted on social media about his pride in having broking federal laws at the Capitol), or Jenny Cudd (who traveled push her way into the Capitol and whose proud social media posts about the insurrection have received millions of views)—each of whom is charged only with misdemeanors.  The government argues Mr. Wood's alleged singular act contributed to escalating unrest in Wilmington, yet it does acknowledge whether the Capitol insurrectionists might be similarly responsible for contributing to the overwhelming

32

of the United States Capitol, giving cover to the property destruction, violence and death, and terror experienced by lawmakers and staff at the capital.

Accordingly, Mr. Wood is entitled to discovery because there is more than "some evidence tending to show the existence of the essential elements of the defense." *Armstrong*, 517 U.S. at 468.

## III.    CONCLUSION

For the foregoing reasons and those stated in the motions to dismiss, the Court should dismiss the indictment.

Respectfully submitted,

ELENI KOUSOULIS
Acting Federal Public Defender

Dated: <u>May 12, 2021</u>      By:    <u>*/s/ Janet Bateman*</u>
JANET BATEMAN
Assistant Federal Public Defender
District of Delaware
800 King Street, Suite 200
Wilmington, DE  19801
de_ecf@fd.org

Attorney for Adrian Wood

33