

**U.S. Department of Justice**

*United States Attorney's Office*
*District of Delaware*

*Hercules Building*
*1313 N. Market Street*          *(302) 573-6277*
*P.O. Box 2046*               *FAX (302) 573-6220*
*Wilmington, Delaware 19899-2046*

May 18, 2021

<u>**VIA ECF**</u>

The Honorable Maryellen Noreika
United States District Judge
District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Wilmington, DE 19801

     **Re:**    **United States v. Adrian Wood**
               <u>**Criminal Action No. 20-CR-56-MN**</u>

Dear Judge Noreika:

     I am submitting two recent District Court opinions for the Court's consideration as it reviews Defendant Adrian Wood's Motion to Dismiss (D.I. 25) and the government's response (D.I. 28). The first, *United States v. Pugh*, 20-CR-73-TFM, WL (D. Ala May 13, 2021), rejects the identical constitutional and statutory arguments pressed by Defendant Wood in his Motion to Dismiss.  The opinion also rejects an arguable selective-prosecution claim.   *See id.* at 6-7 ("Each of the 18 U.S.C. § 231(a)(3) prosecutions that arose from those protests encompass individuals of a variety of races and genders with extremely different ideology.  Thus the Court finds that to the extent that Pugh asserts a selective prosecution claim, the claim fails.").   The second opinion, *United States v. Rupert*, Case No. 20-CR-104 (NEB/TNL), 2021 WL 94201 (D. Minn. March 12, 2021), holds that the Civil Disorder statute is not facially overbroad. *See id.* at *9-10.

                     Respectfully submitted,

                     DAVID C. WEISS
                     United States Attorney

         BY:  */s/ Christopher R. Howland*
                    Christopher R. Howland
                    Assistant United States Attorney

cc:   Janet Bateman, Esquire (via ECF)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIM. ACT. NO. 1:20-cr-73-TFM |
| | ) | |
| TIA DEYON PUGH | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The Grand Jury for the Southern District of Alabama indicted the defendant, Tia Deyon Pugh ("Pugh" or "Defendant") on June 24, 2020. The Indictment charged Defendant with one count of impeding law enforcement during civil disorder in violation of 18 U.S.C. § 231(a)(3). *See* Doc. 16. Now pending before the Court is Defendant's *Motion to Dismiss Indictment* (Doc. 52, filed 1/26/21), *Motion to Dismiss Superseding Indictment* (Doc. 75, filed 5/5/21), and the *Supplemental Motion to Dismiss Superseding Indictment* (Doc. 82, filed 5/7/21). The United States filed its responses and Defendant filed her replies. *See* Docs. 66, 68, 70, 71, 91.

The Court held a hearing on April 15, 2021. Based on the motion briefing, the arguments of the parties, and for the reasons set forth herein, the Defendant's *Motion to Dismiss Superseding Indictment* (Doc. 75) and *Supplemental Motion to Dismiss Superseding Indictment* (Doc. 82) are **DENIED** while the *Motion to Dismiss Indictment* (Doc. 52) is **DENIED as moot**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The essential facts are not seemingly in dispute, but at this stage in proceedings, the Court must generally accept as true the facts presented by the Government as it is not the role of the Court to act as find finder on a motion to dismiss. The "true" facts will ultimately be determined by a jury.

On May 25, 2020, George Floyd died while in police custody in Minneapolis, and as a

result, protests were held nationwide.  On May 31, 2020, a peaceful protest against police brutality followed a planned route through downtown Mobile, Alabama.  Among others at the head of the march was Chief of the Mobile Police Department Lawrence Battiste, IV.  A smaller group of protesters left the planned route and went to the intersection of Government Street and Water Street, where an on-ramp leads to the westbound side of the Interstate 10 highway ("I-10").  I-10 is an interstate highway that connects the east and west coasts of the United States and runs through Mobile, Alabama.  Law enforcement officers constructed a makeshift barricade of marked law enforcement vehicles to block access to I-10.  When the protestors would not disperse, the police deployed tear gas in an effort to disperse the crowd.  After the use of tear gas, one of the protesters, allegedly Pugh, used a bat to break out the window of a police cruiser that was parked on the ramp.  She then fled into the crowd of protestors.  The incident was captured on video by a local news crew.

Eventually, the Mobile Police Department ("MPD") identified Pugh, arrested her, and charged her with state offenses of Inciting a Riot and Criminal Mischief, Third Degree.   After her arrest on state charges, on June 5, 2020, the United States charged Pugh, via Complaint, with a violation of 18 U.S.C. § 231(a)(3).  *See* Doc. 1.  Pugh was arrested and had her initial appearance, preliminary hearing, and detention hearing on June 9, 2020.  *See* Docs. 5, 9, 12, 14.  Pugh was released with conditions.  *See* Docs. 12, 15.

On June 24, 2020, the Grand Jury returned a one-count Indictment with the same charge. *See* Doc. 16.  The Indictment in totality states as follows:

> On or about May 31, 2020, in the Southern District of Alabama, Southern Division, the defendant, TIA DEYON PUGH, did knowingly commit an act, and attempt to commit an act, to obstruct, impede, and interfere with any law enforcement officer lawfully engaged in the performance of an official duty incident to and during the commission of a civil disorder, which in any way and to any degree obstructed, delayed, and adversely affected commerce and the movement of any article

commodity in commerce, in violation of Title 18, United States Code, Section 231(a)(3).

*Id*. In part due to the COVID-19 pandemic and at the request of both Defendant and the Government, the trial date was delayed multiple times.[1]

On January 26, 2021, on the eve of trial, Defendant filed her first Motion to Dismiss Indictment (Doc. 52) which asserts the Indictment suffers multiple defects that require dismissal. The motion presents four reasons for dismissal. First, 18 U.S.C. § 231(a)(3) exceeds Congress' Commerce Clause authority. Second, 18 U.S.C. § 231(a)(3) is a content-based restriction on expression, fails strict scrutiny, and violates the First Amendment. Third, 18 U.S.C. § 231(a)(3) is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause. Finally, the boilerplate allegations in the indictment violate the presentment and notice functions of grand jury indictments under the Fifth and Sixth Amendments as well as Fed. R. Crim. P. 7(c). The first three arguments pertain to the constitutionality of the statute while the fourth argument, made in the alternative, challenges the sufficiency of the indictment. The Government filed its response on March 26, 2021. *See* Doc. 66. The Government argues that Pugh fails to carry her burden to show that 18 U.S.C. § 231(a)(3) is unconstitutional and further argues that the Indictment is sufficient. On April 12, 2021, Pugh filed a reply to the Government's response with further assertions as to the unconstitutionality of the statute. *See* Doc. 68. On the eve of the scheduled hearing, the Government filed a supplemental response (Doc. 70) to which the Defendant replied (Doc. 71). The Court held a hearing on the motion on April 15, 2021.

Subsequent to the hearing, the Government obtained from the Grand Jury a superseding indictment which charged Pugh with the same single-count violation of 18 U.S.C. § 231(a)(3), but

---

[1] A detailed accounting of the multiple delays is summarized in the Court's order on March 25, 2021 delaying the trial to May 17, 2021. *See* Doc. 65.

added a factual summary of Defendant's alleged actions preceding the recitation of the charge. *See* Doc. 73.

Pugh filed her Motion to Dismiss Superseding Indictment where she incorporates by reference her prior motion to dismiss and its arguments. *See* Doc. 75. She followed with a supplement to her motion arguing that the superseding indictment is still deficient. *See* Doc. 82. The Government filed its response on May 12, 2021 addressing both the newly filed motion to dismiss and the supplement. *See* Doc. 91.

The Court finds that no hearing is necessary on the new motion/response and both are fully submitted and ripe for review.

## II.   DISCUSSION AND ANALYSIS – CONSTITUTIONAL CHALLENGES

To address a threshold matter, both parties include extensive briefing on the legislative history of 18 U.S.C. § 231(a)(3) and discuss the racial motivations for voting for or against it. *See* Doc. 1 at 3-9; Doc. 66 at 16-18; Doc. 68 at 2-7. However, the Government's argument is correct that the Court does not go into legislative history without first looking at the statute's plain language. *See* Doc. 66 at 16.

The mandatory starting point in statutory interpretation is the statute's plain language. *Meridor v. United States AG*, 891 F.3d 1302, 1307 (11th Cir. 2018). And, "where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S. Ct. 755, 760, 142 L. Ed. 2d 881 (1999); *see also United States v. Williams*, 790 F.3d 1240, 1245 (11th Cir. 2015) (internal quotations and citation omitted) ("Only when a statute's meaning is inescapably ambiguous will this Court turn to legislative history to aid in interpretation."). The Supreme Court reiterated this point just recently in *Bostock v. Clayton County*, --- U.S. ---, 140 S. Ct. 1731, 1749, 207 L. Ed. 2d 218 (2020). "This Court has explained

many times over many years that, when the meaning of the statute's terms is plain, our job is at an end." *Id*. "The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Id*. (citations omitted).

Therefore, the Court first looks at language of the statute at issue, which is as follows:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—Shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 231(a)(3). "The term 'civil disorder' means any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1). "The term 'commerce' means commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia." 18 U.S.C. § 232(2).

> The term "federally protected function" means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails.

18 U.S.C. § 232(3).

> The term "law enforcement officer" means any officer or employee of the United States, any State, any political subdivision of a State, or the District of Columbia, while engaged in the enforcement or prosecution of any of the criminal laws of the United States, a State, any political subdivision of a State, or the District of Columbia; and such term shall specifically include members of the National Guard (as defined in section 101 of title 10), members of the organized militia of any State, or territory of the United States, the Commonwealth of Puerto Rico, or the District of Columbia not included within the National Guard (as defined in section 101 of title 10), and members of the Armed Forces of the United States, while engaged in suppressing acts of violence or restoring law and order during a civil disorder.

18 U.S.C. § 232(7).

The Court does not find that the language or definitions are inescapably ambiguous. In discrete parts, the statute makes it illegal to: "commit any act" to "obstruct, impede, or interfere" with a "law enforcement officer" who is "lawfully engaged in the lawful performance of his official duties" in connection with "a civil disorder," where the act "in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function." Though arguably broad, the statute is clear. Therefore, the Court finds the legislative history has no bearing. Much like the Supreme Court noted in *Bostock*, even if the statute's application reaches beyond what the legislators may have intended or expected to address, if no ambiguity exists about how the law applies to the facts before the Court, then the legislative history is not considered. *Bostock*, 140 S. Ct. at 1749 (citations omitted). "'[I]t is ultimately the provisions of' those legislative commands 'rather than the principal concerns of our legislators by which we are governed.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201 (1997)). The only exception to this consideration may be under the First Amendment challenge when considering whether the law is content-neutral or content-based, which the Court will address.

Additionally, it is unclear whether Pugh asserts a selective prosecution argument. While Pugh argues that 18 U.S.C. § 231(a)(3) is seldom invoked, she never makes a clear selective prosecution claim. While 18 U.S.C. § 231(a)(3) prosecutions may not be common, it is clearly being applied now to a variety of persons – between the few cases that stemmed from the George Floyd protests that turned into civil disorder and more recently the cases asserted against some participants in the events on January 6, 2021 at the U.S. Capitol. Each of the 18 U.S.C. § 231(a)(3)

prosecutions that arose from those protests encompass individuals of a variety of races and genders with extremely different ideology. Thus, the Court finds that to the extent Pugh asserts a selective prosecution claim, the claim fails.

The Court now turns to the Pugh's first three challenges – all of which relate to the constitutionality of the statute.

## A.   Commerce Clause

Pugh argues that "§ 231(a)(3) unconstitutionally exceeds Congress' authority and intrudes into the States' primary role in general law enforcement because it broadly applies to purely local conduct and requires only an attenuated connection to interstate commerce." Doc. 52 at 12. To the extent Pugh makes a general facial challenge to the constitutionality of the statute as to the interstate commerce requirement, the Court will address it below. However, to the extent Pugh makes a specific factual challenge as to whether the conduct at issue is sufficient to have a substantial effect on interstate commerce, that issue is not yet ripe. The Court cannot presume that either party's version of the facts will ultimately prove true at trial, nor should it at this stage in the proceedings. Should a question remain as to whether the Government has proved that the alleged activities establish the necessary nexus to commerce, Pugh may again raise this issue at trial. *See United States v. Ramos*, Crim. Act. No. 1:02-cr-730-14-AT-AJB, 2016 U.S. Dist. LEXIS 183591, at *20, 2016 WL 8222072, at *7 (N.D. Ga. Dec. 19, 2016), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 16634, 2017 WL 512752 (N.D. Ga. Feb. 6, 2017); *United States v. Alvarado-Linares*, Crim. Act. No. 1:10-cr-086, 2011 U.S. Dist. LEXIS 155112, at *6-8, 2011 WL 7807742, at *2 (N.D. Ga. Nov. 14, 2011), *report and recommendation adopted* 2012 U.S. Dist. LEXIS 64824, 2012 WL 1632048 (N.D. Ga. May 8, 2012).

Turning to the facial challenge of the statute, the Constitution provides that "Congress shall

have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. "This tripartite clause is commonly known as the Foreign Commerce Clause, the Interstate Commerce Clause, and the Indian Commerce Clause, respectively." *United States v. Davila-Mendoza*, 972 F.3d 1264, 1269 (11th Cir. 2020). At play in this statute is the Interstate Commerce Clause.

> [The Supreme Court has] identified three general categories of regulation in which Congress is authorized to engage under its commerce power. First, Congress can regulate the channels of interstate commerce. Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce. Third, Congress has the power to regulate activities that substantially affect interstate commerce.

*Gonzales v. Raich*, 545 U.S. 1, 16, 125 S. Ct. 2195, 2205, 162 L. Ed. 2d 1 (2005)

Pugh relies primarily on *United States v. Morrison*, 529 U.S. 598, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000) and *United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995). In *Lopez*, the Supreme Court identified the following three categories of activity that Congress may regulate under its Commerce Clause power: (1) channels of interstate commerce; (2) instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. *Lopez*, 514 U.S. at 558-59, 115 S. Ct. at 1629-30; *see also Taylor v. United States*, --- U.S. ---, 136 S. Ct. 2074, 2079, 195 L. Ed. 2d 456 (2016) (quoting *Lopez*). Next, in *Morrison*, the Supreme Court instructed courts to consider four factors to determe whether a regulated activity "substantially affects" interstate commerce: (1) whether Congress made findings regarding the regulated activity's impact on interstate commerce; (2) whether the statute contains an "express jurisdictional element" that limits its reach; (3) whether the regulated activity is commercial or economic in nature; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated. *Morrison*, 529 U.S. at 610-12, 120 S. Ct. 1749-51. Recently, the Supreme Court stated that the third category –

those that "substantially affect" commerce – "may be regulated so long as they substantially affect interstate commerce in the aggregate, even if their individual impact on interstate commerce is minimal." *Taylor*, 136 S. Ct. at 2079.

The Court agrees with the Government where it notes that 18 U.S.C. § 231(a)(3) contains a jurisdictional element that materially distinguishes it from the statutes struck down in *Lopez* and *Morrison*. In sum, courts have held that despite *Lopez* and *Morrison*, the Government need only show a minimal effect on interstate commerce when the statute contains an explicit jurisdictional element. For example, in *United States v. Castleberry*, the Eleventh Circuit upheld the Hobbs Act because it contained a jurisdictional element that states "in any way or degree obstructs, delays, or affects commerce or the movements of any article or commodity in commerce," the "substantially affects" test is not applicable, and the Government need only show a minimal effect on interstate commerce to support a conviction. 116 F.3d 1384, 1387 (11th Cir. 1997). In *United States v. Scott*, the Court held that 18 U.S.C. § 922(g) was not a facially unconstitutional exercise of Congress' power under the Commerce Clause because it contains an express jurisdictional requirement, and the element was satisfied when there was a minimal nexus to interstate commerce. 263 F.3d 1270, 1273 (11th Cir. 2001); *see also United States v. Jordan*, 635 F.3d 1181, 1189 (11th Cir. 2011) (citing *Scott* and reiterating holding); *United States v. Thomas*, 810 F. App'x 789, 796 (11th Cir. 2020) (reiterating facial challenge failed with the amended § 922(g) due to the amendment including explicit jurisdictional requirement "affecting interstate commerce.").[2]

Though not binding, the Court finds the language from other circuit cases to be instructive.

---

[2] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

The Sixth Circuit states "[i]ndeed, we regard the presence of such a jurisdictional element as the touchstone of valid congressional use of its Commerce Clause powers to regulate non-commercial activity." *United States v. Coleman*, 675 F.3d 615, 620 (6th Cir. 2012) (upholding the Sex Offender Registration and Notification Act ("SORNA") with an explicit jurisdictional element that is not directed as economic activity). As noted by the Fourth Circuit "Congress may regulate violent conduct interfering with interstate commerce even when the conduct itself has a 'minimal' effect on such commerce." *United States v. Hill*, 927 F.3d 188, 199 (4th Cir. 2019) (citations omitted).

Though Pugh valiantly attempts to distinguish these cases from the situation at hand, the Court cannot find sufficient distinction to stray from the binding principles espoused by the Eleventh Circuit. The Court agrees that for the jurisdictional element to be meaningful, it must be more than a "pretextual incantation evoking the phantasm of commerce." *United States v. Maxwell*, 446 F.3d 1210, 1218 (11th Cir. 2006) (quoting preceding opinion in *United States v. Maxwell*, 386 F.3d 1042, 1062 (11th Cir. 2004)). However, the Court finds that, from a facial challenge, the jurisdictional language in 18 U.S.C. § 231(a)(3) is sufficiently established and not merely language with no substance.

In the statute at hand, first, there must be a civil disorder that, in turn, affects commerce as defined by 18 U.S.C. § 232(2) where law enforcement (or a fireman) is engaged in the lawful performance of his duties incident to, or during, that same civil disorder and <u>then</u> the defendant commits or attempts to commit an act to obstruct, impede, or interfere with the performance of those duties. The jurisdictional hook as stated already limits the conduct to specific circumstances. It does not encompass all instances where a person interferes with law enforcement. Rather 18 U.S.C. § 231(a)(3) is restricted to contemporaneous interference with law enforcement officers

performing their duties during civil disorders affecting interstate commerce. Despite Pugh's attempts to distinguish from the above principles, she cites no case where a statute has been invalidated where there is an explicit jurisdictional hook, nor did the Court find one in its own independent research. Therefore, the Court finds that 18 U.S.C. §231(a)(3) with its jurisdictional hook is sufficient to survive a facial challenge. Whether or not a case can survive a factual challenge is to be decided on a case-by-case basis and is a matter for the jury and/or court at trial.

**B.      First Amendment – Freedom of Speech**

Pugh also argues that 18 U.S.C. § 231(a)(3) violates the First Amendment in two ways. Doc. 52 at 21. First, that it is a "substantially overbroad regulation of protected expression because it imposes steep criminal penalties on an expansive range of speech and expressive conduct." *Id*. Second, because it was "enacted for the express legislative purpose of suppressing the content of messages favoring civil rights advocacy, and the statute's content-based text and purpose fail strict scrutiny." *Id*.

A statute may be overbroad if "it prohibits a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008). "Overbreadth attacks have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S. Ct. 2908, 2916, 37 L. Ed. 2d 830 (1973) (citations omitted). Further, an otherwise constitutional statute "may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned v. City of Rockford*, 408 U.S. 104, 114, 92 S. Ct. 2294, 2302, 33 L. Ed. 2d 222 (1972); *see also City of Houston v. Hill*, 482 U.S. 451, 458, 107 S. Ct. 2502, 2508, 96 L. Ed. 2d 398 (1987) ("[I]n a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a

substantial amount of constitutionally protected conduct."). "As a general matter, laws may not restrict speech simply because of its content or assemblies simply due to distaste for the common cause of those meeting, but reasonable time, place, and manner regulations are permissible to further significant governmental interests." *United States v. Huff*, Crim. Act. No. 3:10-CR-73, 2011 U.S. Dist. LEXIS 36766, at *3-4, 2011 WL 1308099, at *1 (E.D. Tenn. Jan. 3, 2011) (internal quotations omitted) (quoting *Grayned*, 408 U.S. at 116, 92 S. Ct. at 2303). Finally, "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Virginia v. Hicks*, 539 U.S. 113, 124, 123 S. Ct. 2191, 2199, 156 L. Ed. 2d 148 (2003).

The Court first notes that 18 U.S.C. § 231(a)(3) is not a specific statute regulating speech, but rather applies to conduct; however, the statute does not apply to <u>all</u> conduct, but rather conduct in the midst of a civil disorder. Though there is not much caselaw on the statute, at least one circuit specifically addressed the matter. *See United States v. Mechanic*, 454 F.2d 849 (8th Cir. 1971). In *Mechanic*, the Eighth Circuit states "[t]he short answer to the defendants' contention that the statute prohibits protected speech is that, as we read it, § 231(a) (3) has no application to speech, but applies only to violent physical acts." *Id*. at 852. The Government, here, also notes the same interpretation in *United States v. Rupert*, Crim. Act. No. 0:20-cr-104, 2021 U.S. Dist. LEXIS 46798, 2021 WL 942101 (D. Minn. Mar. 12, 2021). However, one major point in *Rupert* is that it is bound by Eight Circuit precedent and this Court is not.

The Court here agrees that 18 U.S.C. § 231(a)(3) applies to conduct, but not necessarily the more stringent view of the Eight Circuit that it only applies to <u>violent</u> physical acts. 18 U.S.C. § 231(a)(3) specifically states "any act to obstruct, impede, or interfere." 18 U.S.C. § 231(a)(3).

The only place where violence is referenced is in the definition of "civil disorder" where it means "any public disturbance involving acts of violence." 18 U.S.C. § 232(1). The Eight Circuit links the violence of the civil disturbance to the act of the individual. However, while that may very well be the case in such situations, it does not necessarily require it. Rather, the act must simply be one that obstructs, impedes, or interferes with law enforcement who are engaged in the performance of duties incident to, and during the commission of, a civil disorder. It is possible under this statutory construction to have a nonviolent act which accomplishes the same goal. Therefore, this Court construes the statute more broadly to include exactly what it says: "any act."

Moreover, "[u]nlawful conduct is not protected conduct. The First Amendment does not give individuals the right to break a generally applicable law for expressive purposes." *United States v. Huff*, 630 F. App'x 471, 486 (6th Cir. 2015) (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65-66, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006)). Much like the Sixth Circuit's analysis in *Huff* as it relates to 18 U.S.C. § 231(a)(2) – a sister provision to the statute at issue here – there is nothing in 18 U.S.C. § 231(a)(3) that prohibits expression or association. Rather, it makes unlawful the deliberate act of obstructing, impeding, or interfering with law enforcement performing their duties at a civil disorder. The fact that the Court could conjure some hypothetical scenario of prosecutorial overreach does not invalidate an entire statute on a facial challenge under the First Amendment. *See Williams*, 553 U.S. at 303, 128 S. Ct. at 1844 (quoting *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984)) ("The mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge."). Rather, such a scenario could be challenged in an "as-applied" challenge.

Pugh also argues that 18 U.S.C. § 231(a)(3) regulates the content of protected expression

without a permissible justification.  To succeed in a typical facial attack, Pugh would have to establish "that no set of circumstances exists under which [18 U.S.C. § 231(a)(3)] would be valid . . . or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472, 130 S. Ct. 1577, 1587, 176 L. Ed. 2d 435 (2010) (internal citations and quotations omitted). Further, "[i]n the First Amendment context, however, this Court recognizes a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id*. at 473, 130 S. Ct. at 1587 (citation and internal quotations omitted).

Finally, the Supreme Court's precedents "allow the government to 'constitutionally impose reasonable time, place, and manner regulations' on speech, but the precedents restrict the government from discriminating 'in the regulation of expression on the basis of the content of that expression.'" *Barr v. Am. Ass'n of Political Consultants*, --- U.S. ---, 140 S. Ct. 2335, 2346, 207 L. Ed. 2d 784 (2020) (quoting *Hudgens v. NLRB*, 424 U.S. 507, 520, 96 S. Ct. 1029, 47 L. Ed. 2d 196 (1976)).  Content-based laws are subject to strict scrutiny and content-neutral laws are subject to a lower level of scrutiny.  *Id*. (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163-66, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015)).  "In order to determine whether a regulation of speech is content based, we must first consider whether, 'on its face,' it 'draws distinctions based on the message a speaker conveys.'" *Harbourside Place, LLC v. Town of Jupiter*, 958 F.3d 1308, 1317 (11th Cir. 2020) (quoting *Reed*, 576 U.S. 155, 135 S. Ct. at 2226).  The Court "may also consider whether the regulation was enacted due to an impermissible motive, i.e., the suppression of free expression." *Id*. (citations omitted).  "When a regulation is content based on its face, strict scrutiny applies and there is no need for the speaker to also show an improper purpose." *Id.* (citing *Reed*, 135 S. Ct. at 2228).

In looking at 18 U.S.C. § 231, the Court finds it is content-neutral on its face, so the Court must look to the second part of the *Reed* test – whether the regulation was enacted for the suppression of free expression.  Even considering the extensive discussion that Pugh devotes to Senator Russell B. Long of Louisiana and her argument that his involvement somehow establishes the discriminatory intent of 18 U.S.C. § 231, the Court cannot find that to be true.  Even assuming that Senator Long did intend what Pugh asserts, the negative intentions of a single senator cannot be imputed to all proponents of the bill.  Moreover, as shown in the ultimate vote, the bill passed with Senator Long voting in the negative and other high-profile civil rights supporters voting for the bill.  Though the time frame in question clearly had a sharp divide among Congress on the rights and beliefs of those involved in the Civil Rights Movement, that alone cannot establish a content-based intent.  Rather, the statute on its face is content neutral and applies to a limited category of expressive conduct – civil disorder affecting interstate commerce and then the <u>act</u> to, or attempt to obstruct, impede, or interfere with, law enforcement or firemen performing their official duties involving the civil disorder.  There is nothing to indicate that it is content-based because it does not apply to any particular speech – it does interfere with any lawful public gatherings to express ideology or speak out on various matters.  "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2754, 105 L. Ed. 2d 661 (1989).  "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."  *Id*.  (citation omitted).  Thus, strict scrutiny would not apply.[3]

---

[3]  The Government argues that even if 18 U.S.C. § 231(a)(3) regulated speech to a degree that a

C.    **Due Process Clause**

Pugh next challenges the statute arguing that it is unconstitutionally vague and violates the Due Process Clause of the Fifth Amendment.

"It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56, 119 S. Ct. 1849, 1859, 144 L. Ed. 2d 67 (1999) (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03, 86 S. Ct. 518, 15 L. Ed. 2d 447 (1966)). Further, the "void-for-vagueness doctrine requires that a penal statute 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *United States v. Marte*, 356 F.3d 1336, 1342 (11th Cir. 2004) (quoting *United States v. Fisher*, 289 F.3d 1329, 1333 (11th Cir. 2002)). That said, "litigants cannot argue that a law is vague based on how it might apply to a hypothetical scenario." *Doe v. Marshall*, 367 F. Supp. 3d 1310, 1334 (M.D. Ala. 2019). Instead, courts "consider whether a statute is vague as applied to the particular facts at issue." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18, 130 S. Ct. 2705, 2718-19, 177 L. Ed. 2d 355 (2010). That is because "a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 18-19, 130 S. Ct. 2719 (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S. Ct.

---

level of scrutiny applied, the Court should apply intermediate scrutiny. *See* Doc. 66 at 38. The Court disagrees. As noted by Justice Thomas in his concurring opinion in *Bruni v. City of Pittsburgh*, 141 S. Ct. 578, 208 L. Ed. 2d 562 (2021), it would appear that in the context of a First Amendment challenge, intermediate scrutiny "is incompatible with current First Amendment doctrine as explained in [*Reed*] and *McCullen v. Coakley*, 573 U.S. 464, 134 S. Ct. 2518, 189 L. Ed. 2d 502 (2014)." *Bruni*, 141 S. Ct. at 578 (Thomas, J., concurring) (quoting *Price v. Chicago*, 915 F.3d 1107, 1117 (7th Cir. 2019). Strict scrutiny would apply if a law were determined to be content-based.

1186, 71 L. Ed. 2d 362 (1982)).

The Supreme Court clarified that the general rule applies to vagueness challenges that implicate the First Amendment. *See Holder*, 561 U.S. at 20, 130 S. Ct. at 2719. "[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. That rule makes no exception for conduct in the form of speech." *Id*. (internal citations omitted); *see also United States v. Di Pietro*, 615 F.3d 1369, 1372 (11th Cir. 2010) (citing *Holder*, the holding that void-for-vagueness challenges are separate and distinct from overbreadth challenges, and the inability to bring challenges that fall squarely within the rule prohibiting a facial vagueness challenge by one to whom a statute may be constitutionally applied.).

While Pugh argues in her reply brief that "the government provides only a passing defense of the statute under the void for vagueness provision of the Due Process Clause," the Court notes that she merely glosses over the United States' primary defense on the challenge – i.e., that she lacks standing to bring a facial vagueness challenge. *Compare* Response, Doc. 66 at 39-40 *with* Reply, Doc. 68 at 29-31. When considering the law above, Pugh must first demonstrate that 18 U.S.C. § 231(a)(3) is vague as applied to her before she may raise a facial vagueness challenge. Pugh fails to do so. By Pugh's own argument, "the statute leaves individuals uncertain regarding criminalized conduct." Moreover, Pugh seeks to have the Court declare that 18 U.S.C. § 231(a)(3) is unconstitutionally vague for either (or both) grounds: that the statute fails to provide fair notice and susceptible to arbitrary and discriminatory enforcement. This is the precise kind of challenge prohibited by binding caselaw. *Di Pietro*, 615 F.3d at 1373.

Consequently, Pugh lacks standing to raise a general facial vagueness challenge pursuant to the Due Process Clause and the motion to dismiss is denied on this basis.

### III.    DISCUSSION AND ANALYSIS – SUFFICIENCY OF THE INDICTMENT

In the alternative, Pugh challenges the sufficiency of the indictment.  Doc. 52 at 37-38; Doc. 82 generally.  In its original response and at the hearing, the Government asserted that the Indictment tracks the language of the statute and conforms with the requirements of Fed. R. Crim. P. 7(c).  The Court disagrees.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation. . . ." U.S. CONST. AMEND. VI.  To comply with the Federal Rules of Criminal Procedure, an Indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and include the "provision of law that the defendant is alleged to have violated." FED. R. CRIM. P. 7(c)(1).

> "An indictment is considered legally sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *United States v. Jordan*, 582 F.3d 1239, 1245 (11th Cir. 2009) (citation and quotations omitted).  "In determining whether an indictment is sufficient, we read it as a whole and give it a 'common sense construction.'" *Id.* (citing *United States v. Gold*, 743 F.2d 800, 813 (11th Cir. 1984) and *United States v. Markham*, 537 F.2d 187, 192 (5th Cir. 1976)).  "In other words, the indictment's 'validity is to be determined by practical, not technical, considerations.'" *Jordan*, 582 F.3d at 1245 (citing *Gold*, 743 F.2d at 812).

*United States v. Schmitz*, 634 F.3d 1247, 1259-60 (11th Cir. 2011); *see also United States v. Chalker*, 966 F.3d 1177, 1190 (11th Cir. 2020) (quoting *United States v. Woodruff*, 296 F.3d 1041, 1046 (11th Cir. 2002)) ("[An indictment] is sufficient if it (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense.").  In making this determination, the Court must take the allegations in the indictment as true.  *United States v. Plummer*, 221 F.3d 1298, 1302 (11th

Cir. 2000).

> The original Indictment against Pugh stated:
>
> On or about May 31, 2020, in the Southern District of Alabama, Southern Division, the defendant, TIA DEYON PUGH, did knowingly commit an act, and attempt to commit an act, to obstruct, impede, and interfere with any law enforcement officer lawfully engaged in the performance of an official duty incident to and during the commission of a civil disorder, which in any way and to any degree obstructed, delayed, and adversely affected commerce and the movement of any article commodity in commerce, in violation of Title 18, United States Code, Section 231(a)(3).

Doc. 16.

While this may track the statute (precisely the Court might add), it provides no information as to exactly what conduct Pugh did to violate the statute. If an indictment tracks the language of the statute, it must be accompanied with a statement of facts and circumstances that will inform the accused of the specific offense, coming under the general description, with which he is charged. *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006); *see also Hamling v. United States*, 418 U.S. 87, 117-18, 94 S. Ct. 2887, 3908, 41 L. Ed 2d 590 (1974) (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)) ("Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific [offense], coming under the general description, with which he is charged."). More recently, the Eleventh Circuit stated "[w]hile it is generally enough for an indictment to track statutory language . . . simply tracking statutory language does not suffice when the resulting indictment fails to 'fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the [offense] intended to be punished." *United States v. Johnson*, 981 F.3d 1171, 1179 (11th Cir. 2020) (citation and internal quotations omitted).

The Indictment contains no information that establishes that (1) at the time of Pugh's

conduct that civil disorder existed, (2) the civil disorder(s) in some way interfered with, obstructed, delayed or adversely affected commerce, (3) law enforcement was lawfully responding to that civil disorder, and (4) that Pugh knowingly committed an act to obstruct, impede, or interfere with those efforts by doing _____. The Court deliberately places a blank in the fourth number because that is the point. The Indictment says nothing other than Pugh violated 18 U.S.C. § 231(a)(3). There is no "To Wit:" clause identifying the conduct or some other means to relay exactly what Pugh allegedly did. In fact, by adding "on or about" in front of the date, the Government then expands the date to a reasonable timeframe before and after May 31, 2020. Rather, at some unspecified place and generalized range of days/time, Pugh did something that the Government alleges violated the statute.

In no way does this satisfy the pleading requirements or satisfy the Eleventh Circuit's discussion on charging requirements. Put differently, the Government skipped the first requirement of Rule 7(c)(1): that there "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

As a point of comparison, in reviewing the Government's Supplemental Response (Doc. 70), the Court pulled the Indictment from the comparator case, *Rupert*, Civ. Act. No. 0:20-cr-104 from the District of Minnesota's docket sheet. Though the Government relies upon this case for another purpose, the Court finds the Indictment in that case to contain far more detail than the instant matter. *See id.*. D. Minn. Docket Sheet, Doc. 12. The Indictment in the *Rupert* case is six pages long. Admittedly, it contains three counts, but leads with an extensive statement of facts with precise details as to exactly what/when/where Rupert allegedly did. Only then does it move to a recitation of the statute in Count 1 incorporating the preceding paragraphs.

In the instant case, the Government attempted to argue that Pugh had the original

Complaint (Doc. 1) to rely upon.  However, while a Complaint is a proper means to initiate a criminal case, the Indictment is the controlling document here and cannot incorporate by reference the prior information.

As such, the Court finds that the original Indictment was fatally deficient.  However, dismissal of that Indictment has been rendered moot by the Grand Jury issuing a Superseding Indictment.  Therefore, the Court now turns to Pugh's assertion that the Superseding Indictment is also deficient.  *See* Doc. 82.

The Superseding Indictment includes the same charge as the original Indictment, but now leads with two sections entitled "General Allegations" and "Pugh's Contact with Law Enforcement" which are then incorporated into the single-count charged.  *See* Doc. 73 at ¶¶ 1-9.

Pugh alleges it is still insufficient for several reasons.  First, "the use of the conclusory term 'civil disorder'" does not include the statutory definition in § 232(1) or the relationship to the "act" charged.  *See* Doc. 82 at 2.  Second, it fails to include "violent" in front of "act" as required by *Mechanic*.  *Id*.  Third, "the inclusion of the term 'knowingly' does not include a specific intent." *Id*. at 3.  Fourth, the Superseding Indictment fails to specify how the alleged civil disorder or Defendant's act obstructed, delayed, and adversely affected commerce and the movement of any article or commodity in commerce.  *Id*. at 3-4.  The Government timely filed its response.[4]  *See* Doc. 91.

Here, the Court finds that the Superseding Indictment does meet the requirements of Rule

---

[4]   The United States indicated that it was not separately ordered to respond to the supplemental motion to dismiss the superseding indictment, but addressed both in a combined response "out of an abundance of caution."  *See* Doc. 91 at 2, n. 1.  However, the Court would have thought given the short time before May 17 trial date and the fact the supplement came in *prior* to the Court's ordered response deadline of May 12 that it would have been obvious that the Court expected the Government to address *both* matters.

7(c) in that the indictment contains "a plain, concise, and definite written statement of the essential facts constituting the offense charged." As it still tracks the language of the statute, the Government has now included the accompanying statement of facts and circumstances that informs the accused of the specific offense, coming under the general description, with which she is charged. *Sharpe*, 438 F.3d at 1263.

With regard to Pugh's first argument, the Court agrees with the Government that it is not required that the indictment define legal terms of art – like "civil disorder." The definition of civil disorder is not a question of fact, but rather a legal term of art. While the fact-finder may find whether or not civil disorder existed, it does not get to define the term. The "legal definition . . . does not change with each indictment" and "it is a term sufficiently definite in its legal meaning to give a defendant notice of the charge against [her]." *Id*.

Next, Pugh avers that the failure to include the term "violent" in front of "act" renders the indictment deficient under the *Mechanic* analysis. As the Court noted earlier in this opinion, the undersigned does not agree with the non-binding analysis from the Eighth Circuit case that violence is required. *Supra* pages 12-13. The Court construes the statute more broadly to include exactly what it says: "any act." Therefore, the omission of the word "violent" does not render the Superseding Indictment deficient.

Third, Pugh alleges, "the inclusion of the term 'knowingly' does not include a specific intent." The Court is not persuaded. While an indictment should set forth the "essential facts" of the charged offense as required by Fed. R. Crim. P. 7(c)(1), it is not necessary to recite the entirety of the evidence the government will present at trial to support the charge. *See United States v. Lehder-Rivas*, 955 F.2d 1510, 1519 (11th Cir. 1992); *United States v. Martell*, 906 F.2d 555, 558 (11th Cir. 1990). The language of the Superseding Indictment tracks the statute and includes

sufficient facts to put Defendant on notice of the charges against her. The issue of the jury finding the link of Pugh's intent behind her actions to the statute's element to disrupt, impede, and interfere with law enforcement is a matter for jury instructions and/or the jury verdict form.

Finally, Pugh's final (and in her words) "perhaps most [notable]" argument, the Superseding Indictment is silent as to how the alleged civil disorder or the defendant's act "in any way and to any degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce." Doc. 82 at 3. Again, an indictment need not be a recitation of every issue that is going to be addressed at trial. It need not address every factual issue of "who, what, where, when, why," but merely must address the essential elements of the offense, notify the accused of the charges to be defended against, and enable the defendant to rely upon a judgment as a bar against double jeopardy. *Chalker*, 966 F.3d at 1190. Moreover, the jurisdictional interstate commerce element may be proven in multiple ways – much like the same element in 18 U.S.C. § 922(g). An indictment need not specify every way that it intends to prove its case.

The Court is satisfied that the Superseding Indictment meets those three requirements. The Superseding Indictment sufficiently alleges the elements of the offense, that: (1) at the time of Pugh's alleged conduct, civil disorder existed; (2) that civil disorder in some way interfered with, obstructed, delayed, or adversely affected interstate commerce; (3) law enforcement was lawfully responding to that civil disorder; and (4) Pugh knowingly acted to obstruct, impede, or interfere with those law enforcement efforts by using a bat to smash the police vehicle's window. The Court is quite certain that Pugh (and her counsel) are on notice of the elements, the charges, and the ability to rely upon any judgment (if one occurs) as a bar against double jeopardy.

Therefore, the Court finds that the Superseding Indictment is sufficient and as it is the

controlling charging document, the request for dismissal is due to be denied.

### IV.  CONCLUSION

For the reasons articulated above, Defendant's *Motion to Dismiss Superseding Indictment* (Doc. 75) and *Supplemental Motion to Dismiss Superseding Indictment* (Doc. 82) are **DENIED** while the *Motion to Dismiss Indictment* (Doc. 52) is **DENIED as moot**.

**DONE** and **ORDERED** this 13th day of May 2021.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE

2021 WL 942101
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

UNITED STATES of America, Plaintiff,
v.
**Matthew Lee RUPERT**, Defendant.

Case No. 20-CR-104 (NEB/TNL)
|
Signed 03/12/2021

**Attorneys and Law Firms**

Angela M. Munoz, Jordan L. Sing, United States Attorney's Office, Minneapolis, MN, for Plaintiff.

Jordan S. Kushner, Law Office of Jordan S. Kushner, Mpls, MN, for Defendant.

ORDER ACCEPTING REPORT
AND RECOMMENDATION

Nancy E. Brasel, United States District Judge

 **\*1**  The United States charged **Matthew Lee Rupert** with one count of civil disorder in violation of 18 U.S.C. Section 231(a)(3), one count of riot in violation of 18 U.S.C. Section 2101(a), and one count of aiding and abetting arson in violation of 18 U.S.C. Sections 2 and 844(i). Rupert moves to suppress: (1) evidence obtained from the execution of search warrants at his residence and from Facebook; (2) evidence obtained from the search of his car following his arrest in Chicago; and (3) statements he made to law enforcement following his arrest. (ECF Nos. 30–32.) Rupert also moves to dismiss the civil disorder and arson charges in the Indictment for failure to state an offense, and to dismiss all three charges because the statutes under which he is charged are vague and overbroad. (ECF Nos. 33–34; *see* ECF No. 12 ("Indictment").) In a January 6, 2021, Report and Recommendation, United States Magistrate Judge Tony N. Leung recommends that the Court: (1) deny Rupert's Motion to Suppress Evidence Seized Pursuant to Search Warrants; (2) deny his Motion to Suppress Evidence from Search and Seizure of Defendant and Vehicle in Chicago; (3) deny his Motion to Suppress Statement; (4) deny his Motion to Dismiss Indictment for Failure to State Offense; and (5) deny

without prejudice in part, deny in part, and grant in part his Motion to Dismiss Charges Based on Void for Vagueness and Overbreadth. (ECF No. 70 ("R&R") at 48–49.) Rupert objects to the R&R, although his objection primarily restates arguments made before Judge Leung. (ECF No. 77 ("Obj.").) The Court reviews those portions of the R&R to which Rupert has objected *de novo*. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b); D. Minn. L.R. 72.2. Following that review, the Court accepts the R&R.

**ANALYSIS**

The R&R sets forth the undisputed facts in the case, [1] and the Court incorporates those facts by reference. (R&R at 2–12.) Rupert argues that the Court should: (1) suppress evidence found while searching his residence and from a warrant issued to Facebook; (2) suppress evidence found in his vehicle during his arrest; (3) suppress his statement made following his arrest; (4) dismiss the civil disorder and arson charges for failure to state an offense; and (5) dismiss the Indictment because the statutes are facially overbroad and vague. (*See* Obj. at 1.)

**I. Warrant Searches**

Rupert challenges three separate warrants: a warrant issued to the social-networking site Facebook for information about his activity on that site (the "Facebook Warrant") and two warrants to search Rupert's residence. (the "Riot and Drug Warrants"). [2] (ECF No. 30.)

*A. The Facebook Warrant*

FBI Special Agent F.M. Stephens requested the Facebook Warrant from a magistrate judge in the District of Minnesota. (R&R at 10.) Rupert objects to the Facebook Warrant's validity, arguing that the magistrate judge who issued it failed to create a proper record of the proceeding as the Federal Rule of Criminal Procedure 4.1(b) requires. (ECF No. 30.)

 **\*2**  The Federal Rules of Criminal Procedure permit a magistrate judge to "issue a warrant based on information communicated by telephone or other reliable electronic means." Fed. R. Crim. P. 41(d)(3); *Id.* 4.1(a). SA Stephens obtained the Facebook warrant through electronic means, presenting the warrant materials to the magistrate judge through simultaneous visual and audio connection. (R&R at 10–12.) When a magistrate judge uses a telephone or other

electronic means in issuing a warrant, Rule 4.1 mandates that any testimony for the application is given under oath. Fed. R. Crim. P. 4.1(b)(1). If the issuance of the warrant relies solely on the applicant's sworn affidavit, the magistrate judge must acknowledge that reliance. Id. 4.1(b)(2)(A). If, however, the magistrate judge takes testimony or looks at other evidence, the magistrate judge must: make a verbatim record of the proceeding; have that record certified as accurate and file it; sign, certify, and file any other written record; and file any exhibits. Id. 4.1(b)(2)(B); United States v. Skarda, 845 F.3d 370, 375 (8th Cir. 2016).

The only basis for the Facebook Warrant was SA Stephens's affidavit—the magistrate judge took no additional testimony and considered no additional exhibits. (ECF No. 54 ("Hr'g Tr.") at 35:20–36:9.) Per Rule 4.1(b)(2)(A)'s dictates, the magistrate judge stated in writing that SA Stephens had attested to the contents of the affidavit through reliable electronic means. (Hr'g Ex. A[3] (ECF No. 39-1) at 14.) As SA Stephens only attested to the veracity of his affidavit and the written materials provided to the magistrate judge, did not offer any testimony or other evidence, and the magistrate judge acknowledged that SA Stephens did so, there was no failure to create a record under Rule 4.1(b).[4]

### B. The Riot and Drug Warrants

The Riot and Drug Warrants were both issued by a magistrate judge in the Central District of Illinois. The applicant was FBI Special Agent David B. Brown. (R&R at 14–15; Hr'g Ex. C (ECF No. 39-3) at 1; Hr'g Ex. D (ECF No. 39-4) at 1.) Rupert raises two objections to the Riot and Drug Warrants: (1) on information and belief, the magistrate judge failed to create a proper record; and (2) the executing agents seized material beyond the scope of the Riot and Drug Warrants.[5] (ECF No. 30 at 1–2.)

#### 1. Failure to Create a Record

Rupert argues that the magistrate judge in Illinois, in issuing the Riot and Drug Warrants, failed to comply with Rule 4.1(b) and create a record. SA Brown applied for both warrants via telephone. (Hr'g Ex. C at 1; Hr'g Ex. D at 1.) He was under oath in seeking both warrants; both applications stated that they were based on the attached affidavits. (Hr'g Ex. C at 1, 10; Hr'g Ex. D at 1, 6.)

Rupert asserts that SA Stephens did not—and could not —know if SA Brown and the magistrate judge had any

discussion related to the application. (ECF No. 59 at 12.) The record, however, contains no evidence from which the Court can reasonably infer that the magistrate judge considered additional evidence in issuing either of the Riot and Drug Warrants. Rupert, as the party seeking to suppress, carries the burden of proof on this issue. Carter v. United States, 729 F.2d 935, 940 (8th Cir. 1984). With no evidence that the magistrate judge based the issuance of the Riot and Drug Warrants on testimony or evidence beyond SA Brown's attestation to the affidavit, there was no violation of Rule 4.1(b).[6]

#### 2. Seizure of Items Beyond the Scope

**\*3** Although Rupert's initial motion to suppress listed several items as outside the scope of the Riot and Drug Warrants, his post-hearing brief only discusses several posters that law enforcement seized. (Compare ECF No. 30 at 2, with ECF No. 59 at 12–13.) Rupert maintains that SA Stephens was unable to testify about how the posters were connected to the alleged offenses or how the Riot and Drug Warrants covered them and the Court must therefore suppress the posters. (ECF No. 59 at 12–13.)

The content of the posters is unclear from the record before the Court. Rupert, in his motion to suppress, describes them as containing protected First Amendment material and the government argues that they contained "derogatory statements about law enforcement officers." (ECF No. 30 at 2; ECF No. 60 at 6.) But nothing in the record indicates what the posters said or depicted, or how they exceeded the scope of the warrant. It is not a straightforward task to analyze the constitutionality of a seizure when the Court is unable to determine what, exactly, was seized. Without some articulation assisting the Court in this task, the Court cannot conclude that suppression is merited.[7] Carter, 729 F.2d at 940; see United States v. Crawford, 220 F. Supp. 3d 931, 936–37 (W.D. Ark. 2016) (noting that the issue of the burden of proof on whether the government has exceeded the scope of a search warrant is unclear in the Eighth Circuit, but that a defendant generally must make some initial, prima facie showing as to illegality).

### II. Search of Rupert's Vehicle

Rupert's argument that the Court should suppress evidence found in his vehicle has several prongs: first, Rupert takes issue with the evidentiary standard Judge Leung applies, arguing that eyewitness testimony of his arrest was required; second, Rupert contends that the curfew order under which

he was arrested was defective; third, he asserts that the Fourth Amendment prohibited a warrantless search of his vehicle. (Obj. at 2–11.)

### A. Evidentiary Standards

Rupert argues that the Court must suppress the evidence because Judge Leung "erred by automatically crediting the general summary of events set forth in the Chicago police officer's report without testimony from any witness with personal knowledge of any of the events." (Obj. at 3.) A suppression hearing is not a trial, however, and the evidentiary standards that apply at such a hearing are lower than those that apply at trial. *United States v. Raddatz*, 447 U.S. 667, 679 (1980). Although the rules of evidence do not apply at suppression hearings, this does not mean that it is open season on taking evidence—the evidence that forms the basis of the Court's ruling "must still be sufficiently reliable and probative." *United States v. Golden*, 418 F. Supp. 3d 416, 422 (D. Minn. 2019) (citing *United States v. Boyce*, 797 F.2d 691, 693 (8th Cir. 1986)).

At the suppression hearing, SA Stephens testified that he received Rupert's arrest report though FBI colleagues in Illinois and their connections with the Chicago Police Department. (Hr'g Tr. at 57:6–11.) For purposes of the motions before the Court only, that testimony was credible, and the report sufficiently reliable and probative of the circumstances of the request. (*Id.* at 56:4–59:13.) Proper resolution of Rupert's motion did not require eyewitness testimony.

### B. Lawfulness of the Curfew Order

**\*4** Next, Rupert objects to Judge Leung's conclusion that his arrest was valid based solely on the fact of a curfew order, "irrespective of whether the curfew order itself was legally valid or was even applicable to Mr. Rupert." (Obj. at 4.) Rupert argues that the R&R cites no authority approving of an arrest where the conduct observed by the officer did not constitute a crime or where the alleged underlying offense was legally invalid or unconstitutional. (*Id.* at 5.)

The Chicago Police Department did not have a warrant for Rupert's arrest. So, the Court must consider the appropriate standard for a warrantless arrest. Warrantless arrests are permissible where "there is probable cause to believe that someone has committed or is committing a crime." *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013) (citing

*Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)). The probable cause determination is a "practical and common-sensical" one; it is based "on the totality of the circumstances and requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (quotation omitted). In making the probable cause determination, the court looks at the events "leading up to the arrest," then looks to whether those facts, "viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quotation omitted). This bar is not high and " 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.' " *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44 n.13 (1983)).

The Court assesses probable cause "from the viewpoint of a reasonably prudent police officer acting in the circumstances of the particular case." *United States v. Davis*, 867 F.3d 1021, 1027 (8th Cir. 2017) (quotation omitted). Given the circumstances under which Rupert's arrest occurred, considering the issuance of a curfew (valid or not), the civil unrest that gave rise to the curfew, and the fact that Rupert's car and the people inside it matched the description of wanted suspects, a reasonably prudent Chicago police officer would have probable cause to believe that Rupert had committed or was committing a crime.

Although Rupert faults the R&R for not determining the legality of the curfew order and argues that the curfew order had no legal basis, (Obj. at 6–10), Judge Leung correctly determined that the legality of the curfew order is irrelevant to the probable cause analysis. (R&R at 21.) The Court considers whether probable cause existed based on "the available facts and circumstances." *United States v. Perry*, 908 F.3d 1126, 1129 (8th Cir. 2018). The circumstances available to the Chicago police officers who arrested Rupert were: seeing Rupert and his associates, whose descriptions matched those of a bulletin that several people were in possession of incendiary or explosive devices in the area; that Rupert and his associates were out on the streets of Chicago after curfew, and that several of those associates fled as the police approached. A "person of reasonable caution" would "believe that an offense was being or had been committed" by Rupert. *Id.* (quotation omitted). Thus, probable cause existed and Rupert's motion to suppress on that basis is denied.

### C. Vehicle Search

The R&R concluded that there were two separate constitutional bases for searching Rupert's vehicle: conducting an inventory search and searching the car on probable cause to believe it contained contraband or evidence of a crime. (R&R at 22–25.) Although Rupert specifically addresses only the contraband issue, the Court considers both. (Obj. at 11.)

#### 1. Inventory Search

**\*5** After lawfully taking custody of an automobile, police "may conduct a warrantless inventory search of the property to secure and protect vehicles and their contents within police custody." *United States v. Rehkop*, 96 F.3d 301, 305 (8th Cir. 1996) (citations omitted). Police may also "take protective custody of a vehicle when they have arrested its occupants, even if it is lawfully parked and poses no public safety hazard." *United States v. Morris*, 915 F.3d 552, 556 (8th Cir. 2019) (quotation omitted). Chicago police saw Rupert next to a maroon sedan with its doors open when they arrested him; he admitted that the car was his, and a registry check confirmed this. (R&R at 23.) Chicago police impounded the car for "MCC violations"[8] and an inventory search of the car turned up "a red bookbag with incendiary explosives/ fireworks." (*Id.*) The search of Rupert's car was lawful under the inventory search exception.

#### 2. Contraband and Evidence of a Crime

Rupert asserts that Judge Leung erred in concluding that Chicago police had probable cause to search Rupert's vehicle because the R&R does not point to a "specific and objective factual basis for a reasonably prudent officer to conclude it is more likely than not that the vehicle contained evidence of a crime." (Obj. at 11.) The "automobile exception" to the Fourth Amendment permits police to execute warrantless searches of vehicles if there "is probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Winarske*, 715 F.3d at 1068 (citations omitted). The scope of such a search may extend to the trunk and containers in the vehicle. *See, e.g.*, *Arizona v. Gant*, 556 U.S. 332, 347 (2009) (holding that if a police officer has probable cause to believe a vehicle contains evidence of a crime, that officer may search "any area of the vehicle in which the evidence might be found"). An officer has probable cause to search under this exception "if the facts and circumstances known to the officers when they began the search were sufficient in

themselves for a person of reasonable caution to believe that contraband or evidence of criminal activity was present in the vehicle." *United States v. Walker*, 840 F.3d 477, 483 (8th Cir. 2016). And again, the probable cause hurdle is not a high one to clear. *Wesby*, 138 S. Ct. at 586.

Before searching Rupert's car, Chicago police had a report of three individuals possessing an incendiary device in the area where they saw the car. (R&R at 24.) Chicago police spotted several individuals matching the report's description in that area standing outside a maroon sedan with its doors open. (*Id.*) As the police approached, two of the individuals ran; the police took three others into custody. (*Id.*) Under these circumstances, Chicago police had probable cause to believe that the car contained contraband or other evidence of a crime. A person of reasonable caution, when seeing people near a car with its doors open, would assume that the car is in their possession and that if those people are suspected of a crime, the car may contain evidence of that crime. Chicago police did not require a warrant to search Rupert's car and the Court denies Rupert's motion to suppress evidence obtained from that search.

### III. Custodial Statements

Rupert contends that F.B.I. agents violated his Fifth Amendment rights when they did not respect his request to speak to a lawyer before interviewing him. (Obj. at 12– 13.) Judge Leung concluded that Rupert's invocation of the right to counsel was ambiguous and that Rupert then also knowingly, voluntarily, and intelligently waived his rights. (R&R at 28, 32.) Rupert only makes specific objections to Judge Leung's conclusion that Rupert ambiguously invoked his right to counsel; he does not address the issue of waiver. (Obj. at 12–13.) The Court addresses both for the sake of completeness.

### A. Invocation of Right to Counsel

**\*6** If a suspect invokes his right to counsel, the police must stop questioning him until counsel is present, unless he "initiates further communication." *Edwards v. Arizona*, 451 U.S. 477, 482, 484–85 (1981). To invoke the right to counsel, "the suspect must unambiguously request counsel." *United States v. Davis*, 512 U.S. 452, 459 (1994). The invocation must be clear enough "that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* Ambiguous or equivocal

invocations will not do—if the reference to an attorney is such "that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," police may continue questioning. *Id.* (emphasis original). This inquiry is objective, not subjective. *Id.* at 458–59. When a suspect makes an ambiguous or equivocal reference to wanting an attorney, "it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Id.* at 461.

Rupert focuses on his initial statement when the police entered the room—that he wanted to speak to a lawyer—and argues that this is a sufficient invocation of his right to counsel. (Obj. at 11–13.) The chronology of events during the interview is as follows: Rupert stated that he wanted a lawyer; one of the agents said "I'm sorry?"; Rupert reiterated that he did not want to speak to them; the agent said "Okay," and identified both himself and the second agent as FBI agents; the agent said that the two wanted to talk to Rupert but understood that he wanted to speak to a lawyer; Rupert then waved the agents in with his hand, told them it was fine, and that he would speak with them. (Hr'g Ex. G at 1:55–2:11.) These circumstances do not amount to an "unambiguous" request for counsel—rather, a reasonable officer under the circumstances would have seen Rupert's statements and actions as ambiguous as to whether he wanted to speak to an attorney. *Davis*, 512 U.S. at 458–59.

### *B. Knowing, Voluntary, and Intelligent Waiver*
Whether a *Miranda* waiver is valid is a two-pronged inquiry. *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011). First, it must be voluntary, "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (quotation omitted). Second, the suspect must make the waiver being fully aware of the "nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quotation omitted). In considering validity, the Court looks to the totality of the circumstances. *Id.*

Rupert's waiver was voluntary. Although Rupert argues that the conversation was involuntary because it had to end when Rupert invoked the right to counsel, as discussed above, Rupert did not unambiguously invoke that right, and he does not argue that the agents acted coercively. Nor did they. The FBI agents in the interview did not intimidate, coerce, or threaten Rupert, either explicitly or implicitly, before or during questioning. (*See generally* Hr'g Ex. G (videorecorded

interview with Rupert).) The agents simply stated their desire to ask Rupert questions, a request to which he acceded. The record contains no evidence that Rupert's "decision to speak with them was the product of anything other than a free and unconstrained choice." *Vinton*, 631 F.3d at 482.

The fact that a statement is made voluntarily is not enough—the defendant must make the statement knowing the rights he or she is giving up by making it. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). To meet this standard, the defendant must be fully aware of "both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Gallardo*, 495 F.3d 982, 990 (8th Cir. 2007) (quotation omitted). Here, Rupert's waiver was knowing and intelligent. The record demonstrates, based on the Court's *de novo* review, that Rupert was fully aware of the nature of his rights and what he was giving up. The agents repeatedly asked if Rupert understood his rights before interviewing him. The agents read him his rights. Rupert demonstrated his own understanding of his rights. And Rupert responded to the agents' questions, demonstrating comprehension.

**\*7** Rupert's motion to suppress his statements fails.

### IV. Failure to State an Offense
Rupert's motion to dismiss the Indictment for failure to state an offense challenges the charges of civil disorder and arson. (ECF No. 33.) To comply with the Federal Rules of Criminal Procedure, an Indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and include the "provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1). If an indictment "contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution," it is valid. *United States v. Palmer*, 917 F.3d 1035, 1039 (8th Cir. 2019). Generally, an indictment need only "track[ ] the statutory language." *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008). Unless "no reasonable construction [of an indictment] can be said to charge the offense," it is sufficient. *United States v. Nabors*, 45 F.3d 238, 240 (8th Cir. 1995) (quotation omitted).

### A. Civil Disorder

Count I of the Indictment charges Rupert with committing civil disorder in violation of 18 U.S.C. Section 231(a)(3). (Indictment at 4.) A civil disorder is a "public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1). Section 231(a)(3) makes it illegal to commit an act to "obstruct, impede, or interfere" with a law enforcement officer who is "lawfully engaged in the lawful performance of his official duties" in connection with the civil disorder, where that act "in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function." 18 U.S.C. § 231(a)(3).

Rupert maintains that the Indictment "fails to set forth any factual allegations to indicate how [he] interfered with any law enforcement officers performing official duties" or obstructed commerce or the performance of federally protected functions. (ECF No. 33 at 2; ECF No. 59 at 1 n.1 (resting on arguments in motion).)

The Indictment alleges that many members of law enforcement and the National Guard were deployed in response to civil disorder, including arson and looting, following the death of George Floyd. (Indictment ¶¶ 1–2.) It further alleges that that civil disorder damaged businesses engaged in interstate commerce, adversely affecting it and federally protected functions. (Id. ¶ 2.) The Indictment also alleges that Rupert acted to obstruct, impede, or interfere with law enforcement responding to the disorder by "passing out explosive devices" and "encouraging others to throw" those devices, obstructing, delaying, and adversely affecting interstate commerce and federally protected functions. (Id. ¶¶ 4–5, 7.) The Indictment cites specific examples of such conduct, including identifying police vehicles and encouraging others to throw bombs at police. (Id. ¶ 5.)

**\*8** The Indictment sufficiently alleges the elements of the offense, that: (1) at the time of Rupert's alleged conduct, civil disorder existed; (2) those civil disorders in some way interfered with, obstructed, delayed, or adversely affected interstate commerce; (3) law enforcement was lawfully responding to that civil disorder; (4) Rupert knowingly acted to obstruct, impede, or interfere with those efforts by handing out explosive devices and encouraging others to throw those

devices. See United States v. Casper, 541 F.2d 1275, 1276 (8th Cir. 1976) (listing elements).

### B. Arson

Count 3 of the Indictment charges Rupert with arson in violation of 18 U.S.C. Sections 2 and 844(i) for causing "malicious damage by means of fire" to a Sprint store in Minneapolis, "a building used in interstate commerce." (Indictment ¶ 11.) Section 844(i) makes it illegal to maliciously damage "by means of fire or an explosive, any ... real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i). Rupert's argument is that the Indictment does not allege that he actually caused any damage. (ECF No. 33 at 2; ECF No. 59 at 1 n.1.)

Contrary to Rupert's contention, courts cannot insist "that a particular word or phrase appear in the indictment when the element is alleged 'in a form' which substantially states the element." United States v. Villareal, 707 F.3d 942, 957 (8th Cir. 2013) (quotation omitted). As long as an indictment, "by fair implication ... alleges an offense recognized by law," it "need not use the specific words of the statute." Id. (citation omitted). The Indictment alleges that Rupert recorded himself asking for lighter fluid, entering the Sprint store, and later exiting, saying that he lit the store on fire. (Indictment ¶ 5.) The Indictment specifically asserts that Rupert lit the store on fire; it is certainly a "fair implication" that lighting a building on fire will cause damage to it. Villareal, 707 F.3d at 957. The Indictment states an offense of arson and the Court denies Rupert's motion to dismiss it on that ground.

### V. Constitutional Challenges to Statutes

Finally, Rupert argues that the charges in the Indictment rely on constitutionally defective statutes. (ECF No. 34 at 1.) Rupert has raised both facial and as-applied challenges to the statutes: 18 U.S.C. Section 231(a)(3) (civil disorder); 18 U.S.C. Section 844(i) [9] (arson); and 18 U.S.C. Sections 2101 et seq., the Anti-Riot Act ("ARA"). No party objects to Judge Leung's conclusion that the as-applied challenges are premature because they will require resolving factual issues about Rupert's alleged conduct, so the Court accepts his recommendation to deny Rupert's motion without prejudice as to the as-applied claims. (R&R at 38–39.) The Court

concludes that further factual development is also required to consider Rupert's facial challenge that the statutes are void for vagueness, and therefore denies his motion without prejudice to the extent it challenges the statutes on this basis. [10] This leaves Rupert's facial challenge that the statutes are overbroad.

**\*9** Under the overbreadth doctrine, a defendant may challenge a statute as unconstitutionally overbroad; statutes are overbroad and facially invalid if they prohibit "a substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). The doctrine only exists in the First Amendment context. *Schall v. Martin*, 467 U.S. 253, 268 n.18 (1984). As such, this type of challenge rarely succeeds against laws or regulations that are "not specifically addressed to speech or to conduct necessarily associated with speech." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003). The Court's first step is to "construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Williams*, 553 U.S. at 293.

### A. Counts 1 and 3: Civil Disorder and Arson

The civil disorder and riot statutes do not expressly regulate First Amendment expression. The civil disorder statute, Section 231(a)(3), applies "only to violent physical acts," not to speech. *United States v. Mechanic*, 454 F.2d 849, 852 (8th Cir. 1971). It covers only "acts to impede, obstruct, or interfere" with law enforcement—it "does not purport to reach speech of any kind." *Id.* at 853. Rupert argues that Section 231(a)(3) does not explicitly require that the acts be physical, but the Court must apply Eighth Circuit precedent in *Mechanic*. [11] (ECF No. 34 at 4); *United States v. Hood*, 342 F.3d 861, 864 (8th Cir. 2003). Because Section 231(a)(3) does not apply to First Amendment activity, Rupert's facial overbreadth challenge to the civil disorder statute fails.

Likewise, the arson statute, Section 844(i), does not explicitly regulate First Amendment activity; rather, it covers malicious damage, by means of fire, to buildings and personal property. [12] 18 U.S.C. § 844(i). And even property owners do not have unlimited freedom to destroy their own property. *See Russell v. United States*, 471 U.S. 858 (1985) (upholding a conviction under Section 844(i) for a landowner who set his own apartment building on fire);

*Evey v. United States*, No. 2:16-CV-08900-SVW, 2018 WL 6131407, at \*6 (C.D. Cal. May 10, 2018) ("Section 844(i) does not have, as an element, that the involved property must belong to 'another.' "). Rupert's facial challenge to Section 844(i) also fails.

### B. Count 2: Riot

The parties do not challenge the R&R's recommendation to dismiss Count 2 to the extent it charges Rupert with "encouraging" or "promoting" a riot based on *United States v. Miselis*, 972 F.3d 518 (4th Cir. 2020). [13] (R&R at 49; ECF No. 78 at 1 n.1.) The Court has reviewed the recommendation for clear error and accepts it.

**\*10** The remainder of Count 2 charges that Rupert acted with intent to incite, organize, participate in, carry on, commit any act in furtherance of, or aid and abet, a riot in violation of the ARA. 18 U.S.C. § 2101(a). To obtain a conviction under the ARA, the government must prove that the defendant has a "specific intent to engage in unprotected speech or conduct," obviating Rupert's concern that an innocent participant in a protest that turns into a riot might face federal felony charges. *Miselis*, 972 F.3d at 535; *see* 18 U.S.C. § 2101(a) ("Whoever travels in interstate or foreign commerce ... with intent—to incite a riot; ..."); (ECF No. 34 at 8). Indeed, the Seventh Circuit has rejected this exact argument. *Nat'l Mobilization Comm. to End the War in Viet Nam v. Foran*, 411 F.2d 934, 938 (7th Cir. 1969) (concluding that the plaintiffs' "guilt by association" argument "fail[ed] to take account of the language of the statute" because the statute covered "riot-connected overt acts, but only if the prescribed intent is present when the interstate travel or use of interstate facilities occurs").

Rupert argues that the *Miselis* court should have struck "organize" from the ARA in addition to "encourage" and "promote." (ECF No. 59 at 15.) In *Miselis*, the Fourth Circuit considered the word "organize" in the context of a riot and concluded that it does not cover "mere abstract advocacy," but does cover "concrete aid" because "by the time speech reaches the point of organizing a riot, it has crossed the line dividing abstract idea from material reality." 972 F.3d at 537. Since the issuance of the R&R, the Ninth Circuit has disagreed with the Fourth Circuit, determining that "the verb 'organize' is similarly overbroad." *United States v. Rundo*, No. 19-50189, 2021 WL 821938, at \*5 (9th Cir. Mar. 4,

2021). But the Ninth Circuit's conclusion surrounding the verb "organize" did not stem from the type of substantive analysis conducted by the Fourth Circuit in *Miselis*. *Compare id., with Miselis*, 972 F.3d at 537. This Court agrees with the analysis of *Miselis* with respect to the term "organize" in the ARA. Therefore, the Court grants Rupert's motion to dismiss the Indictment on grounds of overbreadth to the extent Count 2 charges him with encouraging or promoting a riot under Section 2101(a)(2), but denies the overbreadth challenge in all other respects.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Rupert's objections are OVERRULED;

2. The Report and Recommendation (ECF No. 70) is ACCEPTED;

3. Rupert's Motion to Suppress Evidence from Search Warrants (ECF No. 30) is DENIED;

4. Rupert's Motion to suppress Evidence from Arrest (ECF No. 31) is DENIED;

5. Rupert's Motion to Suppress Statement (ECF No. 32) is DENIED;

6. Rupert's Motion to Dismiss Indictment (ECF No. 33) is DENIED;

7. Rupert's Motion to Dismiss based on Unconstitutional Statutes (ECF No. 34) is DENIED WITHOUT PREJUDICE IN PART to the extent it raises as-applied and facial vagueness challenges to the statutes listed in the Indictment, GRANTED IN PART to the extent that Count 2 of the Indictment charges Rupert with encouraging or promoting a riot under 18 U.S.C. Section 2101(a)(2), and DENIED in all other respects.

**All Citations**

Slip Copy, 2021 WL 942101

## Footnotes

1    Rupert does not dispute Judge Leung's factual findings, only his legal conclusions.

2    With respect to this objection, Rupert "relies on his previously submitted motion and memoranda." (Obj. at 1–2.)

3    Exhibit citations refer to exhibits received at the suppression hearing. (ECF No. 54.)

4    The Court notes that even if a warrant violates Rule 4.1(b), the appropriate remedy for such a violation may not necessarily be suppression of the evidence obtained through executing such a warrant. *Cf. Skarda*, 845 F.3d at 375 ("A violation of Rule 41 warrants exclusion only when (1) the violation is of constitutional magnitude; (2) the defendant is prejudiced in that the search would not have taken place or would not have been as intrusive; or (3) there is evidence of an intentional and deliberate or reckless disregard for the rule."). Rupert has made no arguments addressing this issue.

5    Although a magistrate judge in the Central District of Illinois issued both the Riot and Drug Warrants, Rule 41 permits a defendant to move to suppress evidence where the trial will occur. Fed. R. Crim. P. 41(h).

6    Again, the Court notes that the remedy for a failure to comply with Rule 4.1(b) may not necessarily be suppression and Rupert has not addressed this issue. *Skarda*, 845 F.3d at 375.

7    Admissibility at trial, of course, is another matter, as the Federal Rules of Evidence do not apply at suppression hearings. *United States v. Golden*, 418 F. Supp. 3d 416, 422 (D. Minn. 2019) (citing *United States v. Boyce*, 797 F.2d 691, 693 (8th Cir. 1986)). The Court need not (and does not) resolve the issue at this juncture.

8    What "MCC" stands for is unclear from the record, although it may refer to the Municipal Code of Chicago.

9　　Although the arson charge also includes 🔖 18 U.S.C. Section 2 (aiding and abetting liability), Rupert has not objected to 🔖 Section 2.

10　　*See United States v. Bramer*, 832 F.3d 908, 909 (8th Cir. 2016) (per curiam) (requiring defendant "show that the statute is vague as applied to his particular conduct"); *United States v. Cook*, 782 F.3d 983, 987 (8th Cir.) (holding that to challenge a statute as unconstitutionally vague, the Court must look to the specific facts of the case because a "plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others"), *cert. denied*, 577 U.S. 906 (2015).

11　　Rupert argues that *Mechanic* is no longer good law in light of recent Supreme Court precedent. (ECF No. 59 at 14.) But Rupert's argument as to *Mechanic* rests on its pronouncement as to who may raise a facial challenge. (*Id.*) Rupert does not argue that the Supreme Court has called *Mechanic*'s determination of what the civil disorder statute covers into question.

12　　Rupert argues that flag burning might constitute arson under 🔖 Section 844(i), but historically, other statutes have addressed this specific conduct. *See generally, e.g.*, *United States v. Eichman*, 496 U.S. 310 (1990) (federal Flag Protection Act); *Texas v. Johnson*, 491 U.S. 397 (1989) (Texas law banning flag burning). And a challenge to such specific conduct would more appropriately be the substance of an as-applied, rather than facial, challenge.

13　　*Miselis* held that the terms "encourage" and "promote" in the ARA were overbroad. 🔖 972 F.3d at 536. The Ninth Circuit recently agreed. *United States v. Rundo*, No. 19-50189, 2021 WL 821938 (9th Cir. Mar. 4, 2021).

---

**End of Document**　　　　　　　　　　　　© 2021 Thomson Reuters. No claim to original U.S. Government Works.